Joy C. Rosenquist, Bar No. 214926
jrosenquist@littler.com
LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
Telephone:   916.830.7200
Facsimile:    916.561.0828

Alex T. MacDonald, *Pro Hac Vice Pending*
amacdonald@littler.com
LITTLER MENDELSON, P.C.
815 Connecticut Avenue NW, Suite 400
Washington, District of Columbia 20006
Telephone:   202.842.3400
Facsimile:    202.842.0011

Attorneys for Amici
NATIONAL FEDERATION OF INDEPENDENT BUSINESS (NFIB) SMALL BUSINESS LEGAL CENTER; ASSOCIATED BUILDERS AND CONTRACTORS (ABC); CALIFORNIA EMPLOYMENT LAW COUNCIL; THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; AND THE CALIFORNIA CHAMBER OF COMMERCE

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL LABOR RELATIONS BOARD,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF CALIFORNIA and the PUBLIC EMPLOYMENT RELATIONS BOARD,<br><br>Defendants. | Case No. 2:25-cv-02979-TLN-CKD<br><br>**AMICUS BRIEF OF NATIONAL FEDERATION OF INDEPENDENT BUSINESS (NFIB) SMALL BUSINESS CENTER; NATIONAL ASSSOCIATION OF WHOLESALER-DISTRIBURTORS; CALIFORNIA EMPLOYMENT LAW COUNCIL; ASSOCIATED BUILDERS AND CONTRACTORS; THE CHAMBER OF COMMERCE OF THE UNITES STATES OF AMERICA; AND THE CALIFORNIA CHAMBER OF COMMERCE**<br><br>Date:<br>Time:<br><br>Trial Date:           Not Yet Set<br>Complaint Filed:  October 15, 2025 |

**TABLE OF CONTENTS**

**Page(s)**

I.  INTERESTS OF AMICI ....................................................................................................... 6

II. PRELIMINARY STATEMENT ........................................................................................... 7

III. ARGUMENT ........................................................................................................................ 11

    A.  The NLRA is exclusive even when the NLRB cannot or will not exercise jurisdiction. ................................................................................................................. 11

    B.  AB 288 will sow chaos in national labor markets. ........................................ 17

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

2.    CASE NO. 2:25-cv-02979-TLN-CKD
AMICUS BRIEF OF (NFIB) SMALL BUSINESS CENTER; (ABC); CALIFORNIA LAW COUNCIL;
AND THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Allis-Chalmers Corp. v. Lueck*,
    471 U.S. 202 (1985) ............................................................................................. 12, 19

*Alvarado v. Dart Container Corp. of Cal.*,
    4 Cal. 5th 542 (2018) ..................................................................................................... 8

*Amalgamated Util. Workers v. Consol Edison Co. of N.Y.*,
    309 U.S. 264 (1940) ..................................................................................................... 10

*Amazon.com Servs. LLC v. N.Y. Pub. Emp. Rels. Bd.*,
    No. 1:25-cv-05311 (E.D.N.Y.) ..................................................................................... 20

*Bethlehem Steel Co. v. N.Y. State Lab. Rels. Bd.*,
    330 U.S. 767 (1947) ......................................................................................... 13, 14, 16

*Bisonnette v. LePage Bakeries Park St., LLC*,
    601 U.S. 246 (2024) ....................................................................................................... 8

*California Ass'n of Emp. v. Bldg. & Const. Trades Council of Reno, Nev. & Vicinity*,
    178 F.2d 175 (9th Cir. 1949) ........................................................................................ 16

*NLRB v. Comm. of Interns & Residents*,
    566 F.2d 810 (2d Cir. 1977) ............................................................................. 11, 13, 15

*CSX Transp., Inc. v. Easterwood*,
    507 U.S. 658 (1993) ..................................................................................................... 17

*Donahue v. AMN Servs., LLC*,
    11 Cal. 5th 58 (2021) ..................................................................................................... 8

*Ferra v. Loews Hollywood Hotel, LLC*,
    11 Cal. 5th 858 (2021) ................................................................................................... 8

*Frlekin v. Apple Inc.*,
    8 Cal. 5th 1038 (2020) ................................................................................................... 8

*Garner v. Teamsters, Chauffeurs & Helpers Loc. Union No. 776*,
    346 U.S. 485 (1953) ............................................................................................... 11, 12

*Glacier Northwest, Inc. v. Int'l Bd. of Teamsters Loc. Union No. 174*,
    598 U.S. 771 (2023) ..................................................................................................... 18

*Guss v. Utah Lab. Rels. Bd.*,
    353 U.S. 1 (1935) ..................................................................................... 11, 15, 16, 17

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

AMICUS BRIEF OF (NFIB) SMALL BUSINESS CENTER; (ABC); CALIFORNIA LAW COUNCIL;
AND THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

*Hill v. State of Fla. ex rel. Watson*,
   325 U.S. 538 (1945) ........................................................................................................... 13

*Hob Nob Hill Rest. v. Hotel Emps. & Rest. Emps. Int'l Union*,
   660 F. Supp. 1266 (S.D. Cal. 1987) .................................................................................. 11

*Howlett By & Through Howlett v. Rose*,
   496 U.S. 356 (1990) ........................................................................................................... 17

*Int'l Union of Doll & Toy Workers of U.S. & Canada, AFL-CIO v. Metal Polishers,
   Buffers, Platers & Helpers Int'l Union, AFL-CIO*,
   180 F. Supp. 280 (S.D. Cal. 1960) .............................................................................. 18, 19

*La Crosse Tel. Corp. v. Wis. Emp. Rels. Bd.*,
   336 U.S. 18 (1949) ............................................................................................................. 9

*Machinists & Aerospace Workers v. Wisconsin Empl. Relations Comm'n*,
   427 U.S. 132 (1976) ........................................................................................................... 9

*Mallory v. Norfolk S. Ry. Co.*,
   600 U.S. 122 (2023) ......................................................................................................... 18

*NLRB v. N.Y. Pub. Emp. Rels. Bd.*,
   No. 1:25-cv-01283-GTS-ML (N.D.N.Y.) .......................................................................... 20

*NLRB v. Nash-Finch Co.*,
   404 U.S. 138 (1971) ......................................................................................................... 10

*New Process Steel, L.P. v. National Labor Relations Board*,
   560 U.S. (2010) ................................................................................................................. 16

*Olson v. California*,
   No. 24-269 (U.S. 2024) ...................................................................................................... 8

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
   490 U.S. 477 (1989) ......................................................................................................... 18

*San Diego Bldg. Trades Council v. Garmon*,
   359 U.S. 236 (1959) .................................................................................................. passim

*Smith v. Evening News Ass'n*,
   371 U.S. 195 (1962) ......................................................................................................... 18

*Troester v. Starbucks Corp.*,
   5 Cal. 5th 829 (2018) ......................................................................................................... 8

*Arizona v. United States*,
   567 U.S. 387 (2012) ......................................................................................................... 17

*Viking River Cruises, Inc. v. Moriana*,
    142 S. Ct. 1906 (2022) .................................................................................................. 8

*Weber v. Anheuser-Busch, Inc.*,
    348 U.S. 468 (1955) .................................................................................................... 13

*Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*,
    475 U.S. 282 (1986) ................................................................................................. 9, 11

**Statutes**

29 U.S.C. § 151 ................................................................................................................ 11, 14

29 U.S.C. § 153 ................................................................................................................ 11, 16

29 U.S.C. § 158 ........................................................................................................................ 19

29 U.S.C. § 159 ........................................................................................................................ 14

29 U.S.C. § 160 ................................................................................................ 10, 11, 14, 16

29 U.S.C. § 164 ................................................................................................................ 11, 15

29 U.S.C. § 185 ........................................................................................................................ 18

Cal. Labor Code § 923.1 ................................................................................................ 10, 16, 19

Cal. Lab. Code § 1475 ........................................................................................................... 19

N.Y. Lab. Law § 715 ............................................................................................................. 20

National Labor Relations Act ............................................................................................. *passim*

Taft-Hartley Act ........................................................................................................................ 12

Wagner Act ............................................................................................................................... 13

**Other Authorities**

*Assembly Floor Analysis* ........................................................................................................ 18

Order Delegating Authority to the General Counsel,
    756 Fed. Reg. 69768, 69768 (Nov. 9, 2011) .......................................................... 16

## I. INTERESTS OF AMICI

The National Federation of Independent Business Small Business Legal Center, Inc. (NFIB Legal Center) is a nonprofit, public interest law firm established to provide legal resources and be the voice for small businesses in the nation's courts through representation on issues of public interest affecting small businesses. It is an affiliate of the National Federation of Independent Business, Inc. (NFIB), which is the nation's leading small business association. NFIB's mission is to promote and protect the right of its members to own, operate, and grow their businesses. NFIB represents, in Washington, D.C., and all 50 state capitals, the interests of its members.

National Association of Wholesaler-Distributors (NAW) is an employer and a non-profit, non-stock, incorporated trade association that represents the wholesale distribution industry — the essential link in the supply chain between manufacturers and retailers as well as commercial, institutional, and governmental end users. NAW is made up of direct-member companies and a federation of national, regional, and state associations across 19 commodity lines of trade which together include approximately 35,000 companies operating nearly 150,000 locations throughout the nation. The overwhelming majority of wholesaler-distributors are small-to-medium-size, closely held businesses. As an industry, wholesale distribution generates more than $8 trillion in annual sales volume providing stable and well-paying jobs to more than 6 million workers.

The California Employment Law Council (CELC) is a voluntary, non-profit organization that promotes the common interests of employers and the public in fostering the development in California of reasonable, equitable, and progressive rules of employment law. CELC's membership includes roughly 80 private-sector employers in California who collectively employ more than a half-million Californians. CELC has participated as an *amicus* in many of California's leading employment cases[1] and several cases before the U.S. Supreme Court.[2]

Associated Builders and Contractors (ABC) is a national construction industry trade association

---

[1] *See, e.g.*, *Donahue v. AMN Servs., LLC*, 11 Cal. 5th 58 (2021); *Ferra v. Loews Hollywood Hotel, LLC*, 11 Cal. 5th 858 (2021); *Frlekin v. Apple Inc.*, 8 Cal. 5th 1038 (2020); *Troester v. Starbucks Corp.*, 5 Cal. 5th 829 (2018); *Alvarado v. Dart Container Corp. of Cal.*, 4 Cal. 5th 542 (2018).

[2] *See, e.g.*, *Olson v. California*, No. 24-269 (U.S. 2024); *Bisonnette v. LePage Bakeries Park St., LLC*, 601 U.S. 246 (2024); *Viking River Cruises, Inc. v. Moriana*, 142 S. Ct. 1906 (2022).

representing more than 23,000 members. Founded on the merit shop philosophy, ABC and its 67 chapters help members develop people, win work, and deliver that work safely, ethically, and profitability for the betterment of the communities in which ABC its members work. ABC's membership represents all specialties within the U.S. construction industry and comprises primarily firms that perform work in the industrial and commercial sectors.

The Chamber of Commerce of the United States of America is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

The California Chamber of Commerce ("CalChamber") is a non-profit business association with approximately 12,000 members, both individual and corporate, representing 25% of the state's private sector workforce and virtually every economic interest in the state of California. While CalChamber represents several of the largest corporations in California, 70% of its members have 100 or fewer employees. CalChamber acts on behalf of the business community to improve the state's economic and jobs climate by representing business on a broad range of legislative, regulatory and legal issues.

Amici are committed to rational, orderly, and fair systems of law, including labor law. They therefore have grave concerns with California Assembly Bill (AB) 288, which threatens to splinter national cohesion in labor law by transferring federal jurisdiction from the NLRB to a state agency. As this brief explains, such a transfer would contradict the basic design of federal labor policy, which channels labor disputes into a single, orderly, uniform system. The transfer is not only unlawful, but also bad policy: it would sow chaos in national labor markets by opening the door to more state-by-state experimentation. Amici submit this brief to help the Court evaluate these risks—risks that are already playing out across the country.

**II.   PRELIMINARY STATEMENT**

For nearly a century, the law of private-sector labor relations has been federal law. When Congress

enacted the National Labor Relations Act (NLRA or the Act) in 1935, it established a comprehensive, uniform, and exclusive regulatory system. And to manage that system, it created the National Labor Relations Board (NLRB), a federal agency empowered to develop labor policy at the national level. The NLRA was always meant to be exclusive, and the NLRB always meant to be authoritative. When the NLRA applies, it preempts all state and local law. And when the NLRB has jurisdiction, it displaces all state and local agencies. *See, e.g.*, *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 246 (1959); *Machinists & Aerospace Workers v. Wisconsin Empl. Relations Comm'n*, 427 U.S. 132, 149 (1976); *Wis. Dep't of Indus., Labor & Human Relations v. Gould Inc.*, 475 U.S. 282 (1986); *La Crosse Tel. Corp. v. Wis. Emp. Rels. Bd.*, 336 U.S. 18, 26 (1949). *See also* S. Rep. No. 573, at 85, 74th Cong., 1st Sess. (1935) ("[The NLRA] gives the National Labor Relations Board exclusive jurisdiction to prevent and redress unfair labor practices, and . . . establishes clearly that this bill is paramount over other laws that might touch upon similar subject matters.").

Against that near century of unbroken authority, Califonia now stands in open defiance. The state has amended its Labor Code to give a state agency, the Public Employment Relations Board (PERB), authority over most private-sector employees—including those subject to the NLRA. *See* AB 288 (Cal. 2025) (amending Cal. Labor Code §§ 923.1). As amended, the Labor Code allows the PERB to oversee union elections, certify exclusive bargaining representatives, and remedy unfair labor practices—even if those matters are otherwise within the NLRB's jurisdiction. *See* Cal. Labor Code § 923.1(b)(1)(B). In fact, the PERB can take jurisdiction over those matters even when the NLRB has already taken jurisdiction; a party who has filed a petition or charge with the NLRB can, after six months, go across the street and file the same proceeding with the PERB. *See id.* § 923.1(b)(1)(B)(ii)–(iii). And the PERB will retain jurisdiction until ousted by court order. *See id.* § 923.1(b)(2) (stating that even when conditions triggering PERB jurisdiction expire, PERB will retain jurisdiction "from that point forward unless ordered by a court of competent jurisdiction to cede its jurisdiction").

This scheme is preempted. Since the NLRA's enactment, the Supreme Court has recognized that the Act has preemptive effect to ensure the NLRB's primary jurisdiction over labor relations and to facilitate development of a uniform national labor law. *Amalgamated Util. Workers v. Consol Edison Co. of N.Y.*, 309 U.S. 264 (1940). The Court has read the Act to implement a congressional intent to establish

a uniform labor law. *NLRB v. Nash-Finch Co.*, 404 U.S. 138, 144 (1971). Congress designed the NLRA as a cohesive unit, one that applies the same way in Sacramento as it does in Syracuse. It left no room for the kind of local interference that the California Labor Code now enables. *See* 29 U.S.C. § 160(a); S. Rep. No. 573, at 85; *see also Nash Finch*, 404 U.S. at 144 ("The purpose of the Act was to obtain 'uniform application' of its substantive rules and to avoid the 'diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies.'" (quoting *Garner v. Teamsters, Chauffeurs & Helpers Loc. Union No. 776*, 346 U.S. 485, 490 (1953))).

The state defends this intrusion as a practical necessity: It says that it must act because the right to bargain collectively is "fundamental" and the NLRB "no longer functions in any constructive way." *See* AB 288 § 1(d) (legislative findings); *AB 288: Assembly Floor Analysis* 2 (Cal. Sept. 10, 2025) [hereinafter *Assembly Floor Analysis*].[3] The State claims that the NLRB has proven too slow to process cases and, at the current moment, lacks a statutory quorum. *See* AB 288 § 1(d), (j) (citing the Board's lack of a quorum to justify intervention); *Assembly Floor* Analysis, *supra*, at 2–3. In other words, the state sees a policy gap—one it says it is free to fill using its "inherent" police powers. *See* AB 288 § 1(i) (citing *Barbier v. Connolly* 113 U.S. 27, 31 (1884); *Chicago, B. & Q.R. Co. v. McGuire*, 219 U.S. 549, 570 (1911)).

But that argument also runs up against the Constitution and congressional intent. The Supremacy Clause mandates that federal law is the "supreme law of the land." U.S. Const. art. VI, cl. 2. When Congress wrote the NLRA, it knew—and indeed intended—that the NLRB would sometimes be unable to act because it lacks a quorum. *See* 29 U.S.C. § 153(b). The quorum requirement has been in place since the beginning, and it has always limited the NLRB's authority in some cases. *See* Pub. L. 74-198, § 3(b), 49 Stat. 499, 451 (1935) (specifying two-member quorum); H.R. Rep. No. 969, 74th Cong., 1st Sess., at 2901 (1935) (same). But Congress never suggested that the lack of a quorum would justify state intervention. *See Hob Nob Hill Rest. v. Hotel Emps. & Rest. Emps. Int'l Union*, 660 F. Supp. 1266, 1268 n.3 (S.D. Cal. 1987) ("[T]he failure of the NLRB to assume jurisdiction over a labor case does not in itself permit the states to regulate conduct they would otherwise be precluded from regulating.").

To the contrary, Congress specified only two circumstances where states could act, and neither is

---

[3] Available online: https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=202520260AB288#

present here. First, in section 10(a) of the NLRA, it allowed the NLRB to enter certain cooperative agreements with state agencies. 29 U.S.C. § 160(a). Second, in section 14(c), it allowed state agencies to exercise jurisdiction when the NLRB affirmatively declines to exercise its own. *Id.* § 164(c). And those circumstances are the entire universe in which states may step into the NLRB's otherwise exclusive territory. *Guss v. Utah Lab. Rels. Bd.*, 353 U.S. 1, 9 (1935); *see also NLRB v. Comm. of Interns & Residents*, 566 F.2d 810, 813 n.3 (2d Cir. 1977) ("These provisions are the exclusive means for ceding federal jurisdiction over activities covered by the NLRA."); *Gould*, 475 U.S. at 286 ("[The NLRA] prevents states not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably protected by the Act."). Neither applies here.

Congress's decision to allow only a limited role for states was not accidental. It was a deliberate decision to contain disruption by providing uniformity. The NLRA's first and primary mission is to ensure labor peace. *See* 29 U.S.C. § 151; *Garner*, 346 U.S. at 490. It has performed that intended role, producing a long era of quiescence. *See* Michael Wachter, *The Striking Success of the NLRA*, Regulation (Spring 2014)[4] (concluding that the NLRA as amended "solved the problem of industrial warfare"). It has done that in part because it is predictable and uniform: Parties know what law will govern their dispute wherever the dispute arises. But under California's view, every state could have its own labor law for private-sector workers.[5] Dozens of laws would overlap and collide. Contracts would be harder to negotiate, disputes would be harder to avoid, and disruptions would be harder to contain. The result would be confusion, conflict, and the return of industrial strife. *See, e.g.*, *Garner*, 346 U.S. at 490 ("A multiplicity of tribunals and a diversity of procedures are quite as apt to produce incompatible or conflicting adjudications as are different rules of substantive law."); *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 210 (1985) (observing that divergent local rules would "exert a disruptive influence upon both the negotiation and administration of collective agreements").[6]

---

[4] Available online: https://www.cato.org/regulation/spring-2014/striking-success-nlra#conclusion.

[5] Indeed, some states, including New York, have already moved forward with similarly unconstitutional bills. See section 2, *infra*.

[6] *See also* Alexander T. MacDonald, *Be Careful What You Wish For: The Risks of Competitive Labor Federalism for Pro-Union States*, Federalist Soc'y (June 2, 2025), https://fedsoc.org/commentary/fedsoc-blog/be-careful-what-you-wish-for-the-risks-of-competitive-

Congress did not want that result, and the law does not allow it. This Court should declare AB 288 preempted and enjoin its enforcement.

## III.   ARGUMENT

### A.   The NLRA is exclusive even when the NLRB cannot or will not exercise jurisdiction.

As initially enacted, the NLRA protected only the rights of employees to organize and engage in concerted activities, such as collective bargaining. With the passage of the Taft-Hartley Act in 1947, Congress added to the NRLA significant protections for employers and adopted a general code of regulation for labor relations. Shortly thereafter, the Supreme Court explained that "Congress has taken in hand this particular type of controversy where it affects interstate commerce" and "considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules." *Garner*, 346 U.S. at 488.

In the decades since, union organizing, collective bargaining, and labor disputes have been subjects of purely national regulation. *See Bethlehem Steel Co. v. N.Y. State Lab. Rels. Bd.*, 330 U.S. 767, 771–72 (1947); *Hill v. State of Fla. ex rel. Watson*, 325 U.S. 538, 543 (1945); *see also Comm. of Interns & Residents*, 566 F.2d at 813 n.3. For much of the private-sector workforce, the NLRA occupies the labor-relations field. *See Garmon*, 359 U.S. at 244. It leaves no room for inconsistent, conflicting, or even supplemental state laws, as the Supreme Court has recognized in numerous decisions. The Courrt has repeatedly defined conduct that the Act protects and has delineated "the areas . . . withdrawn from state power." *Weber v. Anheuser-Busch, Inc.*, 348 U.S. 468, 480 (1955); *see Garmon,* 359 U.S. at 245 ("When an activity is arguably subject to § 7 or § 8 of the Act, the States as well as the federal courts must defer to the exclusive competence of the [NLRB] if the danger of state interference with national policy is to be averted.").

This broad preemptive scope is unusual but not accidental. It reflects deliberate choices made in response to specific historical circumstances. In 1935, lawmakers were facing a rising tide of labor unrest. Labor disputes had grown not only more common, but also more violent. From 1927 to 1932, there were on average 1,050 strikes per year affecting 775,000 workers. S. Rep. No. 573, at 69. But in 1933, there

---

labor-federalism-for-pro-union-states (describing how state efforts to erode the NLRB's exclusivity would lead to a competitive rush and further splintering of labor law).

were 1,695 strikes affecting almost 1.2 million workers. *Id.* Those numbers rose again in 1934, hitting 1,856 strikes affecting almost 1.5 million workers. *Id.* Labor disputes were costing the national economy more than $1 billion in production per year (in 1934 dollars). *Id.* And in just two years, they also had cost more than 40 workers their lives. *See* Eric Blanc, *Revisiting the Wagner Act & Its Causes*, Lab. Politics (July 28, 2022)[7] (reviewing casualty statistics); *see also* S. Rep. No. 573, at 70 (citing a "rising tide of labor disputes").

Congress reacted by passing the Wagner Act of 1935, the basis of what is now the NLRA. From the beginning, the statute was meant to be uniform, comprehensive, and exclusive. Congress saw labor disputes as a threat to interstate commerce—one that could cripple important industries like transportation, mining, and manufacturing. *See* S. Rep. No. 1184, at 10–11, 79th Cong., 2d Sess. (1934). These disputes had periodically crippled major transportation and supply chains, making the problem too large for any one state to control. *See id.* What was needed was a single, uniform way to keep labor peace. *See id.* (explaining that the Senate bill was designed to address "an ever-increasing stoppage of the free flow of commerce between the several States and between this and other countries as a result of disturbances in some of our larger industrial enterprise"); *see also* S. Rep. No. 573, at 69 (1935) ("The first object of the bill is to promote industrial peace.").

Accordingly, Congress created a system that was uniform not only in substance but in process. In substance, it adopted a national policy to encourage peaceful settlements through collective bargaining. *See* Pub. L. No. 74-198, § 1, 49 Stat. 449, 449 (1935) (codified at 29 U.S.C. § 151). And in process, it established a centralized administrator with authority to conduct elections, certify representatives, and remedy violations: the NLRB. *Id.* §§ 9, 10, 49 Stat. at 453–54 (codified as amended at 29 U.S.C. §§ 159, 160). That authority allowed the NLRB to develop a cohesive policy for the whole nation—to the exclusion of local authorities:

> Section 10(a) gives the National Labor Relations Board exclusive jurisdiction to prevent and redress unfair labor practices, and, taken in conjunction with section 14, establishes clearly that this bill is paramount over other laws that might touch upon similar subject matters. Thus it is intended to dispel the confusion resulting from dispersion of authority and to establish a single paramount administrative or quasi-judicial authority in connection with the development of the Federal American law regarding collective bargaining.

---

[7] Available online: https://www.laborpolitics.com/p/revisiting-the-wagner-act-and-its.

S. Rep. No. 573, at 15.

Over the years, however, Congress has made two exceptions to the NLRB's plenary authority, both times in response to Supreme Court decisions. First, in response to *Bethlehem Steel Co. v. New York State Labor Relations Board*, Congress allowed the NLRB to make cooperative agreements with state boards in some cases. *Bethlehem Steel* involved a group of foremen. At the time, the NLRB considered the foremen "employees" under the NLRA, but for policy reasons, it had declined to recognize their right to bargain collectively. In response, the foremen tried to organize through the New York State Labor Board. In *Bethlehem Steel*, the Supreme Court blocked the effort. 330 U.S. at 771–72, 776. It held that the state board had no jurisdiction over employees covered by the NLRA—even those for whom the NLRB declined to exercise its full authority—without some affirmative "delegation of power." *Id.* at 776.

Congress responded by authorizing a limited delegation. In section 10(a), it allowed the NLRB to cede control over certain local employers and industries to a state agency. *See* Pub. L. 80-101, § 10, 61 Stat. 136, 146 (1947) (codified at 29 U.S.C. § 160(a)). But Congress stipulated that any agreement with a state agency would be proper only if the state's labor law was fully consistent with the NLRA. *Id.* It also stipulated that the delegation could not cover certain industries important to national commerce, such as mining or manufacturing, unless the covered industry was "predominately local in character." *Id.*; *see also* H.R. Rep. No. 510, at 52 (1947) (describing cooperative-agreement proviso in section 10(a)).

Second, in response to *Guss v. Utah Labor Relations Board*, Congress allowed states to exercise authority in some cases when the NLRB affirmatively declines jurisdiction. In *Guss*, the Supreme Court had come to the opposite conclusion, holding that a state board could not exercise jurisdiction over covered employers and employees even when the Board had expressly declined to exercise its own. 353 U.S. 1, 10–11 (1957). The Court recognized that its decision might create a "no-man's land," where the Board had declined jurisdiction and no state could fill the gap. *Id.* But even so, the Court concluded that this result was required by the NLRA itself. *Id.* ("We believe . . . that Congress has expressed its judgment in favor of uniformity. Since Congress' power in the area of commerce among the States is plenary, its judgment must be respected whatever policy objections there may be to creation of a no-man's-land."). The NLRA excluded all state regulatory activity within its sphere; and that exclusion was effective even when the NLRB declined to step in.

. Congress responded again, enacting section 14(c). Congress specified that the NLRB could, "in its discretion," affirmatively decline to assert jurisdiction over a "class or category" of employers, but only when the relevant employees had relatively little effect on interstate commerce. 29 U.S.C. § 164(c). With those conditions met, a state could then "assum[e] and assert[]" jurisdiction. *See id.*.

Today, sections 10(a) and 14(c) serve different purposes. Section 10(a) allows cooperative agreements with state boards, while section 14(c) allows unilateral cessation by the NLRB. But both statutory provisions underline Congress's view of the NLRB's role. Congress has consistently treated the NLRB as the unitary administrator of national labor law. *See Garmon*, 359 U.S. at 242–43. And although it has allowed states to play a role in some limited cases, it has conditioned their involvement on the NLRB's consent. *See Comm. of Interns & Residents*, 566 F.2d at 813.

California has no such consent. It has no agreement under section 10(a) or a declination under 14(c). Instead, it simply has assumed jurisdiction over employees, employers, and industries covered by the NLRA. *See* Cal. Labor Code § 923.1(b)(1). It has done what Congress said it could not do—seize jurisdiction on its own. *See Bethlehem Steel Co.*, 330 U.S. at 774 ("[A] state regulation in the field of the statute is invalid even though that particular phase of the subject has not been taken up by the federal agency."); *Guss*, 353 U.S. at 10–11. *See also California Ass'n of Emp. v. Bldg. & Const. Trades Council of Reno, Nev. & Vicinity*, 178 F.2d 175, 178–79 (9th Cir. 1949) ("Where the Board has jurisdiction it is exclusive of State jurisdiction (except as provided by 29 U.S.C.A. § 160(a), as amended)."). In fact—as this action demonstrates—far from consenting to California's attempted assumption of jurisdiction, the NLRB has filed suit to enjoin it.

The state defends its power grab by pointing to the NLRB's current staffing. The NLRB, it says, currently has fewer than three confirmed members. The NLRB therefore lacks a statutory quorum and cannot perform its normal functions. *See* AB 288 § 1(d) (citing Board's current lack of a quorum as justification for intervention); Cal. Labor Code § 923.1(b)(1)(B)(i) (allowing PERB to assume jurisdiction over workers otherwise covered by the NLRA when the NLRB loses a statutory quorum).

That statement is true in part,[8] but also irrelevant. Although the NLRB may lack a quorum today,

---

[8] As the NLRB's Acting General Counsel has explained, even without a quorum, agency officials have continued to process much of the agency's day-to-day functions. *See* Press Release, Acting General Counsel Statement on Potential State Legislation Regulating Private Sector Labor Relations, NLRB Office of Pub. Affairs (Aug. 15, 2025),

the presence or absence of a quorum changes nothing about the preemption analysis.

The quorum requirement is a feature of congressional design. From the beginning, the NLRB has been able to operate only with a statutory quorum. *See* Pub. L. No. 74-198, § 1, 49 Stat. 449, 449 (1935) (codified as amended at 29 U.S.C. § 153). The quorum was originally two members; later, it was raised to three. But throughout the NLRB's history, it has been a limit on the NLRB's power. *See New Process Steel, L.P. v. National Labor Relations Board*, 560 U.S. at 687–88 (2010). It has always meant that if the NLRB lost a quorum, the NLRB would be temporarily unable to perform some duties. *Id.* Congress never provided for that circumstance to allow states to step in. To the contrary, Congress established national uniformity even when the NLRB did not or could not act. *See Guss*, 353 U.S. at 11 ("Since Congress' power in the area of commerce among the States is plenary, its judgment must be respected whatever policy objections there may be to creation of a no-man's-land."). And until Congress says otherwise, the NLRA is the "supreme" labor law of the land—quorum or no. *See* U.S. Const. art. VI, cl. 2.

If Congress wants to deputize states when the NLRB lacks a quorum, it certainly knows how to do that. It has already carved out two exceptions allowing states to play such a role. But it has carved out no exception for when the NLRB lacks a quorum. Instead, it has repeatedly and consistently chosen uniformity over diversity. It has chosen to site "paramount" authority in a single administrator, to the exclusion of all others. S. Rep. No. 573, at 117. Congress has been clear; this Court should as well.

The State also defends its intervention as an exercise of its "inherent" police powers. *See* AB 288 § 1(j). It says that the NLRB has been ineffective in protecting the "fundamental" right to organize. *Id.* The State, therefore, has a "duty" to protect its residents' rights in accordance with its own constitution and statutes. *See id.* (arguing that "federal law cannot prevent it from doing its part to enforce and further the rights recognized by the NLRA").

But that is not how federalism works. No matter how ill-advised or ineffective a state may think federal policy is, the state has no power to simply ignore federal law. It cannot substitute its own policy

---

https://www.nlrb.gov/news-outreach/news-story/acting-general-counsel-statement-on-potential-state-legislation-regulating ("Notwithstanding the Board's lack of a quorum, agency operations are continuing to the greatest extent permitted by law); *see also* Order Delegating Authority to the General Counsel, 756 Fed. Reg. 69768, 69768 (Nov. 9, 2011) (delegating functions to agency officials when NLRB lacks a quorum).

LITTLER MENDELSON, P.C.
500 Capitol Mall, Suite 2000
Sacramento, California 95814
916.830.7200

for the will of Congress. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 416 (2012); *Howlett By & Through Howlett v. Rose*, 496 U.S. 356, 371 (1990). The Constitution makes federal law the supreme law of the land; it does not give states the choice to opt out. *See Rose*, 496 U.S. at 371 ("The Supremacy Clause forbids state courts to dissociate themselves from federal law because of disagreement with its content or a refusal to recognize the superior authority of its source."). If it did, federal supremacy would mean nothing. *See also CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993) ("Where a state statute conflicts with, or frustrates, federal law, the former must give way.").

Finally, the state argues that preemption doctrine itself has been eroded. It claims that the NLRA no longer has the same preemptive effect it had in the 1930s. *See Assembly Floor Analysis*, *supra* at 4. As evidence, it points to two decisions—*Smith v. Evening News Ass'n*, 371 U.S. 195, 201 (1962) and *Glacier Northwest, Inc. v. Int'l Bd. of Teamsters Loc. Union No. 174*, 598 U.S. 771 (2023). But neither decision offers the State any support. *Smith* involved a claim under section 301 of the Labor Management Relations Act, which gives federal courts jurisdiction over breach-of-contract claims related to labor agreements. *See* 29 U.S.C. § 185(a). The Court merely held that state courts could consider those claims as well (while applying federal substantive law)—not that states somehow had free rein to regulate labor relations. *Smith*, 371 U.S. at 201. *See also Int'l Union of Doll & Toy Workers of U.S. & Canada, AFL-CIO v. Metal Polishers, Buffers, Platers & Helpers Int'l Union, AFL-CIO*, 180 F. Supp. 280, 286 (S.D. Cal. 1960) (holding that NLRB had exclusive authority to decide questions of representation even when the question implicated a contract claim under a union "no raid" agreement cognizable in court under section 301). And in *Glacier Northwest*, the near-unanimous Court merely applied longstanding preemption doctrine, which recognizes that the NLRA does not preempt state-law claims for intentional property destruction. *See* 5898 U.S. at 783–84. The State points to a concurring opinion from Justice Thomas that suggested a willingness to revisit *Garmon* preemption in a future case. *See id.* at 788 (Thomas, J., concurring). But *Garmon* preemption remains the law, however much California may wish otherwise. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (explaining that Supreme Court precedent may be revisited only by the Supreme Court); *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) (same).

/ / /

AMICUS BRIEF OF (NFIB) SMALL BUSINESS CENTER; (ABC); CALIFORNIA LAW COUNCIL; AND THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA

**B.     AB 288 will sow chaos in national labor markets.**

At bottom, California's arguments sound in policy. California believes that the current federal system under-protects collective-bargaining rights and makes people wait too long to get a decision. *See Assembly Floor Analysis*, *supra*, at 2 ("Justice delayed is justice denied."). And the state sees no prospect for improvement. *See id.* at 2–3 If people are to have an "effective" way to vindicate their rights, California argues, then states must be able to step in.

That view is both wrong and dangerous. If accepted, it would undermine the stability provided by a uniform national system. It also would kick off a labor-law race, with states rushing to offer their own labor-law models. The result would be a crowd of different legal regimes—one that would run roughshod through national labor markets. *See Allis Chalmers*, 471 U.S. at 211 (describing risks of uncertainty and disparity without a uniform federal labor policy); *see also Garmon*, 359 U.S. at 246 ("The governing consideration is that to allow the States to control activities that are potentially subject to federal regulation involves too great a danger of conflict with national labor policy."). Following California's lead, other states would be free to seize jurisdiction for their own local agencies. These agencies could develop their own rules — rules covering everything from strikes to picketing to the duty of bargain.[9] Nor would anything guarantee that these rules would be more protective of employee rights. Nothing in California's logic requires a state to respect the NLRA as a minimum floor. Rather, it would allow states to design systems with greater rights or fewer. State experimentation can cut both ways—often in ways antithetical to the desires of its proponents. *See Int'l Union of Doll & Toy Workers*, 180 F. Supp. at 285 ("One possible solution to this problem would be to permit each tribunal to act independently in the area of employee representation. Yet different rules of procedure and evidence in each forum would quite probably lead to different answers being given to the same question. Avoidance of just this type of conflict and confusion was a paramount purpose in the enactment of the National Labor Relations Act and the creation of the Board . . . .").

---

[9] Indeed, California's law diverges from the NLRA's scheme in important ways. For one, it allows the PERB to impose "penalties" for violations, a remedy unavailable under the NLRA. *See* Cal. Labor Code § 923.1(e)(1)(E). It also allows the PERB to order parties to interest arbitration if they are unable to agree to a contract. *See id.* § 923.1(e)(1)(D). The NLRA, by contrast, protects the parties' rights to insist on their own bargaining positions, and it gives them the right to reject any particular proposal. *See* 29 U.S.C. § 158(d).

That risk is not hypothetical: It is already here. In California alone, lawmakers are pushing to erode federal labor supremacy. Most recently, California lawmakers adopted an expansive bargaining regime for rideshare drivers. *See* A.B. 1340 (Cal. 2025) (adopted October 3, 2025 as Chapter 335, Statutes of 2025). Before that, they adopted an alternative, quasi-sectoral bargaining regime for fast-food employees. *See* Cal. Lab. Code § 1475. And across the country, lawmakers in New York have pushed forward with their own version of AB 288, which has already sparked confusion and litigation. *See* S8034A (N.Y. 2025) (amending N.Y. Lab. Law § 715); *NLRB v. N.Y. Pub. Emp. Rels. Bd.*, No. 1:25-cv-01283-GTS-ML (N.D.N.Y.); *Amazon.com Servs. LLC v. N.Y. Pub. Emp. Rels. Bd.*, No. 1:25-cv-05311 (E.D.N.Y.).

This trend is unlikely to end with California and New York. It will continue until it is stopped—and it should be stopped here. This Court should hold that AB 288 and the amendments it makes to California's Labor Code are preempted by the NLRA. The amendments would allow a state board to regulate matters exclusively within the NLRB's jurisdiction. But the state cannot do that. These matters are governed by federal law and federal law alone. *See Garmon*, 359 U.S. at 244 ("Regardless of the mode adopted, to allow the States to control conduct which is the subject of national regulation would create potential frustration of national purposes.").

Dated:  November 25, 2025　　　　　　　　　　LITTLER MENDELSON, P.C.

　　　　　　　　　　　　　　　　　　　　　　　*/s/ Joy C. Rosenquist*
　　　　　　　　　　　　　　　　　　　　　　　Joy C. Rosenquist
　　　　　　　　　　　　　　　　　　　　　　　Alex T. MacDonald
　　　　　　　　　　　　　　　　　　　　　　　Attorneys for Amici
　　　　　　　　　　　　　　　　　　　　　　　NATIONAL FEDERATION OF INDEPENDENT BUSINESS (NFIB) SMALL BUSINESS LEGAL CENTER; NATIONAL ASSOCIATION OF WHOLESALER-DISTRIBUTORS; CALIFORNIA EMPLOYMENT LAW COUNCIL; THE CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; and THE CALIFORNIA CHAMBER OF COMMERCE

4902-6313-5093 / 123104.1093