Exhibit A

Scott A. Kronland (SBN 171693)
Stacey M. Leyton (SBN  203827)
Emanuel Waddell (SBN 350156)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel. (415) 421-7151
Fax (415) 362-8064
skronland@altber.com
sleyton@altber.com
ewaddell@altber.com

*Attorneys for Amici Curiae Labor Law Professors*

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL LABOR RELATIONS BOARD,<br>        Plaintiff,<br><br>     v.<br><br>STATE OF CALIFORNIA and the PUBLIC EMPLOYMENT RELATIONS BOARD<br>        Defendants;<br><br>INTERNATIONAL BROTHERHOOD OF TEAMSTERS,<br><br>        Intervenor. | Case No. 2:25−CV−02979−TLN−CKD<br><br>**BRIEF AMICI CURIAE OF LABOR LAW PROFESSORS IN OPPOSITION TO PRELIMINARY INJUNCTION**<br><br>Date:<br>Time:<br>Place:  Courtroom 2, 15th floor<br>Judge:  Hon. Troy L. Nunley |

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

INTEREST OF AMICI CURIAE ............................................................................................1

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................2

     I.     Garmon preemption doctrine is predicated on the NLRB functioning as an
           independent agency. ..................................................................................................2

          A.     The presumption that federal laws do not preempt state authority
                  applies to federal workplace laws including federal labor law ......................3

          B.     In the years immediately following the NLRA's adoption, state
                  boards and the NLRB exercised concurrent authority ..................................4

          C.     The Supreme Court subsequently developed the *Garmon* preemption
                  doctrine to protect the primary jurisdiction of an independent NLRB...........7

     II.     The NLRB can no longer operate as Congress intended.............................................9

          A.     The independence of the NLRB was central to Congress' plan for
                  how the NLRA would be enforced. ...............................................................9

          B.     The NLRB no longer operates as an independent agency. ..........................11

     III.    Congress did not intend the mere existence of the NLRB, as it currently
           operates, to result in blanket preemption of non-conflicting state labor law. ...........13

CONCLUSION ....................................................................................................................15

Brief Amici Curiae of Labor Law Professors in Opp. to Prelim. Inj., # 2:25−CV−02979−TLN−CKD

i

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alexander v. Gardner-Denver Co.*,
    415 U.S. 36 (1974) ........................................................................................ 3

*Allen-Bradley v. Wisconsin Employment Relations Board*,
    315 U.S. 740 (1942) .................................................................................... 4, 5

*Bethlehem Steel Co. v. New York State Lab. Rels. Bd.*,
    330 U.S. 767 (1947) .................................................................................... 3, 7

*Cal. Fed. Sav. & Loan Ass'n. v. Guerra*,
    479 U.S. 272 (1987) ...................................................................................... 14

*Chicago, B. & Q.R. Co. v. McGuire*,
    219 U.S. 549 (1911) ........................................................................................ 4

*Consolidated Edison Co. v. NLRB*,
    305 U.S. 197 (1938) ........................................................................................ 4

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990) ........................................................................................ 3

*Fort Halifax Packing Co. v. Coyne*,
    482 U.S. 1 (1987) ....................................................................................... 3, 4

*Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776*,
    346 U.S. 485 (1953) .................................................................................... 7, 8

*Guss v. Utah Labor Relations Board*,
    353 U.S. 1 (1957) ........................................................................................... 7

*Harris v. Bessent*,
    ___ F.4th___, 2025 WL 3496737 (D.C. Cir. Dec 5, 2025) ......................... 12

*Harris v. Bessent*,
    2025 WL 980278 (D.C. Cir. Mar. 28, 2025) ........................................ 10, 13

*Harris v. Bessent*,
    775 F.Supp.3d 164 (D.D.C. 2025) ............................................................. 12

*Hawaiian Airlines, Inc. v. Norris*,
    512 U.S. 246 (1994) ...................................................................................... 4

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) ................................................................................ 8, 10

*Medtronic, Inc. v. Lohr*,
 518 U.S. 470 (1996) ................................................................................. 3

*Metro. Life Ins. Co. v. Massachusetts*,
 471 U.S. 724 (1985) .............................................................................. 3, 4

*Nat'l Ass'n of Immigr. Judges v. Owen*,
 139 F.4th 293 (4th Cir. 2025) ........................................................... 11, 14

*Pac. Merch. Shipping Ass'n v. Aubry*,
 918 F.2d 1409 (9th Cir. 1990) .................................................................. 3

*Retail Clerks Int'l Ass'n, Loc. 1625 v. Schermerhorn*,
 375 U.S. 96 (1963) .................................................................................... 3

*San Diego Building Trades Council v. Garmon*,
 359 U.S. 236 (1959) ..........................................................................*passim*

*Sears, Roebuck & Co. v. San Diego County District Council of Carpenters*,
 436 U.S. 180 (1978) .................................................................................. 8

*Space Expl. Techs. Corp. v. NLRB*,
 151 F.4th 761 (5th Cir. 2025) ........................................................... 11, 12

*Trump v. Slaughter*,
 No. 25-332, 2025 WL 2692050 (U.S. Sept. 22, 2025) ............................. 12

*Trump v. Wilcox*,
 145 S. Ct. 1415 (2025) ............................................................................ 12

*United Const. Workers v. Laburnum Const. Corp.*,
 347 U.S. 656 (1954) ................................................................................ 14

*Wiener v. United States*,
 357 U.S. 349 (1958) .................................................................................. 8

*Wilcox v. Trump*,
 775 F.Supp.3d 215 (D.D.C. 2025)...................................................... 12, 13

**State Cases**

*Davega City Radio v. State Labor Relations Board*,
 281 N.Y. 13 (1939) ................................................................................... 6

*IBEW Local 953 v. Wisconsin Employment Relations Board*,
 245 Wis. 532 (1944) .............................................................................. 5, 6

*R.H. White v. Murphy*,
 310 Mass. 510 (1942) ............................................................................... 6

**Federal Statutes**

29 U.S.C.§ 151 .................................................................................................. 2, 15
29 U.S.C.§ 153 ................................................................................................ 11, 14
29 U.S.C.§ 164 ...................................................................................................... 7

**Other Authorities**

Executive Order 14215 (Feb. 18, 2025) ...................................................................... 13

H.R. Rep. No. 74-1371 (1935) .................................................................................. 10

James A. Gross, *The Making of the National Labor Relations Board: A Study in Economics, Politics, and the Law 1933-1937, Volume I* (1974) .......................... 9, 10

NLRB Edge, *Read the Trump Email Firing Member Wilcox and GC Abruzzo* (Jan. 30, 2025), https://www.nlrbedge.com/p/read-the-trump-email-firing-member ..................... 12

1

**INTEREST OF AMICI CURIAE**

2        Amici are professors who research, write, and teach about labor law and have a

3   longstanding interest in the development of the law in this area.  Amici professors write to shed

4   light on the intent of Congress at the time that it enacted the National Labor Relations Act

5   ("NLRA"), the historical relationship between federal and state protection of collective action by

6   workers, and why, in the absence of an independent National Labor Relations Board ("NLRB"), the

7   NLRA should not be interpreted to broadly preclude all operation of state laws that permit state

8   administrative agencies to enforce the NLRA or parallel state law.  A full list of amici may be found

9   as Appendix A to this brief.

10

**INTRODUCTION**

11        This case raises important issues about the authority of States to protect workers within

12   their jurisdictions.  It is commonplace that state protections for workers (like, for example,

13   prohibitions against employer discrimination or retaliation) operate alongside similar federal

14   protections.  Under longstanding precedent, federal statutes do not preempt States' exercise of their

15   police powers in a manner that neither conflicts with nor poses an obstacle to federal law—unless

16   Congress has made clear and manifest its intent that the federal statute have a broader preemptive

17   scope.  The federal statute at issue in this case, the NLRA, contains no provision explicitly

18   preempting state law.  Nevertheless, the Supreme Court concluded in *San Diego Building Trades*

19   *Council v. Garmon*, 359 U.S. 236 (1959) ("*Garmon*"), that Congress intended the NLRA to broadly

20   preempt state regulation of conduct the Act arguably protects or prohibits, so as to protect the

21   primary jurisdiction of the NLRB, the independent agency Congress created to enforce the NLRA.

22        This conclusion—and *Garmon* doctrine as it has developed—was predicated on the NLRB

23   functioning as an independent agency.  But the NLRB can no longer operate as Congress intended.

24   The District of Columba Circuit has held that NLRA provisions that protect the NLRB's

25   independence are unconstitutional.  The Fifth Circuit reached similar conclusions and enjoined

26   enforcement of the NLRA within its jurisdiction.  The U.S. Supreme Court allowed the removal of

27   an NLRB member in contravention of those independence-preserving provisions (which deprived

28   the Board of a quorum) and signaled that it will likely reach the same conclusion as the District of

---

Brief Amici Curiae of Labor Law Professors in Opp. to Prelim. Inj., # 2:25−CV−02979−TLN−CKD

1

Columbia Circuit, overruling almost a century of precedent on which Congress relied in enacting the NLRA. The Congresses that adopted and amended the NLRA many decades ago never considered whether the NLRA should broadly preempt state law under those circumstances. In light of the strong presumption against preemption of the States' police powers, this Court should not attribute to Congress a decision to broadly preempt state law that Congress itself never made by extending the *Garmon* doctrine to this situation.

Central to Congress's purpose in adopting the NLRA was to redress "the inequality of bargaining power between employees who do not possess full freedom of association or actual liberty of contract, and employers[.]" 29 U.S.C. §151. Congress redressed that inequality by enacting the NLRA to "protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." *Id.* In the absence of a functioning and independent NLRB, States should be free to exercise their police powers to protect workers in the exercise of those rights, as long as their actions do not conflict with the NLRA. Construing federal law to preempt States from, for example, ruling that a worker was unlawfully fired for union activity fails to further—and indeed, undermines—Congress' purpose in enacting the NLRA in contexts where the NLRB cannot vindicate that purpose.

The NLRB seeks a blanket preliminary injunction against the enforcement of state law based on a broad preemption doctrine that cannot be justified in these circumstances. That motion should be denied.

## ARGUMENT

### I. Garmon preemption doctrine is predicated on the NLRB functioning as an independent agency.

The general rule is that, in the absence of an explicit preemption provision, a federal statute does not preempt state laws that do not pose a conflict with or obstacle to federal law. The *Garmon* preemption doctrine is an exception to the general rule that stems from Congress' decision to establish the NLRB as an independent agency.

Brief Amici Curiae of Labor Law Professors in Opp. to Prelim. Inj., # 2:25−CV−02979−TLN−CKD

2

### A. The presumption that federal laws do not preempt state authority applies to federal workplace laws including federal labor law.

"Preemption fundamentally is a question of congressional intent[.]"  *English v. Gen. Elec. Co.*, 496 U.S. 72, 78-79 (1990).  Thus, "'[t]he purpose of Congress is the ultimate touchstone' in every pre-emption case."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (alteration in original) (quoting *Retail Clerks Int'l Ass'n, Loc. 1625 v. Schermerhorn*, 375 U.S. 96, 103 (1963)).  "[W]hen Congress has made its intent known through explicit statutory language, the courts' task is an easy one."  *English*, 496 U.S. at 79.

However, the NLRA contains no express preemption provision.  *See Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 733 (1985); *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 20 n.14 (1987); *see also Bethlehem Steel Co. v. New York State Lab. Rels. Bd.*, 330 U.S. 767, 771 (1947) (Congress has not "seen fit to lay down even the most general of guides to construction of the Act … by saying that its regulation either shall or shall not exclude state action").  When Congress has been silent on the subject, then in the absence of an actual conflict, "where the field which Congress is said to have pre-empted includes areas that have "been traditionally occupied by the States, congressional intent to supersede state laws must be clear and manifest."  *English*, 496 U.S. at 79 (cleaned up).  Consequently, preemption under the NLRA should not be "lightly inferred."  *Fort Halifax*, 482 U.S. at 21.

Congress routinely designs federal employment statutes to operate alongside state police powers, establishing a floor of protection for workers rather than occupying the field.  For instance, the Fair Labor Standards Act establishes federal baselines for wages and hours but does not preempt states (including state agencies like California's Division of Labor Standards Enforcement) from enforcing more protective minimum wage or overtime laws.  *See Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1419 (9th Cir. 1990) (holding that exemption of certain seamen from overtime coverage did not preempt California's overtime law).  Similarly, Title VII of the Civil Rights Act "was designed to supplement rather than supplant[] existing laws and institutions relating to employment discrimination."  *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48–49 (1974).  And the Railway Labor Act does not preempt state-law whistleblower claims where the

1    state law creates rights and obligations independent of a collective bargaining agreement.  *See*

2    *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 260–62 (1994).

3    In keeping with that longstanding congressional tradition, it "never has been argued

4    successfully that minimal labor standards imposed by other federal laws were not to apply to

5    unionized employers and employees."  *Metro. Life*, 471 U.S. at 755.  Federal labor law is generally

6    viewed as "interstitial, supplementing state law where compatible, and supplanting it only when it

7    prevents the accomplishment of the purposes of the federal Act."  *Id.* at 756.  Long before the

8    Wagner Act adopted the NLRA, the Supreme Court recognized the States' authority to enact laws

9    "dealing with the relation of employer and employed." *Chicago, B. & Q.R. Co. v. McGuire*, 219

10   U.S. 549, 570 (1911).  Because the establishment of labor standards falls squarely within this

11   traditional police power, the burden rests heavily on a party claiming preemption to demonstrate

12   that Congress intended to strip the States of their ability to act.  *Fort Halifax*, 482 U.S. at 21.

13       **B.  In the years immediately following the NLRA's adoption, state boards and the NLRB exercised concurrent authority.**

14   In its earliest decisions under the NLRA, the Supreme Court acknowledged that state labor

15   agencies may exercise jurisdiction in areas where the NLRB had not acted.  For example, in

16   *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 223 (1938), the Court acknowledged that state

17   labor laws may validly be applied when the NLRB has not exercised jurisdiction over the same

18   controversy.  In that case, New York had enacted a comprehensive labor law shortly after Congress

19   enacted the NLRA.  The NLRB had ruled that Consolidated Edison violated the right of its

20   employees to choose the union to represent them by entering into collective bargaining agreements

21   with a different union.  The U.S. Supreme Court rejected Consolidated Edison's argument that the

22   NLRA could not constitutionally be enforced because the state law applied, reasoning that the New

23   York Labor Board had not acted and the dispute had arisen before New York enacted its labor law.

24   But in doing so, the Court acknowledged that a different case would be presented if the state agency

25   had already begun enforcement, the NLRB had not, and the basis for federal action did not exist.

26   *Id.* at 223–24.

27   In 1942, the Supreme Court held that state labor relations boards can adjudicate claims

28

under state labor laws so long as they do so in a manner that is consistent with federal law.  In *Allen-Bradley v. Wisconsin Employment Relations Board*, 315 U.S. 740 (1942), a state labor board found that striking employees had engaged in mass picketing, obstructed ingress and egress to the employer's factory, and intimidated employees trying to cross the picket line, all of which violated the Wisconsin Employment Peace Act.  *Id.* at 743.  Although the employer was engaged in interstate commerce on a scale as to make it subject to the NLRA, the NLRB had not asserted jurisdiction in the case.  *Id.* at 745.  The Supreme Court rejected the contention that "the state Act viewed as a whole so undermines rights protected and granted by the federal Act and is so hostile to the policy of the federal Act that it should not be allowed to survive."  *Id.* at 746.  Instead, the Court agreed with the United States' view that "the federal Act was not designed to preclude a State from enacting legislation limited to the prohibition or regulation of this type of employee or union activity" and observed that the legislative history of the NLRA showed that Congress intended to leave states with authority to regulate what federal law did not.  *Id.* at 748.  The Court explained that the "control which Congress has asserted over the subject matter of labor disputes" was sufficiently limited that it did not prevent states from "supplementing federal regulation" in a manner consistent with the federal law's goals.  *Id.* at 750.  The highest courts of the states that had enacted labor laws (Wisconsin, New York, and Massachusetts) similarly recognized their shared federal-state role of protecting union rights.  In *IBEW Local 953 v. Wisconsin Employment Relations Board*, 245 Wis. 532 (1944), a union had filed a charge with the Wisconsin Employment Relations Board seeking reinstatement of four employees on the basis that their firing was an unfair labor practice under the Wisconsin Employment Peace Act.  *Id.* at 534.  The NLRB dismissed the employer's petition asking the NLRB to take jurisdiction, stating that it raised no question concerning the representation of the company's employees.  *Id.* at 536–37.  The employer then insisted, on appeal from the state labor board's ruling, that because the process for certifying a union differed under state and federal labor laws, the NLRB's statement about the absence of a question concerning representation must mean that the union was not properly certified and therefore there was no unfair labor practice in firing the employees.  *Id.* at 537–39.  The Wisconsin Supreme Court rejected the contention, reasoning that, "[i]f in a particular case the National Labor

Brief Amici Curiae of Labor Law Professors in Opp. to Prelim. Inj., # 2:25–CV–02979–TLN–CKD

5

Relations Board takes jurisdiction, of course its determination is superior in legal effect to that of the determination of the state board, if there is a conflict.  In this case the National Board having declined to take jurisdiction, there is no conflict in policy or method." *Id.* at 541.

Similarly, in *Davega City Radio v. State Labor Relations Board*, 281 N.Y. 13 (1939), the New York Court of Appeals held that the New York Labor Relations Board ("NYLRB") could enforce a state labor law prohibiting company unions even though the employer, a substantial retail seller of electric appliances, was within the jurisdiction of the NLRB.  *Id.* at 20.  The Court observed that the New York law and the NLRA were "identical in aims and requirements" and that the Regional Director of the NLRB had notified the NYLRB that the Region would not assert jurisdiction over the case.  *Id.* at 20, 24.  The Court rejected the employer's argument that the NLRA preempted the state law, branding it an effort "to create a twilight zone, in which it may disobey its plain duty, required by both statutes, upon the pretext that its conduct is dictated by the other statute." *Id.* at 24.  Rather, the Court concluded, "[t]o permit State enforcement of a State law consistent with a Federal law on the same subject until such time as the appropriate Federal agency asserts its own jurisdiction in no way lessens the supremacy of the national laws as required by article VI of the Constitution." *Id.* at 24–25.

In Massachusetts, which had adopted its own labor law enforced by a labor relations commission in 1938, a similar dispute arose in *R.H. White v. Murphy*, 310 Mass. 510 (1942).  The state labor commission conducted a three-day evidentiary hearing and, finding that a union represented a majority of the employees in an appropriate bargaining unit, rendered an opinion certifying that union as their representative.  The Supreme Judicial Court of Massachusetts upheld the commission's order, agreeing that a contract with a rival union was invalid because it ignored the labor commission's certification.  *Id.* at 522.  The court rejected the contention that the state commission's ruling was invalid as preempted by the NLRA, explaining:  "There is no conflict between the public policy of this Commonwealth as defined in our labor relations acts and that defined by the United States as determined by Congress in the National labor relations act. In each the public policy defined is the same." *Id.*

Brief Amici Curiae of Labor Law Professors in Opp. to Prelim. Inj., # 2:25−CV−02979−TLN−CKD

6

### C.  The Supreme Court subsequently developed the *Garmon* preemption doctrine to protect the primary jurisdiction of an independent NLRB.

While the dominant understanding in the 1930s and 1940s was that states could exercise some authority over labor relations concurrently with the NLRB, in *Bethlehem Steel*, 330 U.S. at 775, the Supreme Court cautioned that state labor relations agencies' exercise of jurisdiction over employers subject to the NLRA must be circumscribed to instances where federal power "lies dormant and unexercised."  The Court subsequently expanded that caution into the *Garmon* preemption doctrine, which presumes the existence of a functioning and independent NLRB.

Initially, in *Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776*, 346 U.S. 485, 501 (1953), the Court held that when an employer seeking to enjoin union picketing "could have presented [a] grievance to the [NLRB]," the employer could not instead elect to forego that process and instead litigate in state court.  In *Guss v. Utah Labor Relations Board,* 353 U.S. 1 (1957), the Court then held that state labor boards could not assert jurisdiction over labor disputes covered by the NLRA, even when the NLRB declined to exercise jurisdiction.[1]  Two years later, in *Garmon*, 359 U.S. at 245, the Court expanded that doctrine to hold that "state jurisdiction must yield to the exclusive primary competence of the Board" as to any activity even arguably covered by the NLRA.

Under *Garmon* doctrine, courts take a "penumbral" approach that is rooted in a series of "Delphic" inquiries in order to ascertain whether Congress intended to confer primary jurisdiction on the NLRB to decide certain issues.  359 U.S. at 241.  The Supreme Court's inference in *Garmon* that that Congress intended to wholly displace state authority over activities even arguably protected or prohibited by the NLRA was not based on a substantive conflict between state and federal law nor any explicit text in the NLRA.  Instead, it rested on the structural premise that the NLRB was a specific type of agency well-suited to resolving labor disputes at a national level and entitled to sweeping protection of its primary jurisdiction.

---

[1]  Congress subsequently amended the NLRA by adopting Section 14(c), 29 U.S.C. §164(c), which provides that the NLRA does not preclude state agencies from assuming jurisdiction over labor disputes when the NLRB declines to assert jurisdiction.  Congress was concerned that the NLRB's decision to decline jurisdiction might create a "no-man's land."  *Guss,* 353 U.S. at 10–11.

Brief Amici Curiae of Labor Law Professors in Opp. to Prelim. Inj., # 2:25−CV−02979−TLN−CKD

7

1    The Supreme Court has long recognized that structural independence was a critical predicate

2  for Congress to authorize agencies to exercise the type of "quasi-legislative" and "quasi-judicial"

3  functions entrusted to the Board.  *See Humphrey's Executor v. United States*, 295 U.S. 602, 629

4  (1935).  In *Wiener v. United States*, the Court emphasized that for a tribunal charged with

5  adjudicating claims, "absolute freedom from Executive interference" is essential.  357 U.S. 349,

6  353 (1958).  The Court reasoned that Congress did not wish to have the "Damocles' sword of

7  removal by the President" hanging over such a commission "for no reason other than that he

8  preferred to have on that Commission men of his own choosing."  *Id.* at 356.

9    That focus on independence directly informed the development of NLRA preemption

10  doctrine.  In *Garner*, the Court reasoned that Congress "confide[d] primary interpretation and

11  application of [the NLRA] to a specific and specially constituted tribunal," thus creating a

12  "centralized administration of specially designed procedures" governing labor relations nationwide.

13  346 U.S. at 490.   This specific and special nature of the NLRB was key to the Court's subsequent

14  decision that state labor law "must defer to the exclusive competence of the National Labor

15  Relations Board."  *Garmon*, 359 U.S. at 245; *see also id.* at 242 (quoting *Garner*'s reference to

16  "specific and specially constituted tribunal").  And in *Sears, Roebuck & Co. v. San Diego County*

17  *District Council of Carpenters*, 436 U.S. 180, 191 (1978), the Court explicitly linked the exclusivity

18  of federal jurisdiction to the specific character of the NLRB, noting that the NLRA created a

19  regulatory scheme "to be administered by an *independent* agency which would develop experience

20  and expertise in the labor relations area." (Emphasis added).

21    The Supreme Court's inference that Congress intended to displace state power was thus

22  based not merely on the existence of a federal agency, but on the creation of a "specially constituted

23  tribunal" insulated from political pressure and capable of neutral adjudication.  *Garner*, 346 U.S. at

24  490.  *Garmon* preemption exists solely to protect the jurisdiction of the specific, independent, and

25  expert agency Congress envisioned; it is not a freestanding barrier to state police power independent

26  of that agency's functioning.  Without that structural independence, the justification for *Garmon*'s

27  broad preemption rule—deference to independent, expert, apolitical administration—collapses.

28

**II.      The NLRB can no longer operate as Congress intended.**

The NLRA's history shows that the creation of an *independent* NLRB was central to Congress' plan for how the NLRA would be enforced.  In light of recent caselaw, the NLRB is no longer an independent agency and, therefore, no longer functions consistently with the premise underlying the *Garmon* doctrine.

**A.  The independence of the NLRB was central to Congress' plan for how the NLRA would be enforced.**

The structure of the NLRB was in part a reaction to the country's then-recent experience with the National Labor Board ("NLB") and the "old National Labor Relations Board" ("old NLRB").[2] James A. Gross, *The Making of the National Labor Relations Board: A Study in Economics, Politics, and the Law 1933-1937, Volume I*, p. 2 (1974) ("Gross").  These bodies, in Congress's view, had been ineffective because they lacked the legal and practical independence required to interpret and enforce labor rights.  Enforcement fell to other government departments, which were subject to direct political interference and tended to prioritize positive relations with employers.

The NLB was created under the National Industrial Recovery Act ("NIRA")—a statute that called on industries to develop codes of fair competition.  NIRA Section 7(a) required each code of fair competition to guarantee employees' labor rights, including the "right to organize and bargain collectively through representatives of their own choosing," without "interference, restraint, or coercion of employers."  Gross at 14.  The NLB's functions included both mediating individual labor disputes and articulating the meaning of Section 7(a).  But successful mediation depended on employers' acceptance of the NLB—which could be undermined by pro-union legal interpretations. *See* Gross at 31–33.  "The NLB, therefore, chose to decide policy questions only as a last resort and then only on a case-by-case basis in dealing with actual controversies."  *Id*. at 33.  Worsening this policy vacuum, the NLB also lacked the authority to enforce its own orders.  Instead, it was reliant on the National Recovery Administration and the Department of Justice, which were politically controlled bodies.  *Id*. at 35.  Workers and unions lost confidence in the NLB, and a wave of violent

---

[2] The NLB began in August 1933; it was replaced by the old NLRB in June 1934, which was in turn supplanted by the (new) NLRB established by the Wagner Act in July 1935.

strikes followed.  *Id*. at 62.

In 1934, Congress considered a major overhaul of labor-relations law but ultimately adopted what is known as Public Resolution Number 44.  This law authorized President Roosevelt to replace the NLB with what ultimately became the old NLRB.  The old NLRB ostensibly had more independence and authority than the NLB.  But the Secretary of Labor tried to exert control over the old NLRB's budget, Gross at 105–07, and various administration officials—and ultimately President Roosevelt himself—sought to influence the old NLRB's treatment of newspaper publishers, *id.* at 112–22.  The old NLRB also was still dependent on the politically controlled DOJ to bring noncompliance cases, which DOJ largely failed to do.  *Id*. at 125–26.

Against this backdrop, Congress began debating the Wagner Act.  The House and Senate generally agreed on the goals of the legislation but initially differed about how to achieve them.  The House version of the bill initially placed the NLRB in the Department of Labor, though as an independent body, whereas the Senate's language created "an independent agency in the executive branch of the Government."  H.R. Rep. No. 74-1371, at 4 (1935) (Conf. Rep.), *reprinted in* NLRB, 2 Legislative History of the National Labor Relations Act, 1935, at 3255 (1985).  The House ultimately acceded to the Senate's view—though with the removal of the reference to the executive branch, because "[t]he Board as contemplated in the bill is in no sense to be an agency of the executive branch of the Government."  *Id*.  Instead, the NLRB was to "have a status similar to that of the Federal Trade Commission," and both houses agreed to the addition of specific grounds for the removal of Board members, "in light of the decision of the Supreme Court in [*Humphrey's Executor*]," which upheld removal protections for FTC members.  *Id*.

Congress made the removal protections for NLRB members explicit because Congress was concerned that "[i]f Congress in creating the Board vests the appointment power in the President it might be implied that it is intended to vest also in the President a general power of removal."  *Id.*  Indeed, the NLRA was adopted "just over a month after *Humphrey's Executor* was decided and modeled the statute on the FTC's organic statute."  *Harris v. Bessent*, 2025 WL 980278, at *31 (D.C. Cir. Mar. 28, 2025) (Millett, J., opinion dissenting from grant of a stay); *see also* H.R. Rep. No. 74-1371, pt. 1, at 4 (1935) (stating that NLRB "is to have a status similar to that of the [FTC]"

and describing express removal protections for Board members as "desirable in the light of"

*Humphrey's Executor*), reprinted in NLRB, 2 Legislative History of the National Labor Relations

Act, 1935, at 3255 (1985)

Thus, the NLRA provides that members of the Board may be removed by the President only

"upon notice and hearing, for neglect of duty or malfeasance in office, but for no other cause."  29

U.S.C. §153(a).  By strictly limiting the President's removal power, Congress intended to protect

Board members "from being subject to immediate political reactions at elections," ensuring they

could function as an impartial, quasi-judicial body rather than an arm of the Executive Branch.

NLRB, 1 Legislative History of the National Labor Relations Act, at 1467 (1949).

Congress further insulated the Board's adjudicatory functions by extending removal

protections to its Administrative Law Judges ("ALJs"), who hear unfair labor practice cases in the

first instance.   NLRB ALJs are not subject to at-will removal; rather, they may be removed only for

"good cause" as determined by the Merit Systems Protection Board ("MSPB")—a separate,

independent agency.  *See Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 776–78 (5th Cir. 2025)

(discussing the "multilevel protection from removal" enjoyed by NLRB ALJs).  The MSPB itself

was designed to be an independent adjudicator of federal employment disputes, with its own

members protected from removal except for "inefficiency, neglect of duty, or malfeasance in

office."  *Nat'l Ass'n of Immigr. Judges v. Owen*, 139 F.4th 293, 306 (4th Cir. 2025).  This double

layer of protection confirms Congress's intent to establish a suite of impartial decisionmakers free

from political pressure at every level of the decision-making process.

**B.   The NLRB no longer operates as an independent agency.**

In January 2025, President Trump fired NLRB Member Gwynne Wilcox without cause,

depriving the NLRB of a quorum.  In doing so, the President stated his position that "[t]he aims and

purposes of the Administration with respect to the work of the Board can be carried out most

effectively with personnel of my own selection" and cited his substantive disagreement with

Member Wilcox's decisions, stating that they "improperly cabined" employers' speech rights and

1    exceeded the NLRA's bounds regarding the test for joint employment.[3]  The executive branch has

2    defended that termination while acknowledging it violates the NLRA, taking the position that the

3    statutory removal protections for NLRB members are unconstitutional.  *See Wilcox v. Trump*, 775

4    F.Supp.3d 215 (D.D.C. 2025).  Similarly, in February 2025, President Trump fired MSPB Member

5    Cathy Harris without cause.  The executive branch's position is that the statutory removal

6    protections for MSPB members are unconstitutional.  *See Harris v. Bessent*, 775 F.Supp.3d 164

7    (D.D.C. 2025).  As previously explained, the independence of the MSPB protects the independence

8    of the NLRB's ALJs.

9        In May 2025, the Supreme Court granted the government's emergency motions to stay

10   district court injunctions that reinstated Wilcox and Harris, signaling that the Supreme Court is

11   likely to hold that the statutory removal protections are unconstitutional—overruling almost a

12   century of precedent on which Congress relied in enacting the NLRA and its enforcement structure.

13   *See Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) ("The stay reflects our judgment that the

14   Government is likely to show that both the NLRB and MSPB exercise considerable executive

15   power."); *see also Trump v. Slaughter*, No. 25-332, 2025 WL 2692050 (U.S. Sept. 22, 2025) (in

16   constitutional challenge to FTC's statutory removal restrictions, granting certiorari before judgment

17   and setting oral argument for December 8, 2025).  In August 2025, the Fifth Circuit held that that

18   the NLRA's provisions limiting removal of *both* NLRB members *and* ALJs are likely

19   unconstitutional, and that this supports broadly enjoining all enforcement of federal labor law in the

20   circuit.  *Space Exploration Technologies Corp. v. NLRB*, 151 F.4th 761, 775-80 (2025); *see also id.*

21   at 767 (predicting that Supreme Court will soon hold that NLRB's "structure violates the separation

22   of powers").  Finally, on December 5, 2025, the D.C. Circuit held the NLRA provisions that protect

23   the NLRB's independence unconstitutional.  *Harris v. Bessent,* ___ F.4th___,  2025 WL 3496737

24   (D.C. Cir. Dec 5, 2025).

25        Further undermining the NLRB's independence, President Trump has pronounced that all

26

27        [3] *See, e.g.*, https://www.nlrbedge.com/p/read-the-trump-email-firing-member. In the same letter,
     President Trump fired NLRB General Counsel Jennifer Abruzzo, but incorrectly referenced Abruzzo
28   and Wilcox as being "two Board Members."

1    agencies must follow his interpretation of the law.  Executive Order 14215 provides that the

2    President and the Attorney General "shall provide authoritative interpretations of law for the

3    executive branch," and that their "opinions on questions of law are controlling on all employees"—

4    including on "so-called independent agencies."  Exec. Order 14215 (Feb. 18, 2025) §§1, 7; *see also*

5    *id.* ("No employee of the executive branch ... may advance an interpretation of the law ... that

6    contravenes the President or the Attorney General's opinion on a matter of law"); *id.* §§1, 2(b), 5.

7          The upshot of these developments is that the NLRB is no longer operating as an

8    independent agency.  The "loss of the office's independence" changes "the NLRB's character and

9    perception as neutral and expert-driven" agency "entrusted with making impartial decisions about

10   sensitive labor disputes."  *Wilcox v. Trump*, 775 F.Supp.3d at 236.  "With 'the Damocles' sword of

11   removal by the President' hanging over the NLRB," the agency will be "tacking to ever-changing

12   political winds" rather than "impartially administering the law."  *Harris*, 2025 WL 980278, at *41

13   (Millet, J., opinion dissenting from grant of a stay) (citation omitted).  Additionally, the loss of

14   removal protections means the President can deprive the NLRB of a quorum at any time, and

15   thereby "render inoperable, potentially for years on end, [the] board[] that Congress established,"

16   such that "workers will be trapped with no other place to take their disputes for resolution."  *Id.* at

17   *47.  In other words, the "specially constituted" nature of the NLRB has largely been nullified.

### III.    Congress did not intend the mere existence of the NLRB, as it currently operates, to result in blanket preemption of non-conflicting state labor law.

18

19

20         When viewed against the backdrop presumption against preemption, particularly in areas of

21   state police power, *Garmon* preemption is an exception.  The Supreme Court adopted this broad

22   preemption doctrine in the absence of any express NLRA preemption provision based on its

23   understanding that Congress intended to achieve nationally uniform labor relations administration

24   through the mechanism of a "specific and specially constituted tribunal."  *Garmon*, 359 U.S. at 242.

25         Regardless of how one answers the question whether Congress intended to implicitly enact

26   this broad preemption doctrine when it enacted the NLRA, Congress certainly cannot be said to

27   have evidenced an intent, express or implicit, for a *non-independent* NLRB to be afforded sweeping

28   preemptive powers, because Congress did not envision a non-independent NLRB at all.  *See* 29

U.S.C. §153(a) (limiting removal to "neglect of duty or malfeasance"). The *Garmon* preemption rationale was based on the idea of a protected, functioning, expert tribunal that would standardize and stabilize labor law nationwide. If that tribunal does not exist, the solution is inapplicable. *Cf. United Const. Workers v. Laburnum Const. Corp.*, 347 U.S. 656, 669 (1954) (refusing to preempt state law under the LMRA "where the federal preventive administrative procedures are impotent or inadequate"). In these circumstances, the default presumption should be the same as it is in every other area of law: that state law is not preempted unless it directly conflicts with or stands as an obstacle to federal law. After all, a court's "sole task" when determining whether a federal statute preempts state legislation is to ascertain Congress' intent, *Cal. Fed. Sav. & Loan Ass'n. v. Guerra*, 479 U.S. 272, 280 (1987), and it can be said with absolute confidence that Congress never intended that an agency rendered subservient to political whims by invalidation of its removal protections should nonetheless occupy the field of labor relations enforcement.

The Fourth Circuit recently crystallized this logic, holding that the exclusivity of federal jurisdiction under the Civil Service Reform Act (an implied doctrine, like *Garmon* preemption) depended on whether the Merit Systems Protection Board was fulfilling its statutory role. *Owen*, 139 F.4th at 305–07. The court identified two conditions that would defeat exclusive jurisdiction: (1) when the agency "fail[s] to perform [its] duties such that covered employees' claims are not adequately processed," and (2) when the agency loses its independence from the Executive. *Id.* at 305–06. The same reasoning applies with full force to *Garmon*: if the NLRB is no longer functioning or independent, the predicate for deferring to its exclusive jurisdiction collapses. And under the current state of the law, and the triggers in the state statute at issue here, both conditional factors are met.

Nor would it be impractical to allow the States to exercise concurrent enforcement authority. As previously discussed, an example of how the NLRB and state labor boards can have overlapping authority comes from the history of the NLRA itself. In the first decade under the NLRA, unless or until the NLRB had asserted jurisdiction, or had concluded that the NLRA contemplates that a matter remain unregulated, a state labor board could adjudicate a case under state law so long as its resolution was consistent with the substantive protections of federal law.

Take, for example, the quintessential example of employer interference with protected activity under the NLRA:  an employer's termination of or other retaliation against an employee for engaging in concerted activity for mutual aid or protection.  In a context when the NLRB has been disabled from enforcing the NLRA's protections (or is unwilling to do so because the President would disfavor it), a state's exercise of authority to enforce the NLRA's prohibition against such conduct would in no way interfere with the NLRA's terms or purposes.  To hold otherwise would require the Court to conclude that, despite the absence of any preemptive language in the NLRA, and the irrefutable fact that whatever preemptive force Congress did intend rested on the premise of an independent and functional NLRB, the Congress that enacted a law in order to grant employees "full freedom of association [and] self- organization," 29 U.S.C. §151, nonetheless intended to leave such employees without any recourse under either federal or state law.[4]

There is no basis for courts to adopt that presumption.  Indeed, it would be contrary to rules of construction, general preemption doctrine, and the stated purposes of the NLRA.  Accordingly, this Court should reject this facial challenge to a state law designed to protect workers in light of the current status of the NLRB as a nonfunctional and non-independent body.

## CONCLUSION

The motion for a preliminary injunction should be denied.

DATED:  December 12, 2025                 Respectfully submitted,

                                          Scott A. Kronland
                                          Stacey M. Leyton
                                          Emanuel Waddell
                                          ALTSHULER BERZON LLP

                              By: */s/ Stacey M. Leyton*
                                          Stacey M. Leyton

                                          *Attorneys for Amici Curiae Labor Law Professors*

---

[4] It bears emphasis that the NLRB has brought a facial challenge and is seeking a blanket injunction against the state law.  The NLRB's motion does not require the Court to consider whether the NLRA preempts the State from imposing remedies for violations of the NLRA that go beyond those provided by Congress.

---

# APPENDIX A

## List of Amici Curiae[5]

Mark Barenberg
Isidor and Seville Sulzbacher Professor of
Law and Director of Program on Labor
Law and Political Economy
Columbia Law School

Sharon Block
Professor of Practice and Executive
Director of the Center for Labor and a Just
Economy
Harvard Law School

Angela B. Cornell
Clinical Professor of Law and Director of
Labor Law Clinic
Cornell Law School

Kenneth Dau-Schmidt
Carr Professor of Law
Indiana University--Bloomington

Andrew Elmore
Professor of Law & Barreca Labor
Relations Scholar
Boston University School of Law

Cynthia Estlund
Crystal Eastman Professor of Law
New York University School of Law

Richard Michael Fischl
Constance Baker Motley Professor of Law
University of Connecticut School of Law

Catherine Fisk
Barbara Nachtrieb Armstrong
Distinguished Professor of Law
UC Berkeley Law School

Ruben J. Garcia
Ralph Denton Professor of Law and
Director of Workplace Law Program
UNLV Boyd School of Law

Charlotte Garden
Gray, Plant, Mooty, Mooty & Bennett
Professor of Law
University of Minnesota Law School

Kate Griffith
Jean McKelvey-Alice Grant Professor and
Senior Associate Dean for Academic
Affairs, Diversity, and Faculty
Development
Cornell University School of Industrial &
Labor Relations

Jonathan F. Harris
Associate Professor of Law
Temple University Beasley School of Law

---

[5] Amici submit this brief in their individual capacities. Institutional affiliations are listed for
identification purposes only.

Karl E. Klare
George J. and Kathleen Waters Matthews
Distinguished University Professor and
Professor of Law
Northeastern University School of Law

Desirée LeClercq
Assistant Professor of Law & Faculty Co-
Director of the Dean Rusk International
Law Center
University of Georgia School of Law

Ariana L. Levinson
Frost Brown Todd Professor of Law
University of Louisville

Michael Oswalt
Associate Dean for Academic Affairs and
Professor of Law
Wayne State University

James Pope
Distinguished Professor of Law & Sidney
Reitnan Scholar Emeritus
Rutgers Law School

Ryan McGovern Quinn
Assistant Teaching Professor
Northeastern University School of Law

Gali Racabi
Assistant Professor of Labor &
Employment Law
Cornell University School of Industrial &
Labor Relations

Courtlyn Roser-Jones
Assistant Professor of Law
Moritz College of Law at Ohio State
University

Benjamin I. Sachs
Kestnbaum Professor of Labor & Industry
and Faculty Director of the Center for
Labor and a Just Economy
Harvard Law School

Alvin Velazquez
Associate Professor of Law
Indiana University Maurer School of Law

Marley Weiss
Professor of Law
University of Maryland Carey School of
Law

Noah D. Zatz
Professor of Law and Labor Studies
UCLA School of Law