# EXHIBIT A

Catha Worthman, SBN 230399
Darin Ranahan, SBN 273532
FEINBERG, JACKSON, WORTHMAN
& WASOW LLP
2030 Addison Street, Suite 500
Berkeley, California 94704
Telephone: (510) 269-7998
Facsimile: (510) 269-7994
catha@feinbergjackson.com
darin@feinbergjackson.com

*Attorneys for Amicus California Labor Federation*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NATIONAL LABOR RELATIONS BOARD, | Case No. 2:25-cv-02979-TLN-CKD |
| Plaintiff, | **AMICUS BRIEF OF CALIFORNIA LABOR FEDERATION** |
| v. | Judge:      Troy L. Nunley |
| STATE OF CALIFORNIA and the PUBLIC EMPLOYMENT RELATIONS BOARD, | Date:       December 17, 2025<br>Time:       2:00 p.m.<br>Dept.:       Courtroom 2 |
| Defendants, | Complaint Filed:    October 15, 2025 |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, | Trial Date:          Not set |
| Intervenor-Defendant | |

# TABLE OF CONTENTS

I.    Introduction .......................................................................................................... 1

II.   Interests of Amicus ........................................................................................... 1

     A.    California Labor Federation .................................................................... 1

     B.    Interests of Affiliate Labor Organizations ............................................ 2

         1.    UFCW Local 5 (REI Union) ............................................................ 2

         2.    UAW ................................................................................................ 3

         3.    UNITE-HERE Local 11 ................................................................... 4

         4.    SEIU-UHW ..................................................................................... 5

         5.    SEIU Local 721 (Loyola Marymount) ............................................ 7

III.   Background ........................................................................................................ 8

     A.    Labor Rights Under Federal and State Law ......................................... 8

         1.    The Federal Scheme for Enforcement of Labor Rights .................. 9

         2.    California's Longstanding Supplementation of Federal Labor Protections ........... 10

     B.    The Collapse of Protections for Labor Rights at the Federal Level ..................... 12

     C.    AB 288 Was Narrowly Targeted to These Acute Failures of the NLRB ........... 13

IV.   Argument ......................................................................................................... 14

     A.    Delay and Inaction at the Regional Level ......................................... 15

     B.    Delay and Inaction at the National Level .......................................... 17

     C.    Special Circumstances Rendering the NLRB Unable to Function ..................... 18

         1.    Loss of Quorum ............................................................................ 18

         2.    Change to Removal Protections and Court Injunctions ................. 19

V.    Conclusion ...................................................................................................... 19

# TABLE OF AUTHORITIES

**CASES**

*Boire v. Greyhound Corp.*
  376 U.S. 473 (1964) ................................................................................10

*Chamber of Commerce v. City of Seattle*
  890 F.3d 769 (9th Cir. 2018) ....................................................................13

*Food Market Merchandising, Inc. v. Cal. Milk Processor Bd.*
  No. 1:17-cv-00564, 2018 WL 2540323 (E.D. Cal. May 31, 2018) ..........13

*Harris v. Bessent*
  No. 25-5037, 2025 WL 3496737 (D.C. Cir. Dec. 5, 2025) ....................9, 19

*In re NLRB*
  304 U.S. 486 (1938) ................................................................................10

*New Process Steel, L.P. v. NLRB*
  560 U.S. 674 (2010) ................................................................................18

*Novosteel SA v. United States*
  284 F.3d 1261 (Fed. Cir. 2002) ...............................................................13

*Space Exploration Technologies Corp. v. NLRB*
  151 F.4th 761 (5th Cir. 2025) ..................................................................13

*Thomas v. Collins*
  323 U.S. 516 (1945) ..................................................................................8

*Wilcox v. Trump*
  775 F. Supp. 3d 215 (D.D.C. 2025) ..........................................................19

**CONSTITUTIONAL PROVISIONS**

Cal. Const. art. I, §§ 2–3 .............................................................................9

U.S. Const. amend. I ....................................................................................8

**FEDERAL STATUTES**

National Labor Relations Act of 1935
  29 U.S.C. §§ 151–169 ...............................................................................9

29 U.S.C. § 152(3) ......................................................................................11

29 U.S.C. § 153 ......................................................................................9, 10

29 U.S.C. § 159 ..........................................................................................10

**STATE STATUTES**

Meyers-Milias-Brown Act
  Cal. Gov. Code §§ 3500–3511 .................................................................................... 11

State Employer-Employee Relations Act
  Cal. Gov. Code §§ 3512–3524 .................................................................................... 11

Educational Employment Relations Act
  Cal. Gov. Code §§ 3540–3549.3 ................................................................................. 11

Cal. Lab. Code § 98.6(a) ................................................................................................. 11

Cal. Lab. Code § 923 ...................................................................................................... 10

Cal. Lab. Code § 923.1 ........................................................................... 13, 14, 15, 17, 18

Cal. Lab. Code § 1101 .................................................................................................... 11

Cal. Lab. Code § 1102 .................................................................................................... 11

Cal. Lab. Code § 1140.4(b) ............................................................................................ 10

Cal. Lab. Code § 1476(a) ............................................................................................... 11

Cal. Lab. Code § 2750.3 ................................................................................................... 2

Cal. Lab. Code § 6310 .................................................................................................... 11

Cal. Lab. Code § 6399.7 ................................................................................................. 11

Cal. Lab. Code § 232(c) ................................................................................................. 11

Cal. Lab. Code § 232.5(c) .............................................................................................. 11

Cal. Unemp. Ins. Code § 621 ........................................................................................... 2

**REGULATIONS**

29 C.F.R. § 102.48(a) ..................................................................................................... 10

29 C.F.R. § 102.67 ......................................................................................................... 10

**LEGISLATIVE MATERIALS**

Assem. Bill No. 5 (2019–2020 Reg. Sess.) ...................................................................... 2

Assem. Bill No. 288 (2025–2026 Reg. Sess.) ........................................................... passim

Assem. Bill No. 1840 (2025-2026 Reg. Sess.) .............................................................. 11

**OTHER AUTHORITIES**

Kate Andrias, The New Labor Law, 126 Yale L.J. 2 (2016) ................................................. 11

Margaret Poydock et al., Econ. Pol'y Inst., 16 Million Workers Were Unionized in 2024 (Jan. 28, 2025) ....................................................................................................................... 13

Savannah Hunter et al., UC Berkeley Labor Ctr., State of the Unions: California Labor in 2024 (Aug. 25, 2025) ................................................................................................................. 13

Lynn Rhinehart & Celine McNicholas, Econ. Pol'y Inst., Shortchanged—Weak Anti-Retaliation Provisions in the National Labor Relations Act Cost Workers Billions in Back Pay and Damages (Apr. 22, 2021) ............................................................................................................... 11

Nat'l Labor Relations Bd., Performance & Accountability Report (FY 2004) .................................... 16

Nat'l Labor Relations Bd., Performance & Accountability Report (FY 2024) ...................... 15, 16, 17

Nat'l Labor Relations Bd., Office of Gen. Counsel, Mem. GC 23-06 (Apr. 12, 2023) ....................... 16

Nat'l Labor Relations Bd., Office of Gen. Counsel, Mem. GC 24-03 (Mar. 4, 2024) ......................... 16

AMICUS BRIEF OF CALIFORNIA LABOR FEDERATION

# I.    INTRODUCTION

Amicus the California Labor Federation AFL-CIO ("the Federation") is the umbrella organization for California labor organizations committed to advocating for the rights of working people to self-organization, union representation, and collective bargaining. The Federation writes to bring to the Court's attention the impact that the dismantling of the National Labor Relations Board ("NLRB" or "the Board") has had on itself and its members, and the circumstances that led to the passage of Assembly Bill No. 288 (2025-2026 Reg. Sess.) ("AB 288"). AB 288 fills the void left by the NLRB's increasing dysfunction, allowing workers and their unions to seek protections for their rights from the state labor relations agency, the Public Employee Relations Board ("PERB"), *after* first filing with the NLRB and *only* when the NLRB fails to or is unable to act. Far from a wholesale attack on the structure of federal labor relations, as the NLRB argues in its brief, AB 288 is narrowly and carefully designed to uphold federal and state labor relations law and policy, consistent with similar state laws that operate in conjunction with federal law, not in conflict with it. Without repeating the arguments by the State of California or Intervenor the International Brotherhood of Teamsters, Amicus writes to provide more context for the California Legislature's adoption of AB 288 and to urge the Court to uphold AB 288 in order to ensure that workers may meaningfully and effectively associate, organize, and bargain collectively, notwithstanding the delays and incapacity of the NLRB.

# II.    INTERESTS OF AMICUS

## A.    California Labor Federation

The Federation is a labor federation that consists of more than 1,300 unions that represent 2.5 million union members in the manufacturing, retail, transportation, construction, hospitality, public sector, health care, entertainment and other industries. The Federation is dedicated to promoting and defending the interests of working people and their families for the betterment of California's communities. From legislative campaigns to grassroots organizing, its affiliates are actively engaged in every aspect of California's economy and government. The Federation's three main areas of work include legislative action, political action and support for organizing. The Federation's achievements have included restoring daily overtime pay, raising the minimum wage, passing the nation's first paid

family leave law and passing Assembly Bill No. 5 (2019-2020 Reg. Sess.), primarily codified at Labor Code section 2750.3 and Unemployment Insurance Code section 621.

**B.      Interests of Affiliate Labor Organizations**

The Federation's members and the workers they represent have faced devastating consequences from the accelerated dismantling of federal labor law protections, some examples of which are described in more detail below.

**1.      UFCW Local 5 (REI Union)**

UFCW Local 5 is the largest private sector union in Northern California, representing workers in diverse industries including grocery and other retail, food harvesting and processing, cannabis, financial services, and healthcare. With nearly 25,000 members in a jurisdiction that spans the map from Eureka to Salinas and beyond, UFCW Local 5 works to demand fair wages, comprehensive benefits, safe working conditions and a healthy work-life balance for all workers in our industries. The REI Union, represented in part by UFCW, is a national coalition of Recreational Equipment, Inc. (REI) workers active in eleven of the company's retail locations. The union is focused on securing a wide range of improvements and benefits, including better staffing levels, fair wages, safe working conditions, job security, and paid sick leave.

Over the past four years, REI workers across the country have carried out a sustained and coordinated campaign to hold the company accountable and secure a first union contract. During this period, eleven REI stores voted to unionize, yet none has reached a collective bargaining agreement. Throughout the campaign, workers alleged widespread violations of federal labor law, including retaliation, intimidation, and failures to bargain in good faith. These allegations resulted in dozens of unfair labor practice filings and multiple formal complaints issued by the National Labor Relations Board. While the union and REI have since reached settlements resolving the cases that were pending before the Board, the remedies obtained were narrow and delayed. Many workers experienced substantial economic hardship—including lost wages, missed opportunities, and prolonged instability—as a direct result of REI's conduct. These harms occurred largely outside the Board's remedial process and were never fully made whole.

Although the National Labor Relations Board has issued at least four complaints against REI, including the failure to bargain in good faith, these enforcement efforts pale in comparison to the scope of the issues raised. For example, REI workers have already filed 34 unfair labor practice charges with the NLRB, totaling 175 alleged violations of labor laws. *See* Deven McCoy, *REI Faces Criticism by the National Labor Relations Board for Unfair Practices*, BikeMag (Mar. 24, 2025), *available at* https://www.bikemag.com/news/rei-union-complaint. The agency's backlog and reduced capacity have made timely resolution of this extensive misconduct impossible. For example, a complaint that a regional office issued in March 2025 was not scheduled to be heard until December 2025, nearly nine months later. *See id.*; Compl., *Recreational Equipment, Inc.*, No. 32-CA-345434 (N.L.R.B. Mar. 19, 2025), *available at* https://apps.nlrb.gov/link/document.aspx/09031d4583f7314f.

The NLRB's chronic backlog, limited capacity, and periods without a full quorum have made timely accountability difficult and, at times, impossible. Employers including REI have been able to delay consequences by appealing adverse administrative law judge rulings, effectively stalling enforcement for years. UFCW Local 5 has repeatedly seen workers democratically choose union representation only to be denied a first contract due to employer intransigence compounded by these structural failures.

### 2.     UAW

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") is one of the largest and most diverse unions in North America, with members in the United States, Canada, and Puerto Rico and in virtually every sector of the economy, including approximately 120,000 workers in higher education—graduate students, postdoctoral scholars, researchers, university staff, and faculty—at institutions across the country.

On December 10, 2024, UAW filed a petition with Region 31 of the NLRB to represent a unit of non-tenure track faculty at the University of the Southern California ("USC"). *In re University of Southern California*, Case No. 31-RC-356388 (NLRB filed Dec. 10, 2024). The NLRB conducted a preelection hearing from January 6 to January 30, 2025, and the parties submitted post-hearing briefs on February 21, 2025. Among other objections, USC took the position that the NLRB's election rules violate the NLRA and that the NLRB's structure is unconstitutional because it limits the removal of

NLRB Administrative Law Judges and Board Members, and permits Board Members to exercise executive, legislative, and judicial power in the same administrative proceeding. Debbie Truong, *Fighting faculty union, USC argues national labor board 'unconstitutional,'* LA Public Press (Apr. 14, 2025), https://lapublicpress.org/2025/04/usc-faculty-union-nlrb-unconstitutional/. The Regional Director has yet to issue a decision on UAW's petition for a representation election.

Although the faculty in the proposed unit demonstrated majority support more than a year ago, the NLRB has yet to determine whether these workers will even be afforded the right to have an election to decide whether to form a union. Further, USC has indicated that if the Regional Director rules in the union's favor, USC intends to pursue its constitutional challenges on an appeal if it decides to appeal. Such an outcome threatens additional substantial delays. Throughout the pendency of the petition, these workers have contended with unprecedented attacks on higher education by the federal government without union protections, and USC has implemented numerous policy changes that impact faculty. President Carol Folt, et al., *Update on USC's Financial Planning and Resilience Efforts*, USC Office of the Provost (Mar. 24, 2025), https://www.provost.usc.edu/update-on-uscs-financial-planning-and-resilience-efforts/. Faculty in the proposed unit are powerless to negotiate over decisions that affect their terms and conditions of employment while their petition for an election remains pending before the NLRB.

### 3.    UNITE-HERE Local 11

UNITE HERE Local 11 represents more than 32,000 workers employed in hotels, restaurants, airports, sports arenas, and convention centers throughout Southern California and Arizona. Local 11 is an affiliate of UNITE HERE, an international labor union representing approximately 270,000 workers across the United States and Canada.

On October 15, 2024, UNITE HERE Local 11 filed a petition with Region 31 of the National Labor Relations Board seeking an election to represent workers at the Jamaica Bay Inn in Marina del Rey, California. *See* NLRB Case No. 31-RC-352713. In response to the organizing campaign, the hotel engaged in conduct that Local 11 has alleged constituted serious violations of the National Labor Relations Act, including unlawful retaliation, promises, and threats—among them an implied threat of immigration-related consequences if workers unionized. Between September 2024 and January 2025,

Local 11 filed nine unfair labor practice charges with the NLRB. *See* NLRB Case Nos. 31-CA-354584, 31-CA-355308, 31-CA-355534, 31-CA-355542, 31-CA-355533, 31-CA-355525, 31-CA-376940, 31-CA-373936, 31-CA-357798, 31-CA-357787, 31-CA-357736. A year later, all nine charges—along with additional charges filed in subsequent months—remain pending investigation. The NLRB has issued no determinations on the merits and sought no remedial relief.

Despite the hotel's conduct, the workers prevailed in the union election held on November 12, 2024. Rather than accept the outcome, the hotel filed objections with the NLRB. After a four-day hearing, the Regional Director for Region 31 overruled the objections on August 8, 2025. The hotel then filed a request for review with the Board. Because the Board lacks a quorum, it is legally incapable of acting on that request, and the case has stalled indefinitely. In the interim, the hotel has expressly refused to bargain. As a direct result of the Board's incapacity, more than a year after winning a valid representation election, the workers have been unable to begin negotiations for a first contract, and there is no realistic prospect that the NLRB will be able to provide effective relief in the foreseeable future.

### 4.    SEIU-UHW

Service Employees International Union, United Healthcare Workers-West ("UHW") represents more than 120,000 front-line healthcare workers across the state of California. It is a diverse union representing workers in acute care hospitals, behavioral health centers, community clinics, and dialysis centers. UHW represents a wide range of classifications including professionals (including but not limited to laboratory scientists, registered nurses, pharmacists, physical therapists, Licensed Social Workers), technical employees (such as Licensed Vocational Nurses, Radiology Technicians, Surgical Technicians, Telemetry Technicians, Respiratory Therapists, Laboratory Technician, Pharmacy Technicians), and essential service personnel (housekeeping/environmental services, dietary services, maintenance technicians, unit secretaries, medical scribes, and Certified Nursing Assistants).

UHW has run into unreasonable roadblocks with the NLRB in at least three recent instances. On or about June 10, 2024, UHW filed a petition for recognition (RC Petition) for an employer-wide administrative/clerical, service, and technical unit at Clinicas de Salud del Pueblo d/b/a Innercare, a

community clinic organization with approximately 19 locations across Riverside and Imperial Counties (Cases 21-RC-344126 and 21-RC-344127). The Union had majority support at the time it made its demand for voluntary recognition and when it filed the RC petition based on the number of signed authorization cards. From the moment UHW filed its petition, workers faced a relentless union-busting campaign from the employer that saw eleven workers terminated, had captive audience meetings, repeatedly intimidated, threatened, and coerced workers, surveilled workers, interrogated workers about their union sympathies and support, and forced workers to attend meetings with hired union busters. Based on the extreme anti-union campaign launched by the employer, UHW lost the election held in July 2024. Over the course of the campaign, UHW filed over thirty unfair labor practice ("ULP") charges and over thirty objections to the election results. While the Regional Director dismissed some charges, they have yet to issue a Complaint on any of the remaining charges over a year later. The remaining charges include allegations that Innercare terminated workers because of their support for the Union; interrogated workers for being in possession of union literature; ordered workers to remove union literature from the workplace and to not discuss the union in the workplace; and threatened job loss if the workers organized.

On or about June 27, 2024, UHW filed an RC petition with Region 21 to add workers to its existing bargaining unit at the City of Hope Medical Center in Duarte, CA (Case No. 21-RC-335061). The NLRB conducted a pre-election hearing on July 1, 2024, but the Regional Director has yet to issue a decision on the petition for a representation election. Although the workers in question demonstrated majority support more than a year ago, the NLRB has yet to determine whether these workers will be afforded the right to have an election to decide whether to join the union. The Region contacted UHW in fall 2025 to ask if the Union was still interested in organizing the workers given how much time had passed since the hearing. UHW confirmed it was still very much interested in representing the workers it petitioned for.

Finally, since 2023, UHW has been actively organizing dialysis workers employed by DaVita, Fresenius, Satellite, and U.S. Renal. These employers have repeatedly taken advantage of the same systemic problems at the NLRB described above. For example, workers at several dialysis clinics, who have already voted to join the Union, are waiting for the NLRB to resolve frivolous objections

and appeals filed by these companies. Even for workers at those clinics with certified bargaining units, the parties are nowhere close to reaching collective bargaining agreements. This is primarily because, per the example below, when UHW challenges these unlawful bargaining tactics at the NLRB, the agency is unable to promptly or decisively act.

UHW's experience organizing a bargaining unit at the DaVita Concord facility is an illustrative example. On or about March 4, 2024, the Union filed a representation petition with Region 32 of the NLRB seeking a bargaining unit of DaVita Concord workers. An election took place on May 16 and 17, 2024, where DaVita Concord workers voted to join UHW. DaVita promptly filed a request to review the Region's Decision and Direction of Election and objections to the conduct of the election. On July 5, 2024, Region 32 dismissed DaVita's objections to the election and certified the Concord bargaining unit. At this time, UHW sent DaVita a written demand to bargain. In response, DaVita—citing no legal authority—wrongly claimed that it was under no obligation to bargain with the Union until the Board in Washington, D.C. ruled on its requests for review. UHW thereafter filed an unfair labor practice charge on August 2, 2024, with Region 32 alleging that DaVita was unlawfully refusing to bargain (*see* NLRB Case No. 32-CA-347702).

On September 26, 2024, while Region 32 was investigating this unfair labor practice charge, the NLRB dismissed DaVita's request for review of the Decision and Direction of Election. However, as of the time of Gwynne Wilcox's firing from the Board by President Trump (and the resulting lack of quorum), the NLRB had not yet ruled on DaVita's request for review of the election objections. Despite this, on April 24, 2025, Region 32 agreed to place UHW's refusal to bargain charge in abeyance until the NLRB ruled on the request for review. Thus, DaVita has succeeded in indefinitely delaying the legal obligation to bargain while the Board lacks a quorum (and likely for some time after quorum is reestablished, given the inevitable backlog of cases). Meanwhile, workers at DaVita Concord, who signed authorization cards indicating their intent to join UHW no later than March 2024, have been waiting in limbo for almost two years without a contract.

**5.     SEIU Local 721 (Loyola Marymount)**

SEIU Local 721 represents more than 100,000 workers in hospitals, foster care, mental health, courts, law enforcement, libraries, street services, beach maintenance, sanitation, water treatment,

parks services, and watershed management across Southern California. Recently, it has been engaged in an organizing campaign at Loyola Marymount University (LMU).

In the course of this campaign, LMU agreed to a stipulated election agreement in May 2024 for a unit of non-tenure-track faculty. LMU did not bring up a religious exemption from the NLRB's jurisdiction, or any other jurisdictional or other bar, at that time. The union won a mail ballot election in June 2024, with 227 faculty members voting in favor of SEIU Local 721's representation and only 29 faculty members voting against. The NLRB certified SEIU Local 721 as the non-tenure-track faculty's exclusive bargaining representative later in June 2024. SEIU Local 721 immediately made information requests to LMU, which LMU responded to throughout the fall of 2024. The parties held twelve sessions to bargain over a first contract, occurring from December 20, 2024, through July 29, 2025. Despite this conduct and the ongoing bargaining, on September 12, 2025, LMU unilaterally withdrew recognition, invoking a religious exemption from the NLRB's jurisdiction.

In the course of the campaign, SEIU Local 721 has filed various ULP charges against LMU. These include some charges filed as early as January 2025, and a charge about the withdrawal of recognition that was filed immediately upon receipt of LMU's invocation of its alleged religious exemption from NLRB jurisdiction. The Regional Director of Region 31 has informed SEIU Local 721 that it does not have the staff to investigate these ULP charges and does not know when they will be able to make a determination about jurisdiction. As a result SEIU Local 721's campaign is left in a limbo state, even as LMU continues to engage in further unfair labor practices, such as recently changing terms and conditions of employment without notice or opportunity to bargain for SEIU Local 721.

### III.    BACKGROUND

#### A.    Labor Rights Under Federal and State Law

Under the First Amendment to the constitution of the United States and its equivalent in the California Constitution, workers have the rights to control the labor that they provide, and to freely join with their coworkers to achieve improvements in their wages and working conditions. *See*, *e.g.*, *Thomas v. Collins*, 323 U.S. 516, 532 (1945) (the right to "discuss, and inform people concerning, the

advantages and disadvantages of unions and joining them is protected not only as part of free speech, but as part of free assembly"); Cal. Const., art. I, §§ 2-3.

### 1.    The Federal Scheme for Enforcement of Labor Rights

Under federal law, the rights to free assembly, to organize, to form a union, to collectively bargain, and to take collective action to improve wages and working conditions are codified under the National Labor Relations Act of 1935 ("NLRA") for private sector workers. 29 U.S.C. §§ 151-169. The National Labor Relations Board ("NLRB") was constituted as an independent agency tasked with enforcing the NLRA and protecting workers' rights under the law. 29 U.S.C. § 153(a).

The NLRB has a unique structure that divides its management between two internal branches. First, the Board, which consists—when fully staffed—of five presidentially-appointed members in Washington, D.C., serves as the adjudicatory branch of the agency, in which capacity it also oversees Administrative Law Judges (ALJs), inferior tribunals that function akin to trial courts. Second, the General Counsel, also a presidential appointee, serves as the prosecutorial branch of the agency and supervises the agency's 26 regional offices. *See Harris v. Bessent*, No. 25-5037, 2025 WL 3496737 at *10 (D.C. Cir. Dec. 5, 2025).

The NLRB's two core functions are adjudication of unfair labor practice ("ULP") complaints and oversight of union election petitions, each of which follow distinct procedural paths. ULP complaints are challenges to certain actions by unions or employers that violate specific provisions of the NLRA, such as an employer refusing to bargain in good faith or a union engaging in a secondary boycott. ULP complaints are initiated by a union or an employer filing a charge with a regional office. The regional office, under the direction of the General Counsel, then conducts an investigation and determines whether charges are merited. If not, the regional office may dismiss the charge. (Complainants may appeal this dismissal to the General Counsel's Office of Appeals in Washington D.C., which makes a final, unreviewable determination.) *See generally* Nat'l Labor Relations Board, Investigate Charges, https://www.nlrb.gov/about-nlrb/what-we-do/investigate-charges (last visited Dec. 11, 2025). If the regional office (or Office of Appeals) determines the complaint has merit, it then attempts to negotiate a settlement between the parties. If settlement is unsuccessful, the regional office issues a complaint and proceeds to litigate the claim on behalf of the complaining party, with an

ALJ presiding over the hearing. After the ALJ issues its decision, a party may effectively appeal that decision to the Board by filing an "exception." If no exception is filed, the ALJ decision becomes final. *See* 29 C.F.R. § 102.48(a). If an exception is filed, the decision is effectively held in abeyance until the Board issues a decision. Finally, Board orders on ULPs are not self-enforcing: if a party does not voluntarily comply, the Board must petition a federal court of appeals for enforcement of the order. *In re NLRB*, 304 U.S. 486, 495 (1938).

Representation petitions, which cover administration of and disputes regarding workers' decisions around unionization of their workplace, follow a different procedural path. While representation petitions are within the purview of the Board, not the General Counsel (29 U.S.C. § 159), the Board has delegated its authority to the regional offices, retaining authority to review the decisions of the regional offices (29 C.F.R. § 102.67). In practice, this means that petitions to conduct union elections are filed with the regional offices, which, if such petitions are sufficient, conduct the elections. Challenges and objections to elections are filed with the regional office, which investigates and issues a ruling on those challenges and objections. A party that disagrees with this ruling may request discretionary review of it with the Board. If the Board denies review, the regional office's determination becomes final. If it grants review, it then issues a final ruling that affirms or rejects the regional office's determination. 29 U.S.C. § 153(b). Notably, although employers are not granted mandatory review of election results, they can ultimately obtain such review by refusing to bargain with the victorious union and then challenging the validity of the election if and when the union brings a ULP charge for failure to bargain in good faith. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 476-78 (1964); Nat'l Labor Relations Bd., *Protecting your legal rights* (last visited Dec. 12, 2025), https://www.nlrb.gov/about-nlrb/rights-we-protect/the-law/protecting-your-legal-rights (advising employers that, "[t]o obtain court review [of the Board's certification of a union], you must refuse to bargain with the union, and then petition the court to review the Board's decision finding your refusal to bargain an unfair labor practice.").

### 2.    California's Longstanding Supplementation of Federal Labor Protections

Alongside this federal backdrop, California law has also long codified workers' fundamental and constitutionally protected rights, stating in Section 923 of the Labor Code, passed in 1937, that

"[workers] have full freedom of association, self-organization, and designation of representatives of [their] own choosing, to negotiate the terms and conditions of [their] employment, and [they] shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection."

California has historically protected labor rights side-by-side with the NLRA, particularly where there are gaps in NLRA coverage. For example, in 1975, California became the first state in the country to protect agricultural workers' rights to organize, under the Agricultural Labor Relations Act. *See* Cal. Lab. Code § 1140.4(b). Agricultural workers are excluded from the NLRA. *See* 29 U.S.C. § 152(3). The Public Employee Relations Board ("PERB") is the independent state agency established within a comprehensive statutory framework governing public employee relations in California, including the Educational Employment Relations Act, Cal. Gov. Code §§ 3540-49.3, the Meyers-Milias-Brown Act, Cal. Gov. Code §§ 3500-11, and the State Employer-Employee Relations Act, Cal. Gov. Code §§ 3512-24. Most recently, in the same legislative session that saw the passage of AB 288, the California Legislature further expanded PERB's reach by providing for the agency to oversee organizing and bargaining rights for independent contractor rideshare drivers, to the extent they are also excluded from the NLRA's coverage. *See* Assem. Bill No. 1840 (2025-2026 Reg. Sess.); 29 U.S.C. § 152(3).

Other labor rights codified in California operate adjacent to federal labor law protections, and are not preempted by federal law despite potentially overlapping coverage. *See*, *e.g.*, Cal. Lab. Code §§ 232(c), 232.5(c) (prohibiting retaliation against employees who disclose their wage rates or their employers' working conditions); *id.* §§ 98.6(a), 6310, 6399.7 (prohibiting retaliation against workers who complain to the Labor Commissioner or the Division of Occupational Safety and Health); *id.* §§ 1101, 1102 (protecting workers against employer coercion or threats for political activity); *id.* § 1476(a) (prohibiting employers from retaliating against fast food workers if they testify before the Fast Food Council).

**B.    The Collapse of Protections for Labor Rights at the Federal Level**

Although labor rights at both the state and federal levels are protected by law and policy, workers have become increasingly unable to use and enforce these rights. The failure of the NLRB to act effectively has been well-documented over the years in numerous scholarly articles, which have described how workers and unions have been left without reliable, effective remedies for violations of their rights. *See*, *e.g.*, Kate Andrias, *The New Labor Law*, 126 Yale L.J. 2 (2016) (describing weak enforcement mechanisms, slight penalties, and lengthy delays); Lynn Rhinehart & Celine McNicholas, Econ. Pol'y Inst., *Shortchanged—Weak Anti-Retaliation Provisions in the National Labor Relations Act Cost Workers Billions in Back Pay and Damages* (Apr. 22, 2021), https://files.epi.org/uploads/225230.pdf (documenting systematic failures in NLRB remedies and enforcement); *see also* Cal. Opp'n to Mot. 5-7 (Dec. 3, 2025), ECF No. 17 (describing how constitutional challenges to the NLRB and diminished resources undermine the agency's ability to provide effective remedies to workers); IBT Opp'n to Mot. 2-4 (Dec. 3, 2025) ECF No. 16 (showing lack of quorum and independence have exacerbated existing delays in case processing). In recent years, staffing at the agency has dwindled and workloads soared, resulting in chronic delays and backlogs.

Recently, the NLRB's dysfunction reached crisis levels, beginning with the firing of NLRB member Gwynne Wilcox before her term was set to expire in 2028, leaving the Board without the three-member quorum necessary to issue decisions. *See* Michael J. Lebowich et al., Proskauer, *Breaking: In a Novel Move, President Trump Fires National Labor Relations Board Member and, Following Biden precedent, the NLRB General Counsel* (Jan. 28, 2025), https://www.proskauer.com/blog/breaking-in-a-novel-move-president-trump-fires-national-labor-relations-board-member-and-following-biden-precedent-the-nlrb-general-counsel. This means that appeals of administrative law judge decisions in unfair labor practice cases face a dead end, with no quorum to resolve them. *See* Marina Multhaup, *A Labor Agency with No Labor Board*, OnLabor (May 9, 2025), https://onlabor.org/a-labor-agency-with-no-labor-board/. Although the NLRB now contends that the lack of a quorum will soon end, NLRB Reply Br., ECF No. 23 at 5 n. 6, this is not the first time that the NLRB has been incapacitated by political jockeying that has resulted in fewer than the

1   minimum number of board members being in office, and it is a problem that unfortunately may recur.

2   *See* Cal. Opp'n to Mot. 5 (Dec. 3, 2025), ECF No. 17. Meanwhile, employers have brought challenges

3   to the constitutionality of the NLRB, including SpaceX's lawsuit, which resulted in the Fifth Circuit

4   issuing an injunction finding that the current structure of the NLRB is unconstitutional. *See Space*

5   *Exploration Technologies Corp. v. NLRB*, 151 F.4th 761 (5th Cir. 2025). California employers,

6   including some where workers represented by affiliates of Amicus are organizing are bargaining, have

7   also filed challenges to the constitutionality of the NLRB. *See supra* § II.B.2. The ultimate

8   constitutionality of the NLRB, after 90 years of operation, thus remains subject to fundamental

9   challenges to its structure, independence, and functioning.

10  **C.      AB 288 Was Narrowly Targeted to These Acute Failures of the NLRB**

11          In this context, and with an increasing interest in collective organizing among workers,[1]

12  Amicus was among the organizations that lobbied in support of AB 288, which was designed to allow

13  the designated state agency PERB to step in when, but only when, the NLRB is unable or fails to act.

14          Primarily codified at California Labor Code Section 923.1 ("Section 923.1"), AB 288 provides

15  at subparagraph (A) of Section 923.1(b)(1) for enforcement of labor laws for individuals who would

16  have been deemed employees under the National Labor Relations Act as of January 1, 2025, but are

17  no longer deemed employees due to subsequent legislative, executive, or judicial action.[2] As the State

18  of California notes in its brief, the NLRB does not challenge AB 288 as applied in the context of

19  subparagraph (A). *See* Cal. Opp'n to Mot. at 13:6-16 (Dec. 3, 2025), ECF No. 17. Nor could they, as

20  NLRA preemption does not apply to workers who are not deemed employees under the NLRA. *See*

21  *Chamber of Commerce v. City of Seattle*, 890 F.3d 769, 794-95 (9th Cir. 2018).[3]

22

---

23  [1] *See*, *e.g.*, Margaret Poydock et al., Econ. Pol'y Inst., *16 million workers were unionized in 2024* (Jan. 28, 2025), https://files.epi.org/uploads/295318.pdf; Savannah Hunter et al., UC Berkeley Labor

24  Center, *State of the Unions: California Labor in 2024* (Aug. 25, 2025), https://laborcenter.berkeley.edu/state-of-the-unions-california-labor-in-2024/.

25  [2] All citations to the California Labor Code are to the code as amended by AB 288.

26  [3] On reply, the NLRB offers some argument on subparagraph (A), but the Court should consider this argument waived as it was not raised in the opening brief. *Food Market Merchandising, Inc. v. Cal.*

27  *Milk Processor Bd.*, 2018 WL 2540323 (E.D. Cal. May 31, 2018) (citing *Novosteel SA v. U.S.,*

28  *Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)). Additionally, subparagraph (A) is not preempted in at least some of its applications, and thus inappropriate for a facial challenge. *See City of Seattle*, 890 F.3d at 794-95.

1    Thus, only the other set of circumstances under subparagraph (B) of Section 923.1(b)(1) is

2    properly before the Court. Clauses (i) through (iv) of subparagraph (B) set forth four different

3    circumstances in which AB 288 may take effect, each of which are responsive to gross failings of the

4    NLRB resulting from years of disinvestment and recent developments more acutely undermining the

5    scheme envisioned at the time of the NLRA's passage 90 years ago: (i) certain circumstances,

6    including election certification, when the NLRB either (aa) lacks quorum, (bb) has lost its intended

7    structure as a result of a constitutional challenge to removal protections, or (cc) is enjoined by a court

8    from processing a case due to a constitutional challenge to its structure or authority; (ii) where no

9    election certification, complaint, or decision has been issued *and* there are processing delays resulting

10   in a delay of six months or more; (iii) where certification of the results of an election has been issued

11   by a regional director or administrative law judge but there are processing delays resulting in failure

12   by the NLRB to accept or decline review or grant special permission to appeal for more than six

13   months; or, (iv) for cases on review or exceptions before the NLRB, when there are processing delays

14   resulting in a case remaining pending for more than 12 months without the issuance of a final

15   decision.

16       Paragraph (3) of subdivision (c) provides further context for the types of ULP charges that

17   might be brought under subparagraph (B) of subdivision (b), such as refusals to bargain, refusals to

18   recognize a union, refusal to give effect to an election certification, unilateral withdrawal of

19   recognition of a union, failure to bargain in good faith if the parties have been bargaining for over six

20   months, violation of *Weingarten* rights, retaliation for union activities, failure to respond to union

21   information requests, and unilateral changes by an employer engaging in first contract negotiation.

## IV.    ARGUMENT

23       AB 288 targets delay, inaction, and inability to act at both the regional and national levels of

24   the NLRB, problems that have become increasingly acute in recent years. This delay and inaction

25   affects both of the NLRB's core functions: adjudication of unfair labor practice (ULP) complaints and

26   oversight of union election petitions, with harmful consequences for workers and their unions. AB

27   288 does not seek to supplant the NLRB, but rather provides a route to effective relief through backup

28   state procedures where the NLRB lacks the statutory or administrative ability to act.

**A.  Delay and Inaction at the Regional Level**

Clause (ii) of Section 923.1(b)(1)(B) addresses delay and inaction at NLRB regional offices. The NLRB's 26 regional offices—including Regions 20, 21, 31, and 32 covering California and part of Nevada—are the agency's front line for addressing private-sector labor disputes nationwide. As discussed above, they handle both the initial processing and prosecution of ULP charges, as well as the conduct of representation petitions. Clause (ii) addresses delays in the regional offices in certification of election results and issuance of ULP complaints of six months or more. In addition, it addresses delays in ALJ determinations of complaints of six months or more.

Concerns about delays with regional offices and ALJ determinations are supported by the NLRB's own data. On one side of the equation, its staffing has plummeted in recent years. As it noted in 2024, "[i]n the past two decades, staffing in field offices has shrunk by 50%." Nat'l Labor Relations Bd., *Union Petitions Filed with NLRB Double Since FY 2021, Up 27% Since FY 2023* (Oct. 14, 2024), https://www.nlrb.gov/news-outreach/news-story/union-petitions-filed-with-nlrb-double-since-fy-2021-up-27-since-fy-2023. "In FY 2011, when the NLRB faced a similar volume of case intake, the Agency had 62% more field staff—1,222 in FY 2011 vs. 754 in FY 2024—allowing the investigation and resolution of cases much more quickly." *Id.*

On the other side of the equation, demand for regional office resources, in the form of election petitions and ULP charges, has skyrocketed. Regarding elections, "[f]rom October 1, 2023 to September 30, 2024, the National Labor Relations Board received 3,286 union election petitions, up 27% since FY 2023, when the Agency received 2,593 petitions." *Id.* "This is more than double the number of petitions received since FY 2021, when the NLRB received 1,638 petitions." *Id.* Regarding ULP charges, "from FY 2023 to FY 2024, unfair labor practice charge filings increased 7% (from 19,869 to 21,292 cases)." *Id.* The combined total of election petitions and ULP charges—24,578—is "the highest total case intake in over a decade." *Id.*

This equation has resulted in significant delays. For example, while in FY 2022 it took the regional offices on average 84.8 days from the filing of a ULP charge to resolve it, by FY 2023 that figure had jumped approximately 266 days and by FY 2024 remained elevated at 168 days. *See* Nat'l Labor Relations Bd., Performance & Accountability Report 57 (FY 2024),

https://www.nlrb.gov/sites/default/files/attachments/pages/node-130/nlrb_fy2024_par_508.pdf. This recent spike has been similar at the regional offices serving California: Regions 20, 21, 31, and 32. *Compare* Nat'l Labor Relations Bd., Office of Gen. Counsel, Mem. GC 23-06 at 2 (Apr. 12, 2023), https://apps.nlrb.gov/link/document.aspx/09031d4583a24e78 *with* Nat'l Labor Relations Bd., Office of Gen. Counsel, Mem. GC 24-03 at 3 (Mar. 4, 2024), https://apps.nlrb.gov/link/document.aspx/09031d4583c9a800.

ALJ decisions on ULP complaints also have been proceeding at a glacial pace. In FY 2022, it took an average of 141.9 days between when a regional office filed a complaint and when a hearing was held, and an average of 146 days between a hearing and a decision. *See* Nat'l Labor Relations Bd., Office of Gen. Counsel, Mem. GC 23-06 at 2 (Apr. 12, 2023), https://apps.nlrb.gov/link/document.aspx/09031d4583a24e78. By FY 2023, the average time from complaint to hearing had jumped to 189.2 days and the average time from hearing to decision had stayed roughly the same at 141 days. Nat'l Labor Relations Bd., Office of Gen. Counsel, Mem. GC 24-03 at 3 (Mar. 4, 2024), https://apps.nlrb.gov/link/document.aspx/09031d4583c9a800. For ULP complainants, these delays are cumulative. And, even after getting an ALJ decision, that decision might not be final as a party could contest it by filing an exception with the Board, effectively placing it in abeyance until the Board acted.

These delays serve to effectively stymie worker organizing, and cause real harm to workers. For example, as discussed above in Section II.B.2, one union local filed a petition for election on December 10, 2024, and participated in a pre-election hearing in January 2025, but *still* has not had an election held, over a year after its petition was filed. Another local obtained a ULP complaint from an NLRB regional office in March 2025, but was not scheduled to have a hearing until December 2025, nearly nine months later. *See supra* § II.B.1. Another filed nine unfair labor practice charges between September and December 2024 but more than a year later all remain pending investigation. *See supra* § II.B.3. Another had a pre-election hearing with a regional office in July 2024 but still has not had an election called nearly a year and a half later. *See supra* § II.B.4.

**B.   Delay and Inaction at the National Level**

Clauses (iii) and (iv) of Section 923.1(b)(1)(B) address delay and inaction at the NLRB national office. Clause (iii) addresses the Board's failure to accept or deny review within 6 months in situations where its review is discretionary. Clause (iv) addresses the Board's failure to issue a decision within 12 months after either granting review, for discretionary appeals, or after the filing of exceptions, which require mandatory review. Both of these delays significantly burden labor relations in California.

For example, the Board reported that its median processing time for requests for review was 74 days in FY 2021 and 43 days in FY 2022. *See* Nat'l Labor Relations Bd., Performance & Accountability Report 169 (FY 2024), https://www.nlrb.gov/sites/default/files/attachments/pages/node-130/nlrb_fy2024_par_508.pdf. By way of contrast, the median processing time ranged from 12 to 14 days in FY 2000 to 2004. *See* Nat'l Labor Relations Bd., Performance & Accountability Report 18 (FY 2004), https://www.nlrb.gov/sites/default/files/attachments/pages/node-130/nlrb2004par.pdf. After granting a request for review or receiving an exception, the Board's median time to issuance of an opinion was 117 days in FY 2023. *See* Nat'l Labor Relations Bd., Office of Gen. Counsel, Mem. GC 24-03 at 3-4 (Mar. 4, 2024), https://apps.nlrb.gov/link/document.aspx/09031d4583c9a800.

Even if it were functioning, which it is not in light of its lack of quorum, the Board faces a daunting backlog of ULP and election certification cases. The Board completed work on only 59 percent of the new ULP and representation cases originating in FY 2024. Nat'l Labor Relations Bd., Performance & Accountability Report 78 (FY 2024), https://www.nlrb.gov/sites/default/files/attachments/pages/node-130/nlrb_fy2024_par_508.pdf. Of the ULP cases that would have been pending over 18 months by the end of 2024, the Board closed only 47 percent of cases. *Id*. This is a dramatic decrease from FY 2022 and FY 2023, which saw 81 and 76 percent completion of these older cases respectively.

**C.    Special Circumstances Rendering the NLRB Unable to Function**

Finally, clause (i) of Section 923.1(b)(1)(B) addresses circumstances that prohibit the NLRB from acting as intended by Congress, including loss of quorum, evisceration of intended structure, and court injunctions prohibiting action.

**1.    Loss of Quorum**

With President Trump's removal of Board Member Wilcox in January 2025, the NLRB lost its quorum — the minimum three board members required to make final agency decisions. *See New Process Steel L.P. v. NLRB*, 560 U.S. 674, 676 (2010). This was the third time in the past 20 years that the Board lost its quorum and, although the NLRB now says that the quorum will soon be returned, it makes sense that California would be prepared for this recurrent problem that undermines the enforcement of basic labor rights.

Employers have used the absence of the quorum to challenge the ability of the NLRB to certify elections. As of October 2025, employers had filed at least 22 appeals challenging union elections, arguing that elections cannot be certified while the NLRB is shorthanded. John Kruzel & Daniel Wiessner, *Frozen feud: How Trump and the Supreme Court helped put historic Whole Foods union bid on ice*, Reuters, Oct. 2, 2025, https://www.reuters.com/sustainability/boards-policy-regulation/frozen-feud-how-trump-supreme-court-helped-put-historic-whole-foods-union-bid-2025-10-01/. The lack of a quorum also lessens the chance that employers will be subject to penalties for ULPs, such as firing workers for organizing their workplace. A regional office may investigate a charge, recommend that such a worker be returned to work with backpay, and even win a hearing in front of an ALJ, but an employer may in turn file an exception with the full board, knowing that review cannot occur until or unless the Board regains its quorum, effectively barring any relief and allowing an employer to break the law without repercussion. The experiences of amicus's member organizations, as set forth above, as well as of the Teamsters, see Terrasa Decl. ¶¶ 8-9, ECF No. 16-7, illustrate how lack of a quorum justifies the state stepping in to enforce rights when the NLRB is unable to.

1

**2.    Change to Removal Protections and Court Injunctions**

The final triggers contained in AB 288 similarly provide for PERB to step in only when the NLRB becomes unable to fulfill the role assigned to it by Congress. A key element of this role involves the NLRB's independence from political whim, including the protection of Board members from removal except for good cause. *Wilcox v. Trump*, 775 F. Supp. 3d 215, 221 (D.D.C. 2025), *rev'd Harris v. Bessent*, No. 25-5037, 2025 WL 3496737 (D.C. Cir. Dec. 5, 2025); *see also* Cal. Opp'n to Mot. 22:21-23:16 (Dec. 3, 2025), ECF No. 17. Even more fundamentally, the ability of the NLRB to operate *at all* is threatened by multiple lawsuits challenging its constitutionality. Its ability to operate is now enjoined in the Fifth Circuit, for example. If this injunction is ultimately upheld at the Supreme Court, or spreads to the Ninth Circuit, then there would be no federal agency in operation that could preempt state law from acting. It is logical that California would want to be prepared for this situation, given the current chaotic state of play.

**V.    CONCLUSION**

For all of these reasons and the reasons cited in the briefing and papers before the Court, the Court should uphold AB 288 over the facial challenge brought by the NLRB. In the alternative, the Court should apply AB 288's severability clause, as AB 288 is clearly not facially preempted in its entirety.

DATED: December 15, 2025      By:      /s/ Catha Worthman
Catha Worthman
Darin Ranahan
FEINBERG, JACKSON, WORTHMAN
& WASOW LLP
2030 Addison Street, Suite 500
Berkeley, California 94704
Telephone: (510) 269-7998

***Attorneys for Amicus California Labor Federation***