Dylan B. Carp (State Bar No. 196846)
JACKSON LEWIS P.C.
50 California Street, 9th Floor
San Francisco, California 94111-4615
Telephone: (415) 394-9400
Facsimile: (415) 394-9401
E-mail: Dylan.Carp@jacksonlewis.com

Attorneys for Proposed Amici Curiae
COALITION FOR A DEMOCRATIC WORKPLACE
INTERNATIONAL FOODSERVICE DISTRIBUTORS ASSOCIATION
NATIONAL RETAIL FEDERATION

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

NATIONAL LABOR RELATIONS BOARD,

Plaintiff,

v.

STATE OF CALIFORNIA and the PUBLIC EMPLOYMENT RELATIONS BOARD,

Defendants.

Case No. 2:25-cv-02979-TLN-CKD

**PROPOSED BRIEF OF AMICI CURIAE COALITION FOR A DEMOCRATIC WORKPLACE, INTERNATIONAL FOOD SERVICE DISTRIBUTORS ASSOCIATION, AND NATIONAL RETAIL FEDERATION IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Complaint Filed: 10/15/2025
Trial Date: Not Yet Set

**PROPOSED AMICUS CURIAE BRIEF IN SUPPORT OF SUMMARY JUDGMENT**

## INTEREST OF AMICUS CURIAE

The Coalition for a Democratic Workplace (CDW) is a trade organization composed of hundreds of organizations representing millions of businesses that employ tens of millions of workers nationwide in nearly every industry. Its members include national, regional, and state employer associations and businesses ranging from single-worksite employers to companies with integrated multistate operations. They share an interest in a lawful, balanced, and predictable federal labor-relations system.

The International Foodservice Distributors Association (IFDA) is a leading trade association representing foodservice distributors throughout the United States. IFDA members play a crucial role in the foodservice supply chain, delivering food and related products to restaurants, K–12 schools, hospitals and care facilities, hotels and resorts, U.S. military bases and government facilities, and other operations that make meals away from home possible. The industry generates more than $400 billion in sales, employs 431,000 people, and operates 17,100 distribution centers in all 50 states and the District of Columbia.

Established in 1911, the National Retail Federation (NRF) is the world's largest retail trade association and the voice of retail worldwide. Retail is the largest private-sector employer in the United States. NRF's membership includes retailers of all sizes, formats, and channels of distribution, spanning all industries that sell goods and services to consumers. NRF provides courts with the perspective of the retail industry on important legal issues affecting its members and frequently files amicus curiae briefs to ensure that the retail community's position is heard.

Amici have a substantial interest in the proper interpretation and application of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 151–169, including Congress's assignment of primary authority over private-sector labor relations to the NLRB and the Act's limited mechanisms for permitting state labor jurisdiction. Although amici and their members do not always agree with the Board's policy choices, employers need one lawful and accountable federal system. AB 288 threatens that system by allowing California's Public Employment Relations Board (PERB) to declare federal authority "impliedly ceded" and apply a distinct state labor code to businesses Congress placed within the NLRA.

Amici's members are directly affected by that attempted substitution of state for federal authority. Many centralize labor-relations and human-resources functions, assign employees across state lines, operate integrated regional or national networks, and bargain over units or agreements not confined to California. IFDA members operate foodservice supply chains and distribution networks serving customers and institutions throughout the country, while NRF members operate through numerous formats and channels of distribution, often as parts of integrated multistate businesses. For these employers, AB 288 is not merely a change of forum: it may change the regulator, governing precedent, bargaining rules, certification procedures, remedies, and duration of jurisdiction in the middle of the same dispute. It may also subject different parts of the same integrated business to conflicting federal and state labor regimes. The outcome therefore will directly affect employers covered by the NLRA, including amici's members, giving each amicus a direct and substantial interest in the questions presented.

No party's counsel authored this brief in whole or in part. No party or party's counsel contributed money intended to fund preparing or submitting it, and no person other than CDW, its members, or its counsel made such a contribution.

## INTRODUCTION

The NLRB's summary-judgment memorandum establishes the governing *Garmon* and obstacle-preemption principles and seeks final relief against Section 2 of AB 288 except where federal law actually leaves room for state action. ECF No. 39-1 at 9–18. The earlier business amici explained the NLRA's commitment to national uniformity and warned that state substitution would splinter national labor markets. ECF No. 14-1 at 7–8. CDW agrees with that framework and does not repeat it at length. This brief instead focuses on the statutory limits California bypasses and the practical consequences for employers when the same labor dispute is placed before two sovereigns.

AB 288 rests on a simple but invalid premise: whenever the NLRB cannot or does not act—or federal law stops protecting a worker—California may step in and decide the labor dispute itself. Part I explains why a loss of quorum, removal ruling, temporary injunction, or agency delay does not turn federal authority into state authority. Part II shows that California

may take matters assigned to the NLRB only after a § 10(a) agreement or qualifying § 14(c) declination; that traditional state-law exceptions concern different controversies; and that the loss of federal protection permits state regulation only when federal law actually leaves room for it. Part III shows that AB 288 sends the same federal petitions and charges to PERB and lets PERB keep them after the NLRB can act again. Part IV shows what that means for employers: competing representatives, opposite orders on the same conduct, a state-imposed contract, seven-figure penalties, and no safe course between the two systems.

## BACKGROUND

Section 2 of AB 288 adds California Labor Code § 923.1. It permits a worker whose position was, or would have been, subject to the NLRA as of January 1, 2025, to petition PERB under two sets of circumstances. First, the worker may proceed if the NLRA is repealed or narrowed, or if its enforcement is enjoined in a case involving that worker. Cal. Lab. Code § 923.1(b)(1)(A). Second, the worker may proceed if the NLRB has "expressly or impliedly ceded jurisdiction." *Id.* § 923.1(b)(1)(B). AB 288 deems jurisdiction ceded when, among other things, the Board lacks a quorum, the Supreme Court invalidates Board-member removal protections, a court enjoins continued processing because of a constitutional challenge, or specified periods pass without federal action. *Id.* § 923.1(b)(1)(B)(i)–(iv).

Once a trigger is satisfied, PERB may process a representation petition previously filed with the NLRB, certify an exclusive representative, resolve objections and voter-eligibility challenges pending before the NLRB, decide unfair-labor-practice charges, order bargaining and other remedies, impose civil penalties, and compel binding first-contract arbitration after six months without an executed agreement. *Id.* § 923.1(c)(1)–(3), (e)(1), (e)(3). PERB may act under its own procedures and may rely on its own decisions and NLRA precedent in the manner that most expansively effectuates the rights created by AB 288. *Id.* § 923.1(e)(1)–(2). And if the condition that allowed PERB to enter the matter later disappears, PERB "shall retain jurisdiction over pending matters" and "shall maintain jurisdiction from that point forward" unless a court orders otherwise. *Id.* § 923.1(b)(2).

This Court preliminarily enjoined AB 288's lack-of-quorum, loss-of-independence, and delay triggers. ECF No. 30 at 12–17. The NLRB now seeks summary judgment and final relief against Section 2, while excluding three narrow applications from the requested relief: valid express cession or declination; an actual repeal or congressional narrowing intended to permit state regulation; and a final, non-appealable order permanently preventing NLRB enforcement or processing in the particular matter. ECF No. 39-1 at 17–18; ECF No. 39-3 at 2.

## ARGUMENT

## I. POST-BRIEFING AUTHORITY REMOVES THE PRINCIPAL SUPPORT FOR AB 288'S CHANGED-CIRCUMSTANCES PREMISE.

### A. *Margolin* eliminated the authority California relied on for its changed-circumstances theory.

The NLRB correctly notes that *Margolin* reversed the decision California and the Teamsters asked this Court to follow. ECF No. 39-1 at 1–2. California argued that *Owen* made federal exclusivity depend on whether the responsible agency remained functional and independent, and this Court found that reasoning compelling at the preliminary-injunction stage. ECF No. 17 at 11–12, 17, 19; ECF No. 30 at 14. *Owen* thus supplied the supposed bridge from federal dysfunction to state jurisdiction. The Supreme Court's reversal removed that bridge. *Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. 339, 342–43 (2026) (per curiam). Although the Court reversed on party-presentation grounds and did not decide the changed-circumstances theory on the merits, no operative appellate judgment now accepts that theory.

Justice Thomas, joined by Justice Barrett, addressed the merits the majority did not reach. He rejected the Fourth Circuit's premise that new political and institutional conditions could reopen a statutory channeling rule already fixed by Congress and Supreme Court precedent. Neither the President's view that removal protections were unconstitutional nor the actual removal of protected officials changed the statute's meaning or the binding force of the Court's interpretation. "Conditions may have changed, but the statute has not." *Margolin*, 608 U.S. at 344–45 (Thomas, J., concurring). Courts may not rewrite a statutory scheme to approximate what Congress might have wanted had it anticipated a constitutional defect. *Id.* at 345. "Statutes

change only when Congress changes them," not when judges conclude that the existing scheme no longer serves Congress's purposes. *Id.*

AB 288 makes the same move. California's findings assert that underfunding, staffing shortages, narrowed coverage, quorum problems, and constitutional litigation have made the NLRB ineffective, and then declare that federal inaction "constitutes a rule of decision ceding jurisdiction." 2025 Cal. Stat. ch. 139, § 1(d), (k)–(l). But those conditions do not alter §§ 10(a) and 14(c). A loss of quorum, removal ruling, temporary injunction, or administrative delay may affect when the Board can act, but it does not supply the Board agreement or qualifying declination Congress required before California may assume jurisdiction. AB 288 does not interpret the federal conditions for state entry; it replaces them.

On remand, the Fourth Circuit denied NAIJ's request for renewed briefing and, after reviewing the parties' new submissions, the prior briefing, and the record, affirmed the district court's ruling that it lacked jurisdiction, modifying the dismissal to be without prejudice. *Nat'l Ass'n of Immigr. Judges v. Owen*, No. 23-2235, slip op. at 3 (4th Cir. Aug. 19, 2026) (per curiam) (unpublished). The court noted that *Slaughter* may cast doubt on the constitutionality of the MSPB's removal protections, but that neither that issue nor severability had been briefed. *Id.* at 3 n.*. The remand decision therefore did not revive *Owen*'s former functionality-and-independence inquiry or provide affirmative support for treating a possible constitutional defect as an exception to the statutory channeling scheme.

### B. *Slaughter* confirms that a federal removal defect does not transfer jurisdiction to a State.

The NLRB explains that even if the Supreme Court invalidates the Board-member removal restriction, the Board would retain its statutory authority, the NLRA's severability clause would leave the remainder of the Act operative, and the ruling would not open the door to a state-law patchwork. ECF No. 39-1 at 15–16 & n.6. *Slaughter* supplies a distinct and complementary point: a removal ruling determines who controls federal executive power; it does not reassign that power to a State.

*Slaughter* held that the FTC's for-cause removal provision violated the separation of powers because the agency exercises executive authority that must remain subject to presidential control. 609 U.S. ___, slip op. at 25–27. That holding concerns the relationship between the President and federal officials exercising federal power. It does not dissolve the agency, eliminate its statutory jurisdiction, or transfer that jurisdiction to another sovereign.

AB 288 nevertheless treats a removal ruling as if it had that effect. It provides that a Supreme Court decision invalidating Board-member removal protections triggers state jurisdiction over the Board's representation and unfair-labor-practice matters. Cal. Lab. Code § 923.1(b)(1)(B)(i). But the federal remedy for a removal defect—whether severance, a limitation on a federal official's authority, or a temporary injunction—remains a matter of federal law. None is a Board agreement under § 10(a) or a Board declination under § 14(c). *Slaughter* changes the conditions under which federal authority may be exercised; it does not change which sovereign possesses that authority.

That conclusion does not address the final, non-appealable order the NLRB excludes from its requested relief. ECF No. 39-1 at 17–18. The narrower point is that neither *Slaughter* itself nor ongoing removal litigation gives California jurisdiction while the NLRA continues to govern the matter.

## II. AB 288'S STATE-ENTRY TRIGGERS DO NOT SATISFY ANY FEDERALLY RECOGNIZED BASIS FOR STATE LABOR JURISDICTION.

The NLRB correctly explains that §§ 10(a) and 14(c) require affirmative Board action and that no recognized *Garmon* exception permits PERB to take over the Board's cases. ECF No. 39-1 at 13–17. Four points reinforce that conclusion. Section 10(a) does more than require an agreement: it restricts what the Board may cede and makes cession unavailable when the governing state law is inconsistent with the NLRA. Section 14(c) requires a Board-made, class-based, commerce-related declination that California cannot manufacture from federal silence or delay. The cases preserving state authority concern controversies different from the federal labor dispute, not the same NLRB petition or charge. And when federal protection disappears, state regulation is permissible only if federal law actually leaves room for it.

**A. Section 10(a) requires a Board agreement satisfying Congress's substantive limits.**

Section 10(a) establishes both the mechanism and the limits for ceding federal labor jurisdiction to a State. It empowers the Board "to prevent any person from engaging in any unfair labor practice . . . affecting commerce" and provides that this power "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law, or otherwise." 29 U.S.C. § 160(a). The proviso then authorizes the Board, "by agreement with any agency of any State or Territory," to cede jurisdiction over cases to that agency. *Id.* The Board therefore decides whether to cede jurisdiction, and cession occurs through an affirmative agreement—not through a State's assessment of whether the Board remains willing or able to act.

The proviso also limits the permissible scope of any agreement. The Board may not cede cases in the mining, manufacturing, communications, or transportation industries unless the industry is "predominantly local in character." *Id.* Nor is a cession agreement valid or applicable to cases if the state-law provision governing them is inconsistent with the corresponding NLRA provision or has received an inconsistent construction. *Id.* The agreement requirement and these restrictions work together: the agreement identifies the cases to be transferred and permits the Board to determine whether the transfer falls within the limits Congress imposed. A State cannot declare jurisdiction transferred while bypassing both the federal actor responsible for the transfer and the statutory safeguards governing it.

*Guss v. Utah Labor Relations Board* enforced that design even though doing so produced a regulatory gap. The NLRB had certified the union, but when the union later filed § 8(a)(1), (3), and (5) charges, the Regional Director declined to issue a complaint under the Board's discretionary jurisdictional standards; the union then filed substantially the same charges with the Utah Board. 353 U.S. 1, 4–5 (1957). Because the Board had not entered into a § 10(a) agreement authorizing Utah to act, the Supreme Court held that the proviso was "the exclusive means whereby States may be enabled to act concerning the matters which Congress has entrusted to the National Labor Relations Board." *Id.* at 9. Although that conclusion created a "no-man's-

land" in which neither the Board nor the State would act, the Court held that closing the gap was Congress's responsibility. *Id.* at 10–11. Federal nonaction did not itself transfer the matter to Utah.

The Second Circuit applied the same principle where the asserted implication arose from an affirmative Board ruling rather than mere inaction. After Congress extended the NLRA to nonprofit hospitals, the Board asserted jurisdiction and concluded that interns and residents were primarily students who should not receive collective-bargaining rights under the Act. *NLRB v. Committee of Interns & Residents*, 566 F.2d 810, 811–13 (2d Cir. 1977). A union then sought a representation election before the New York State Labor Relations Board, contending that the federal decision left the State free to act. *Id.* at 811–12. The Second Circuit rejected that inference. Sections 10(a) and 14(c), it explained, contain "explicit mechanisms" for state labor jurisdiction, and "[h]ad the NLRB intended to cede jurisdiction" to the State, "it would have been simple to do so." *Id.* at 813. The court therefore found "[n]o reason to assume the NLRB did implicitly what it could have done expressly." *Id.*

AB 288 rests on an even weaker inference. It treats events that express no Board judgment about state jurisdiction—a loss of quorum, a judicial injunction against continued processing, or the passage of specified periods without federal action—as "implied cession." Cal. Lab. Code § 923.1(b)(1)(B)(i)–(iv). If the affirmative Board policy determination in *Committee of Interns* did not imply cession, institutional incapacity and administrative delay cannot do so.

AB 288 also bypasses § 10(a)'s substantive restrictions. It permits PERB to assume jurisdiction over cases involving transportation, manufacturing, communications, and mining without any determination that the relevant industry is predominantly local. Nor does it permit the Board to determine whether the California provisions governing the assumed cases are consistent with the corresponding provisions of the NLRA. In applications where the NLRA remains operative, AB 288 instead authorizes PERB to apply state procedures and remedies, including binding first-contract arbitration. Cal. Lab. Code § 923.1(e)(1)(D), (e)(2). As Part IV.C explains, that remedy conflicts with the federal policy of leaving substantive contract terms to the parties' bargaining. The narrower point here is that § 10(a) makes consistency a condition of

a valid cession, while AB 288 eliminates the Board agreement through which that condition would be addressed.

AB 288 therefore substitutes a unilateral state declaration for the federally controlled cession Congress prescribed. There is no agreement, no Board-defined scope of transfer, no determination that an affected interstate industry is predominantly local, and no federal assessment of whether California law is consistent with the NLRA. California instead decides when jurisdiction passes, what cases PERB will take, and what state procedures and remedies will govern. Section 10(a) assigns those decisions to the Board and permits them only through an agreement satisfying Congress's substantive limits.

**B. Section 14(c) permits state jurisdiction only after a Board-made declination.**

Section 14(c) was Congress's targeted response to the gap exposed by *Guss*. Unlike § 10(a), it does not depend on a cession agreement. It permits the Board, "in its discretion," to decline jurisdiction, "by rule of decision or by published rules," over disputes involving a "class or category of employers" when, "in the opinion of the Board," their effect on commerce is not sufficiently substantial to warrant federal jurisdiction. 29 U.S.C. § 164(c)(1). Only then may a state agency or court assume jurisdiction over disputes the Board has declined "pursuant to paragraph (1)." *Id.* § 164(c)(2). Congress thus closed the *Guss* gap through a defined federal decision—not by treating federal nonaction as an implied transfer.

AB 288's own findings confirm the attempted substitution. California declares that federal inaction "constitutes a rule of decision ceding jurisdiction of those cases." 2025 Cal. Stat. ch. 139, § 1(l). But § 14(c) requires a rule of decision by the Board, exercising the Board's discretion over a class or category of employers based on the disputes' effect on commerce. The Board has made no such determination. A loss of quorum, a judicial injunction, or specified periods of delay may affect whether or when a particular federal case is decided, but they are not the Board-made, class-based, commerce-related declination § 14(c)(1) requires. Cal. Lab. Code § 923.1(b)(1)(B)(i)–(iv). California cannot convert its own declaration about federal inaction into the federal determination Congress assigned to the Board.

**C. The exceptions preserving independent state interests do not authorize a State to decide the same federal labor controversy.**

*San Diego Building Trades Council v. Garmon*, 359 U.S. 236 (1959), held both that States must defer when conduct is arguably protected by § 7 or prohibited by § 8 and that the Board's failure to assume jurisdiction does not, standing alone, free a State to regulate activity it otherwise could not regulate. *Id.* at 245–46. The Teamsters' cases do not create a third route to Board-type jurisdiction. They preserve state authority over different controversies.

*United Construction Workers v. Laburnum Construction Corp.*, 347 U.S. 656 (1954), drew that distinction expressly: "To the extent that Congress prescribed preventive procedure against unfair labor practices, conflicting state procedure to the same end is excluded." *Id.* at 665. The Court nevertheless permitted common-law damages for the consequences of completed tortious conduct because federal law supplied no comparable compensatory procedure. *Id.* at 663–66. The state action redressed an independent tort; it did not create a state procedure for preventing or remedying unfair labor practices as such.

*Sears, Roebuck & Co. v. San Diego County District Council of Carpenters*, 436 U.S. 180 (1978), likewise allowed a state trespass action because the state and federal controversies were different. The state case concerned the location of the picketing—whether the union could remain on Sears's property—while the potential federal controversy concerned the object of the picketing. *Id.* at 197–98. The absence of a reasonable opportunity to obtain a Board ruling did not create a general state substitute. *Sears* emphasized that "when the same controversy may be presented to the state court or the NLRB, it must be presented to the Board." *Id.* at 202.

*Glacier Northwest, Inc. v. International Brotherhood of Teamsters Local Union No. 174*, 598 U.S. 771 (2023), did not recognize another exception permitting state regulation of conduct arguably protected by the NLRA. It held that the conduct alleged in the complaint was not arguably protected because the union had failed to take reasonable precautions against foreseeable and imminent harm to the employer's property. *Id.* at 779–84. The threshold for *Garmon* preemption therefore was not satisfied.

AB 288 is different from each of those cases. It does not preserve a traditional state tort, adjudicate a controversy different from the potential federal controversy, or regulate conduct outside the NLRA's arguable protection or prohibition. It directs the petitioner to submit the original NLRB charge or petition and supporting materials; permits PERB to resolve objections and voter-eligibility challenges pending before the NLRB; and authorizes PERB to decide the underlying recognition, bargaining, and unfair-labor-practice issues. Cal. Lab. Code § 923.1(c)(1)–(3), (d)(1)(C)–(D), (e)(1)(A)–(C). AB 288 thus presents PERB with the same filing, the same parties, and the same representation or unfair-labor-practice controversy. That is not the protection of an independent state interest. It is a parallel state procedure directed to the same controversy and the same regulatory end as the federal process.

### D. Loss of federal protection permits state regulation only when federal law actually leaves room for it.

The NLRB does not contend that every withdrawal of federal coverage forecloses state regulation. Its motion excludes from the requested relief an actual repeal of the Act, a congressional narrowing intended to permit state-by-state regulation, and a final, non-appealable order permanently barring federal enforcement or processing in a particular matter. ECF No. 39-1 at 17–18. Those applications reflect the correct inquiry: not simply whether federal protection is absent, but why it is absent and whether federal law has left the subject open to the States.

*Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776*, 346 U.S. 485 (1953), recognized that conduct beyond the Board's power may be "governable by the State or entirely ungoverned." *Id.* at 488. Those are alternative possibilities. The absence of federal power does not itself select the first.

*Beasley v. Food Fair of North Carolina, Inc.*, 416 U.S. 653 (1974), illustrates the required inquiry. The NLRB declined to issue a complaint because the discharged workers were supervisors excluded from the Act's protection. *Id.* at 655–57. The Court did not hold that every federal exclusion foreclosed every form of state regulation. It explained that § 14(a), 29 U.S.C. § 164(a), did not "wholly foreclose" state regulation concerning supervisors and examined the particular federal policy at issue. *Id.* at 657. It then held that North Carolina could not protect

supervisors against discharge for union membership because § 14(a) embodied a national policy against compelling employers to treat supervisors as employees for collective-bargaining purposes. *Id.* at 657–62. The workers' exclusion from federal protection therefore foreclosed, rather than invited, the contrary state protection.

*Committee of Interns* makes the distinction explicit. Even when the issue is exclusion from the Act's definition of "employee," the preemption consequence turns on congressional intent. 566 F.2d at 817 n.5. The supervisor exclusion reflects an affirmative national labor policy and therefore displaces contrary state law. By contrast, Congress's exclusion of agricultural workers has been understood to leave room for state regulation. *Id.*; *United Farm Workers of America v. Arizona Agricultural Employment Relations Board*, 669 F.2d 1249, 1257–58 (9th Cir. 1982). "Loss of coverage," standing alone, does not determine which consequence follows.

Subparagraph (A) ignores that distinction and fixes January 1, 2025, as its baseline. Any later contraction in federal coverage automatically activates California's replacement regime, without asking whether federal law leaves the subject open to state regulation or instead embodies a policy California would reverse. Cal. Lab. Code § 923.1(b)(1)(A). An actual repeal or a congressional narrowing designed to permit state regulation may leave room for California law. But an executive interpretation or judicial construction may instead reflect a federal judgment that particular workers or conduct should not receive the rights California seeks to confer.

Subparagraph (A) also treats an injunction against federal "enforcement" in a particular worker's case as a loss of coverage. *Id.* A final, non-appealable order permanently barring federal enforcement or processing may present the circumstance the NLRB excludes from its requested relief. But a preliminary or interlocutory injunction may restrain federal officials without amending the NLRA, changing the worker's statutory status, or permanently withdrawing the federal system. Section 923.1(b)(2) then requires PERB to retain jurisdiction after that temporary obstacle disappears.

California may regulate only to the extent federal law actually leaves room for state regulation. It may not treat every narrowing of the NLRA, executive action, judicial

construction, or temporary case-specific injunction as automatic authority to confer rights federal law affirmatively withholds or to substitute PERB for the NLRB in matters that remain within the federal field.

**III. AB 288 CREATES A PARALLEL STATE SYSTEM FOR THE BOARD'S OWN CASES AND KEEPS IT AFTER FEDERAL PROCESSING RESUMES.**

The NLRB correctly explains that AB 288 obstructs the federal scheme by empowering PERB to exercise jurisdiction concurrent with the NLRB and to supplant or augment federal labor policy. ECF No. 39-1 at 16, 19. AB 288's operative provisions make that conflict apparent on the face of the statute. For triggers that arise while the NLRA continues to govern—including delay, lack of a quorum, removal litigation, and a temporary injunction against federal processing—the same representation or unfair-labor-practice matter may fall within both agencies' asserted authority. The NLRB's statement of undisputed facts, citing the Teamsters' answer, accordingly, describes § 923.1 as permitting PERB to exercise jurisdiction "concurrent with the NLRB." ECF No. 39-2 ¶ 7.

AB 288 makes clear that the state and federal proceedings concern the same case. A covered worker may ask PERB to "process any representation petition previously filed with the National Labor Relations Board" or to decide an unfair-labor-practice matter. Cal. Lab. Code § 923.1(c)(1), (3). The worker must provide PERB, where applicable, the original NLRB charge or petition, the supporting documentation and evidence submitted to the NLRB, and the NLRB's correspondence concerning the matter. *Id.* § 923.1(d)(1)(C)–(D). PERB may then resolve objections and voter-eligibility challenges pending before the NLRB, certify a representative, order bargaining, and decide the unfair-labor-practice charge. *Id.* § 923.1(e)(1)(A)–(C). AB 288 therefore changes the sovereign decisionmaker, procedures, and remedial policy—not the parties, facts, filing, or underlying dispute.

The overlap arises in two ways. Under AB 288's delay triggers, the federal charge or petition remains pending before the NLRB when PERB becomes authorized to process it. *Id.* § 923.1(b)(1)(B)(ii)–(iv). The jurisdiction is concurrent from the outset. Under a temporary institutional impediment, the overlap arises when federal processing resumes. Section

923.1(b)(2) requires PERB to "retain jurisdiction over pending matters" and "maintain jurisdiction from that point forward" after the triggering condition disappears unless a court orders otherwise. Nothing in AB 288 automatically stays the state proceeding, requires PERB to defer to later federal action, gives either agency priority, or requires PERB to dismiss when the NLRB resumes processing. Ending the overlap requires a separate court order. The agencies may therefore remain positioned to decide the same election, certification, bargaining obligation, or unfair-labor-practice charge.

*Garner* explains why Congress did not permit that arrangement. Congress did not merely enact substantive labor rules that any competent tribunal could administer. It assigned their primary interpretation and application to a specifically constituted federal agency and prescribed the procedures through which that agency must act. *Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776*, 346 U.S. 485, 490–91 (1953). Centralized administration was intended to avoid the "diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies." *Id.* at 490. AB 288 recreates that danger. PERB proceeds under its own procedures, may rely on its own decisions and NLRA precedent in the manner that most expansively effectuates the state-created rights, and is reviewed through California's appellate courts. Cal. Lab. Code § 923.1(e)(1)–(2), (4). The possibility that PERB may consult federal precedent does not cure the conflict. Congress assigned the decisionmaker, procedures, remedies, and route of review—not merely a body of substantive rules.

*Bethlehem Steel Co. v. New York State Labor Relations Board*, 330 U.S. 767 (1947), makes the problem especially concrete in the representation context. There, federal and state labor boards claimed authority over the same employers, employees, and representation relationship while exercising discretion under different standards. *Id.* at 774–76. The Court rejected concurrent state authority because the second board would either follow the first, making its action superfluous, or depart from the first, producing conflict. *Id.* at 775–76. Nor could federal supremacy depend on which tribunal happened to act first. *Id.* at 776. AB 288 creates the same problem by design: it directs PERB to decide matters already filed with or

pending before the NLRB and preserves PERB's authority when federal processing continues or resumes.

For the temporary and delay-based triggers at issue, AB 288 does not merely allow PERB to enter the federal field without authorization. It makes concurrent state and federal administration of the same cases the default—immediately under the delay triggers and once federal processing resumes under the temporary-impediment triggers. The resulting conflict falls directly on employers.

## IV. AB 288 LEAVES EMPLOYERS NO SAFE COURSE BETWEEN COMPETING REPRESENTATIVES, CONFLICTING ORDERS, AND STATE-IMPOSED CONTRACT TERMS.

The NLRB explains that AB 288 allows two labor agencies to act on the same dispute and threatens chaotic and unpredictable labor relations. ECF No. 39-1 at 16, 19. For an employer, the problem is immediate. It must decide which union to recognize, which employees are in the bargaining unit, whether discipline may stand, what workplace rule may be enforced, and which agency's order must be obeyed.

Under the delay, quorum, removal, and temporary-injunction triggers challenged here, the federal case remains pending or can resume. AB 288 nevertheless allows PERB to take the same matter. It gives the employer no priority rule, automatic stay, or safe harbor. The examples below follow directly from the authority AB 288 gives PERB; they do not depend on disputed facts.

### A. A recognition demand can produce two representation cases and two bargaining duties.

The problem can begin with an ordinary demand for recognition. A union tells an employer that it represents the employees and demands bargaining. The employer questions the union's majority support, the proposed bargaining unit, or both. It files an RM petition asking the NLRB to decide whether the employees want representation and, if so, in what unit. 29 U.S.C. § 159(c)(1)(B).

AB 288 allows the union or employees to take the same dispute to PERB. If the federal case remains unresolved for more than six months without a certification, they may ask PERB to process the federal petition. Cal. Lab. Code § 923.1(b)(1)(B)(ii), (c)(1). In a post-election case, PERB may also act if a qualifying removal ruling or constitutional injunction stops continued federal processing. *Id.* § 923.1(b)(1)(B)(i). PERB may then hold its own election, resolve objections or voter-eligibility challenges still pending before the NLRB, or certify a representative through written designations or another process it recognizes. *Id.* § 923.1(c)(2), (e)(1)(A)–(B).

The two agencies could answer every important question differently. One could approve a facility-wide unit while the other approves a smaller group. One could include shift leads as employees while the other excludes them as supervisors. Those rulings would produce different voter lists and could change the outcome of the election.

The agencies could also reach opposite results on representation. The union could lose an NLRB secret-ballot election but obtain a PERB certification based on written designations. One agency could uphold an election while the other sets it aside and orders a rerun. They could rule differently on challenged ballots or campaign objections. If another union is involved, the agencies could even certify different representatives.

The employer must act before those differences are resolved. It must decide which union receives employee information, attends disciplinary meetings, and bargains over wages, schedules, benefits, and workplace rules. It must also decide which employees are represented, whose terms and conditions may be changed, and whether shift leads may participate in confidential management discussions.

Every answer creates legal risk. If the employer refuses to bargain with the PERB-certified union, it may face a state refusal-to-bargain charge, injunctive relief, and penalties. If it recognizes that union after the NLRB finds that the union lacks majority support, it may face a federal claim that it unlawfully recognized or supported a minority union. If the NLRB certifies a different union, bargaining with either union necessarily means refusing to bargain with the other.

Even agreement on the union would not solve the problem if the agencies define different units. The employer would still have conflicting answers about which employees are represented, which workers are supervisors, which employees must be included in information requests, and where the duty to bargain begins and ends.

AB 288 supplies no priority rule, automatic stay, or safe harbor. Once PERB takes the case, it may keep jurisdiction after the federal trigger disappears unless a court orders otherwise. Cal. Lab. Code § 923.1(b)(2). The employer therefore cannot assume that the NLRB's eventual ruling will end the state proceeding.

An RM petition is supposed to give the employer one answer to a basic question: who, if anyone, must it recognize and bargain with? AB 288 can produce two proceedings, two voter lists, two election results, and two bargaining duties. The employer must choose which result to follow—and may face liability under the other system whichever choice it makes.

### B. The same discipline or policy decision can produce two cases and opposite orders.

The conflict does not end once representation is settled. Suppose an employer disciplines a California-based driver under a companywide attendance rule after an incident on a Nevada route. A Nevada manager approves the discipline, and the employee files an NLRB charge. Beginning January 1, 2027, once the applicable AB 288 trigger is met, the employee may file the same matter with PERB while the federal case remains unresolved. Cal. Lab. Code § 923.1(c)(3)(E).

The charging party must give PERB the original NLRB charge, the supporting documents and evidence submitted to the NLRB, and the NLRB's correspondence concerning the case. *Id.* § 923.1(d)(1)(C)–(D). But AB 288 states that the supporting documents and evidence "shall not be served on the respondent" and must remain confidential in PERB's investigatory file. *Id.* § 923.1(d)(2)–(3). PERB may therefore begin with the charging party's federal file even though the statute does not require that supporting submission to be served on the employer.

The employer must still defend the same decision twice. It must preserve and produce the same schedules, dispatch records, personnel documents, and communications. The same supervisors and human-resources employees may have to participate in two investigations and two hearings under different procedures. The employer must meet both sets of deadlines while continuing to run the workplace.

The two agencies may then give opposite answers. PERB could order reinstatement, backpay, withdrawal of the attendance rule, bargaining over a replacement rule, injunctive relief, and penalties. The NLRB could later dismiss the charge, find the discipline lawful, or order a different remedy. The reverse could also occur: PERB could reject the claim before the NLRB later finds a federal violation.

The employer cannot wait for the conflict to resolve itself. Employees must be scheduled and paid. Discipline must be applied consistently. Supervisors must know what rule they may enforce tomorrow. Following PERB's order may require the employer to abandon a companywide policy or create a California exception for employees who cross state lines. Refusing to comply in order to preserve the federal position may lead to more state enforcement.

AB 288 answers none of the practical questions. It does not say whether compliance with one order excuses noncompliance with the other, whether one agency's findings bind the other, or how the employer must unwind actions taken under the first decision when the second reaches a different result. And § 923.1(b)(2) keeps PERB in the case after the federal obstacle ends unless a court orders otherwise.

The state enforcement process adds pressure. Once a state appellate court enforces a PERB order, a petition for California Supreme Court review does not stay the decision unless a court expressly orders a stay. A violation may be punished through contempt. Cal. Lab. Code § 923.1(e)(4). The employer may therefore be forced to follow the state result while the same dispute remains alive in the federal system.

This is not a choice between two optional forums. The charging party may invoke PERB, but the employer cannot opt out of either case. It must defend both, meet both sets of deadlines, and make day-to-day operating decisions before either system supplies a final answer.

**C. Six months without a contract can lead to government-imposed terms and large penalties.**

Even if the agencies agree on the representative, AB 288 changes the bargaining rules. Federal law requires good-faith bargaining, but it does not require either side to accept a proposal or reach an agreement. Section 8(d) states that the duty to bargain "does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(d).

*H.K. Porter Co. v. NLRB*, 397 U.S. 99 (1970), enforced that line even after the Board found repeated bad-faith bargaining. The Board could order the parties back to the bargaining table, but it could not write their contract. *Id.* at 107–09. Congress left wages, benefits, schedules, and other contract terms to the bargaining process.

For bargaining relationships that remain governed by the NLRA, AB 288 goes further. PERB may order binding arbitration once more than six months have passed without an executed agreement, so long as the representative was certified by the NLRB or PERB or was voluntarily recognized by the employer. Cal. Lab. Code § 923.1(e)(1)(D). AB 288 does not require a finding of bad faith, impasse, or an unlawful refusal to make a concession. The passage of time is enough.

The statute also does not limit the terms the arbitrator may decide. An award could set wages, health-plan contributions, schedules, seniority rules, subcontracting restrictions, transfer rights, and grievance procedures. Those are matters the NLRB may require the parties to discuss but may not decide for them.

The problem is especially serious for a regional employer. An arbitrator could impose terms for a California unit while federal bargaining continues over a regional unit that uses the same payroll, benefits, scheduling, and dispatch systems. An employee who transfers from Reno to Sacramento could change representatives, wage scales, seniority rights, scheduling rules, and grievance procedures while remaining under the same supervisors and on the same payroll. The employer may be unable to administer the California award without either extending it beyond California or creating conflicting systems inside one operation.

Federal law does not permit California to choose the bargaining outcome. State efforts to control the substantive terms of a collective-bargaining agreement are as inconsistent with the federal system as similar efforts by the NLRB. *Lodge 76, International Ass'n of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 149–50 (1976). California has "no more authority than the Board to upset the balance that Congress has struck between labor and management." *Chamber of Commerce of the United States v. Brown*, 554 U.S. 60, 74 (2008) (quoting *Metropolitan Life Insurance Co. v. Massachusetts*, 471 U.S. 724, 751 (1985)).

The penalties make resistance dangerous. PERB may order injunctive relief and penalties, including when an employer refuses to comply with an AB 288 order. Cal. Lab. Code § 923.1(e)(1)(E). If PERB finds a pattern or practice of unfair practices, it may assess $1,000 "per worker per violation." *Id.* § 923.1(e)(3). Two violations affecting 500 workers would produce $1 million in civil penalties, apart from backpay, reinstatement, bargaining obligations, injunctive relief, litigation costs, and contempt exposure. The statute states no aggregate cap.

The representation conflict makes that pressure especially severe. Refusing to recognize PERB's representative may produce a bargaining order and penalties. Recognizing that representative may conflict with the federal election or certification. Resisting compulsory arbitration may lead to enforcement. Implementing the award may change the bargaining status quo in the federal unit. AB 288 gives the employer no way to preserve both positions without risking liability in one system.

A single recognition demand can therefore set off a chain of conflicting obligations. The NLRB and PERB may define different units, count different voters, reach different election results, and impose different bargaining duties. PERB may then compel contract terms after six months, assess per-worker penalties, and keep the case after federal processing resumes. The employer must follow California, preserve its federal position, or try to do both. AB 288 gives it no safe answer.

## CONCLUSION

AB 288 makes two different but equally invalid moves. For matters that remain within the federal system, it treats delay, a lack of quorum, removal litigation, or a temporary injunction as permission for California to take the same petitions and charges, decide them under a separate state system, and keep them after federal processing resumes. For workers who lose federal protection, it assumes that every loss of coverage leaves California free to supply rights federal law withheld. Neither premise is correct. Sections 10(a) and 14(c) require affirmative Board action before California may take matters otherwise assigned to the NLRB; the recognized preemption exceptions preserve only genuinely independent state controversies; and a loss of federal protection permits state regulation only when federal law actually leaves room for it.

The Court should grant the NLRB's motion for summary judgment and the requested declaratory and injunctive relief. That relief would leave untouched state authority arising from a valid § 10(a) agreement within its scope and statutory limits, a qualifying § 14(c) declination, a genuinely independent state-law claim, an actual repeal or congressional narrowing intended to permit state regulation, or a final, non-appealable order permanently barring federal enforcement or processing in a particular matter. It would prevent only what the NLRA does not allow: California's use of delay, a lack of quorum, removal litigation, or a temporary restraint on federal processing to create and retain a second labor-relations system—and its use of state law to override a federal policy that leaves no room for contrary state regulation.

Respectfully submitted,

Dated: September 17, 2026

JACKSON LEWIS P.C.

By: /s/ Dylan B. Carp

Dylan B. Carp
Counsel for Amici
COALITION FOR A DEMOCRATIC WORKPLACE
INTERNATIONAL FOOD SERVICE DISTRIBUTORS ASSOCIATION
NATIONAL RETAIL FEDERATION