JULIE GUTMAN DICKINSON (SBN 148267)– *designated for service*
jgutmandickinson@bushgottlieb.com
JENNIFER A. ABRUZZO *(Pro hac vice forthcoming)*
jabruzzo@bushgottlieb.com
HECTOR DE HARO (SBN 300048)
hdeharo@bushgottlieb.com
LUKE TAYLOR (SBN 338327)
ltaylor@bushgottlieb.com
BUSH GOTTLIEB
A Law Corporation
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260
Telephone: (818) 973-3200
Facsimile: (818) 973-3201

Attorneys for Intervenor International Brotherhood of Teamsters

(additional counsel on next page)

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA, SACRAMENTO DIVISION

NATIONAL LABOR RELATIONS BOARD,

Plaintiff,

vs.

STATE OF CALIFORNIA and the PUBLIC EMPLOYMENT RELATIONS BOARD,

Defendant.

and

INTERNATIONAL BROTHERHOOD OF TEAMSTERS,

Intervenor.

Case No. 2:25-cv-02979-TLN-CKD

**Memorandum of Points and Authorities In Support of Intervenor International Brotherhood of Teamsters' Opposition to Plaintiff National Labor Relations' Board's Motion for Summary Judgment; and In Support of Intervenor's Conditional Cross-Motion for Summary Judgment**

Judge: Troy L. Nunley
Date: November 12, 2026
Time: 2:00 pm
Crtrm.: 2
Oral Argument Requested

David O'Brien Suetholz
dsuetholz@teamster.org
Clement Tsao
ctsao@teamster.org
Willie J. Burden
wburden@teamster.org
INTERNATIONAL BROTHERHOOD OF TEAMSTERS
25 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 624-6847

Edward M. Gleason, Jr.
ed@hsglawgroup.com
HERZFELD, SUETHOLZ, GASTEL, LENISKI AND WALL, PLLC
128 C Street NW
Washington, D.C. 20001
Phone: (202) 978-3507

Pamela M. Newport
pamela@hsglawgroup.com
HERZFELD, SUETHOLZ, GASTEL, LENISKI AND WALL, PLLC
600 Vine Street | Suite 2720
Cincinnati, OH 45202
Phone: (513) 381-2224

Richard Griffin
rgriffin@bredhoff.com
BREDHOFF & KAISER, PLLC
805 15th Street NW Ste. 1000
Washington, DC 20005
Phone: (202) 842-2600

Jeanne Mirer
jmirer@julienmirer.com
JULIEN MIRER & ASSOCIATES, PLLC
1 Pierrepont Plaza, 12th Floor
Brooklyn, NY 11201
Phone: (212) 231-2235

Ian Hayes
ihayes@hayesdolce.com
HAYES DOLCE LLP
135 Delaware Avenue, Suite 502
Buffalo, NY 14202
Phone: (716) 534-8388

Attorneys for Intervenor International Brotherhood of Teamsters

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

# TABLE OF CONTENTS


TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

BACKGROUND ..... 2

I. Procedural History ..... 2

II. The NLRB's loss of independence and quorum. ..... 2

A. The NLRB has lost its independence. ..... 2

B. The President is enjoying the NLRB's dependence. ..... 4

C. Lost quorums incapacitate the Board and preclude enforceable orders. ..... 6

III. The NLRB has suffered decades-long atrophy since *Garmon*. ..... 7

ARGUMENT ..... 8

I. Summary Judgment Standard ..... 8

II. The *Garmon* doctrine does not control. ..... 8

A. Lost independence negates *Garmon*'s applicability ..... 11

1. The *Garmon* doctrine presupposes an independent NLRB. ..... 11

2. Without the Board's removal protections, the NLRB is not independent. ..... 14

3. The record countermands concluding the NLRB remains independent. ..... 15

4. Any intent to promote uniformity through such broad preemption was conditioned on the NLRB's independence. ..... 16

5. Ending quorums is now a tool of Presidential control. ..... 17

B. The NLRB no longer protects workers' rights. ..... 21

III. AB 288's triggers are permissible. ..... 22

IV. AB 288 is not obstacle preempted. ..... 23

V. Sections 10(a) and 14(c) are not exclusive bases for state regulation. ..... 26

VI. Extending *Garmon* would contravene the Tenth Amendment....28
CONCLUSION....29

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

**<u>Table of Authorities</u>**

**Page(s)**

**Federal Cases**

*Alexander v. Gardner-Denver Co.*,
415 U.S. 36 (1974) ........ 10, 26

*Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of Am. v. Lockridge*,
403 U.S. 274 (1971) ........ 19, 27

*Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emps. of Am., Div. 998 v. Wisconsin Emp. Rels. Bd.*,
340 U.S. 383 (1951) ........ 9

*Ass'n To Pres. & Protect Loc. Livelihoods v. Sidman*,
147 F.4th 40 (1st Cir. 2025) ........ 29

*Boire v. Greyhound Corp.*,
376 U.S. 473 (1964) ........ 6

*Bricklayers Loc. 20 v. Martin Jaska, Inc.*,
752 F.2d 1401 (9th Cir. 1985) ........ 8

*Brown v. Pro Football*,
518 U.S. 231 (1996) ........ 1, 21

*California v. ARC Am. Corp*,
490 U.S. 93 (1989) ........ 26

*Caudill v. Lancaster Bingo Co.*,
2005 WL 2738930 (S.D. Ohio Oct. 24, 2005) ........ 26

*Chamber of Com. of the United States of Am. v. City of Seattle*,
890 F.3d 769 (9th Cir. 2018) ........ 22

*Chicago, B. & Q.R. Co. v. McGuire*,
219 U.S. 549 (1911) ........ 9

*Eng. v. Gen. Elec. Co.*,
496 U.S. 72 (1990) ........ 9, 16, 17

*Fed. Commc'ns Comm'n v. Consumers' Rsch.*,
606 U.S. 656 (2025) ........ 14

*Glacier Nw. v. Int'l Bhd. of Teamsters Loc. Union No. 174*,
598 U.S. 771 (2023) ........ 1, 9, 18, 27

*Guss v. Utah Labor Relations Board*,
353 U.S. 1 (1957) .......... 27

*Harris v. Bessent*,
160 F.4th 1235 (D.C. Cir. 2025) .......... 2

*Harris v. Bessent*,
2025 WL 980278 (D.C. Cir. Mar. 28, 2025) .......... 2, 3

*Harrison Steel Castings Co. v. NLRB*,
923 F.2d 542 (7th Cir. 1991) .......... 6

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......... 13

*Hemmings v. Tidyman's Inc.*,
285 F.3d 1174 (9th Cir. 2002) .......... 26

*Hines v. Davidowitz*,
312 U.S. 52 (1941) .......... 24

*Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*,
476 U.S. 380 (1986) .......... 19, 22

*Knox v. Brnovich*,
907 F.3d 1167 (9th Cir. 2018) .......... 25

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .......... 13

*Margolin v. Nat'l Ass'n of Immigr. Judges*,
608 U.S. 339 (2026) .......... 10

*McLamb v. NLRB*,
141 F.4th 1308 (D.C. Cir. 2025) .......... 13

*Metro. Life Ins. Co. v. Massachusetts*,
471 U.S. 724 (1985) .......... 8, 13

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018) .......... 28, 29

*Nash v. Fla. Indus. Comm'n*,
389 U.S. 235 (1967) .......... 24

*New Process Steel v. NLRB*,
560 U.S. 674 (2010) .......... 5

*NLRB v. Committee of Interns and Residents*
566 F.2d 810 (2d Cir. 1977) .......... 27

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

*NLRB v. J. Weingarten*,
420 U.S. 251 (1975) .......... 1, 5, 21

*Norton v. S. Utah Wilderness All.*,
542 U.S. 55 (2004) .......... 14

*RAV Truck & Trailer Repairs v. NLRB*,
997 F.3d 314 (D.C. Cir. 2021) .......... 6

*San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*,
359 U.S. 236 (1959) .......... *passim*

*Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*,
436 U.S. 180 (1978) .......... *passim*

*Seila L. LLC v. Consumer Fin. Prot. Bureau*,
591 U.S. 197 (2020) .......... 14

*Silverman v. Whittall & Shon*,
1986 WL 15735 (S.D.N.Y. June 6, 1986) .......... 6, 13

*Space Expl. Techs. Corp. v. NLRB*,
151 F.4th 761 (5th Cir. 2025) .......... 3, 8

*Trump v. Slaughter*,
146 S. Ct. 2283 (2026) .......... *passim*

*Trump v. Wilcox*,
145 S. Ct. 1415 (2025) .......... 2, 3, 13

*UAW-CIO v. Russell*,
356 U.S. 634 (1958) .......... 27

*United Const. Workers v. Laburnum Const. Corp.*,
347 U.S. 656 (1954) .......... 22, 27

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) .......... 23, 24

*Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig*
959 F.3d 1201 (9th Cir. 2020) .......... 24

*Western Cab Co. & United Steel*,
365 NLRB 761 (2017) .......... 6

*Wiener v. United States*,
357 U.S. 349 (1958) .......... 11

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

**Federal Statutes**

29 U.S.C.
§ 151 .......... 1, 20, 24
§ 156 .......... 4
§ 160 .......... 6, 26, 27

44 U.S.C.
§ 3502(5) .......... 4

29. U.S.C.
§ 153 .......... 28

**California Statutes**

Cal. Bus. & Prof. Code
§ 16600 .......... 26

Lab. Code
§ 923.1 .......... *passim*

**Other Authorities**

U.S. Const. amend. X .......... 28

Exec. Order 14215 (Feb. 18, 2025) .......... 4, 15

Fed. R. Civ. P. 56(a) .......... 8

H.R. REP. NO. 74-969 (1935) .......... 11

John Kallas et al., *Breaking the deadlock: How union and employer tactics affect first contract achievement*, 54. INDUS. REL. J. 223 (2023) .......... 7

Lawrence Mishel et al., *Explaining the erosion of private sector unions*, ECON. POL'Y INST. (Nov. 8, 2020) .......... 7

*National Labor Relations Board: Hearings on S. 1958 Before the Senate Comm. on Education and Labor, 74th Cong.*, at 115-16 (1935) (Sen. Wagner) .......... 11

Paul C. Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA*, HARV. L. REV. 1769 (1983) .......... 8

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

**INTRODUCTION**

Congress enacted the National Labor Relations Act ("NLRA") in 1935 during the Great Depression to address nationwide industrial and economic instability emanating from widespread strikes, violence, and other protest activity caused by a lack of sufficient channels for employees to engage with their employers to improve their wages and working conditions. While the NLRA's substantive aims were various—promoting industrial democracy, redistributing wealth, and peacefully resolving labor disputes—Congress envisioned that the route to fulfilling all those goals was "meaningful collective bargaining." *See, e.g.*, *Brown v. Pro Football*, 518 U.S. 231, 237 (1996) (collecting cases); 29 U.S.C. § 151 ("The denial by some employers of the right of employees to organize and the refusal by some employers to accept the procedure of collective bargaining lead to strikes and other forms of industrial strife or unrest . . . burden[] and affect[] the flow of commerce . . . [and] aggravate recurrent business depressions, by depressing wage rates . . . ."). Safeguarding collective bargaining requires the National Labor Relations Board ("NLRB" or "Board") to *actively* enforce the NLRA. In fact, fundamental to Congress's core objective was the intention that the Board would actively "adapt the [NLRA] to changing patterns of industrial life." *NLRB v. J. Weingarten*, 420 U.S. 251, 266 (1975).

This case involves a state law ("AB 288") that allows California's Public Employment Relations Board ("PERB") to decide labor cases that could otherwise only be heard by the NLRB. AB 288 recognizes that the premises underlying *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236 (1959) ("*Garmon*") have been negated. That implied preemption doctrine requires a functioning, independent NLRB. The NLRB is no longer either. Congress would not have intended such a dysfunctional NLRB under a President's thumb to effect a preemption regime that Justices Thomas and Gorsuch recently described as "strange[ly] . . . broad." *Glacier Nw. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 785 (2023).

Nor is AB 288 facially obstacle preempted. AB 288 in no way bars anyone from bringing charges to the NLRB and seeking the NLRA's protections. It merely permits PERB to advance the same fundamental policies underlying the NLRA, when the NLRB is unable or unwilling to do so. If specific applications of AB 288 in the future prove to conflict with the NLRA, courts can evaluate as-applied challenges in suitable cases. AB 288's severability clause permits finding applications preempted, without invalidating the rest of the law.

## **BACKGROUND**

### I. Procedural History.

Plaintiff's Complaint alleges that Section 2 of AB 288 is preempted because it empowers PERB to regulate activity arguably protected or prohibited by the Act, and stands as an obstacle to Congress's purposes and objectives. Dkt. 1 at 9, claim for relief ¶ 2 (citing *Garmon*). The Court granted the International Brotherhood of Teamsters' ("IBT") motion to intervene. Dkt. 6. On December 26, 2025, the Court granted in part and denied in part Plaintiff's Motion for Preliminary Injunction. Dkt. 30. IBT served discovery requests on Plaintiff on July 31, Dkt. 40-1 at 4-29, and Plaintiff moved for summary judgment on August 26. On September 21, the Court granted IBT's motion for leave to file a conditional cross-motion for summary judgment with its opposition to Plaintiff's motion for summary judgment and to separately file its Rule 56(d) motion. Dkt. 51.

### II. The NLRB's loss of independence and quorum.

#### A. The NLRB has lost its independence.

The NLRA was structured to carefully insulate the Board's members from presidential control, by prohibiting the President from removing Board members except for cause. *Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) (citing 29 U.S.C. §153(a)); IBT's Statement of Undisputed Facts ("SUF") ¶ 9; *infra* II.A. Those members have now lost that independence. On January 27, 2025, President Trump removed Board member Gwynne Wilcox based on his view that these

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

statutory removal protections are unconstitutional. *Harris v. Bessent*, 2025 WL 980278, at *2 (D.C. Cir. Mar. 28, 2025); SUF ¶ 10. The Supreme Court stayed the D.C. Circuit's *en banc* decision enjoining Wilcox's removal, signaling that the Supreme Court was likely to eventually hold these removal protections are unconstitutional. *Wilcox*, 145 S. Ct. at 1415; SUF ¶ 11. Thereafter, the D.C. Circuit Court of Appeals held that the NLRA's statutory removal protections for NLRB Board Members are unconstitutional. *Harris v. Bessent*, 160 F.4th 1235, 1242 (D.C. Cir. 2025); SUF ¶ 12.[1] In short, the NLRB's historic independence from Presidential control is no longer operative. The consequence is that Board members, fearing removal at the whim of the President, may engage in self-interested decision making as opposed to fully effectuating the statutory mandate of protecting workers' rights as intended by Congress. Or equally troubling, may be removed at any time, thereby resulting in a potential perpetual cycle of lost quorums, which detrimentally impacts workers as further discussed below.

After *Harris* was decided, the Supreme Court decided *Trump v. Slaughter*, 146 S. Ct. 2283 (2026). The Court there held that "all that is left of *Humphrey's* is its observation that an agency that exercises *no* part of the executive power need not fall within the rule of Presidential removal." *Id*. at 2302 (emphasis added). "If anything more *is* left of *Humphrey's*, we overrule it." *Id*. This Court need not decide whether *Slaughter* applies to the Board's removal protections. The status quo before—and after—*Slaughter* is that the Board lacks removal protections. The Supreme Court's stay on Wilcox's reinstatement, standing alone, establishes this fact, as Board members have no basis to think the Court would permit their reinstatement if they are fired. And *Harris*'

---

[1] It further sanctioned political interference with the NLRB's Administrative Law Judges by holding that the Merit System Protection Board's ("MSPB") members' removal protections are unconstitutional. *Id.* Those members are who enforce "good cause" removal protections for the NLRB's ALJs. *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 768 (5th Cir. 2025); SUF ¶¶ 13-14. The MSPB's lost independence is therefore tantamount to ALJ's lost independence. Were that not enough, the President's Office of Personnel Management ("OPM") has now issued a new rule that authorizes the OPM to fire federal employees based on allegations concerning "post-appointment conduct". SUF ¶ 26.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

invalidation of the Board's removal protections eliminates any doubt that this is the status quo. Intervenor maintains that the *Garmon* doctrine does not control in the absence of the Board's removal protections. Since those protections have been lost independent of *Slaughter*, this Court need not pass on *Slaughter*'s application to the Board.

Nor need the Court determine whether either *Slaughter* or the Supreme Court's stay in *Wilcox* constitutes "the Supreme Court finding that National Labor Relations Board members are unconstitutionally protected from removal" for purposes of meeting the condition the legislature set for AB 288's independence trigger. Dkt. 39-1 ("MSJ") at 15-16. That is a question of how to interpret California's statute that Plaintiff's action does not present and that is irrelevant to determining whether AB 288's independence trigger—or any other trigger—is facially preempted.[2]

**B. The President is enjoying the NLRB's dependence.**

The President is enjoying his novel power. Within weeks of firing Wilcox, the President issued an Executive Order providing that "[t]he President and the Attorney General, subject to the President's supervision and control, shall provide authoritative interpretations of law for the executive branch." Exec. Order 14215 (Feb. 18, 2025) ("EO 14215) §7; IBT's Statement of Undisputed Material Facts ("SUF") ¶ 15. Their "opinions on questions of law are controlling on all employees"—including on "so called" independent agencies such as the NLRB—and "[n]o employee of the executive branch . . . may advance an interpretation of the law . . . that contravenes the President or the Attorney General's opinion on a matter of law." *Id.*; EO 14215

[2] If this Court nonetheless concludes it must reach the issue, it should conclude *Slaughter*'s reasoning applies to the Board. First, *Slaughter* reasoned that the FTC's "power to promulgate substantive rules that carry the force of law" constitutes executive power. 146 S. Ct. at 2304-05. The Board likewise exercises such power. 29 U.S.C. § 156. Second, *Slaughter* indicated that the power to "enforce[] [an agency's] statutes and rules through in-house adjudications" is executive. 146 S. Ct. at 2305. The Board likewise is responsible for in-house adjudication. 29 U.S.C. § 160(c).

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

§§1, 2(b), 5, 7; *see also* 44 U.S.C. § 3502(5). Additionally, the order instructs that previously independent agencies must now receive clearance for regulatory actions from the Executive Office of the President. *See* EO 14215 § 1; SUF ¶ 16. The NLRB had never before been subject to this requirement. *Id.* ¶ 17. The NLRB must now establish a "Regulatory Policy Officer" and "Regulatory Second" as intermediaries between the Board and the Executive Office of the President ("EOP") to coordinate the EOP's pre-clearance of the Board's rulemaking. *Id*. ¶ 18.

Aside from the foregoing commands—now backed by pain of discharge—the Order establishes, *inter alia*, two channels of continuous contact between the NLRB and Executive Office of the President. First, the NLRB's chairman "shall regularly consult with and coordinate policies and priorities with the directors of OMB, the White House Domestic Policy Council, and the White House National Economic Council." EO 14215 §6(a); SUF ¶ 19. Second, the NLRB "shall establish a position of White House Liaison" who "shall be placed in Schedule C of the excepted service." EO 14215 §6(b); SUF ¶ 20.

In addition to this White House Liaison, the White House has signaled it expects additional Schedule C employees in the NLRB to carry out his agenda. An April 10, 2025 Office of Personnel Management ("OPM") memo to all agencies explains that agencies should have Schedule C employees "in important confidential, policy-determining, policy-making and policy-advocating roles . . . to drive the unusually expansive and transformative agenda the American people elected President Trump to accomplish." *Id.* ¶ 21. The NLRB has one such Schedule C employee as the Board's Director of the Office of Public and Congressional Affairs, and another as policy advisor to the General Counsel. *Id.* ¶ 22.

The White House also has conscripted the NLRB's Senior Executive Service ("SES") to "link" Board members and other NLRB presidential employees with "the rest of the federal workforce" to further the President's agenda. Specifically, the NLRB explains that "Members of

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

the SES serve in the key positions just below the top Presidential appointees. SES members are the major link between these appointees and the rest of the Federal workforce. *Id.* ¶ 23. SES Members "operate and oversee nearly every government activity" in the NLRB. *Id.* ¶ 24. OPM has issued guidance and is creating SES training programs to ensure that SES members in "so-called" independent agencies like the NLRB "deliver on key administration priorities." *Id.* ¶ 25.

**C. Lost quorums incapacitate the Board and preclude enforceable orders.**

In Wilcox's absence, the Board lacked a quorum for over eleven months. Without a quorum, the Board cannot issue any decisions. *New Process Steel v. NLRB*, 560 U.S. 674, 676 (2010); SUF ¶ 27. Although the NLRB's regional offices and ALJs may apply extant Board precedent to cases during this time, their determinations are not considered final, and the Board's inability to issue new decisions prevents it from "adapt[ing] the [NLRA] to changing patterns of industrial life." *J. Weingarten*, 420 U.S. at 266, to steer the preliminary decision-making of those offices and ALJs, *Western Cab Co. & United Steel* , 365 NLRB 761, fn 4. (2017).

Furthermore, no NLRB action becomes an enforceable judgment against a party until it becomes a final Board order and then additionally, if challenged, is enforced by a Court of Appeal. *See* 29 U.S.C.A. § 160(c, e, f)*; RAV Truck & Trailer Repairs v. NLRB*, 997 F.3d 314, 319 (D.C. Cir. 2021) (hearing Board's cross-petition for enforcement); *Silverman v. Whittall & Shon*, 1986 WL 15735, at *1 (S.D.N.Y. June 6, 1986) (explaining that NLRB orders are not "binding" until enforced by court); SUF ¶ 28. When the Board lacks a quorum, the most an employer need do to prevent an ALJ decision in an unfair labor practice case from becoming an "order of the Board", 29 U.S.C. §160(c), that a "person aggrieved" may seek enforcement of, *id.* §160(f), is "fil[e]" "exceptions" to the ALJ decision with the Board, *id*. §160(c). The quorum-less Board cannot then issue a "final order". *See* §160(f) (courts possess jurisdiction over only petitions to review of "final orders"); *Harrison Steel Castings Co. v. NLRB*, 923 F.2d 542, 545 (7th Cir. 1991) ("[A]

charged party may only seek judicial review of Board *orders*—not Board 'findings,' or 'charges,' or 'actions'"). In fact, during the recent lost quorum, employers did not need to even file exceptions to delay ultimate determinations. That's because the NLRB's Executive Secretary did not receive authority to automatically adopt ALJs' decisions and recommended orders as "the order of the Board" under §160(c) even when exceptions are not filed.

In a *representation* case, MSJ at 5, all an employer needs to do is file a request for review of a regional determination with the Board, and without a quorum, the request will just sit there unless the Regional Director reconsiders their decision or the petitioner withdraws the matter. SUF ¶ 8. To further delay their statutory obligations, employers may also refuse to recognize and bargain with the union— triggering an unfair labor practice charge known as "test of certification"—and then follow the same playbook. *See Boire v. Greyhound Corp.*, 376 U.S. 473, 477-78 (1964) (noting federal courts lack jurisdiction to review certification proceedings, and outlining test of certification process required to obtain enforceable judgment).

Without a quorum, workers lack recourse when employers flout regional determinations and ALJ decisions.

## III. The NLRB has suffered decades-long atrophy since *Garmon*.

Even before the Board lost a quorum, the NLRB had become notorious for its increasingly slow processes and weak enforcement capacity, and employers' increased willingness since the 1970s to willfully violate the NLRA has steeply reduced unionization and collective bargaining. SUF ¶ 3; John Kallas et al., *Breaking the deadlock: How union and employer tactics affect first contract achievement*, 54. INDUS. REL. J. 223 (2023), https://onlinelibrary.wiley.com/doi/epdf/10.1111/irj.12399, at pp. 225-27 (discussing employers' "tak[ing] advantage" of this, citing "increased employer opposition" since 1980s as one impediment to unionization, and noting decline in first contract rates since 1955); Lawrence

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

Mishel et al., *Explaining the erosion of private sector unions*, ECON. POL'Y INST. (Nov. 8, 2020), https://files.epi.org/pdf/215908.pdf at pp. 21-22, (similarly examining impact of employers' increased opposition since 1970s on unionization); Paul C. Weiler, *Promises to Keep: Securing Workers' Rights to Self-Organization Under the NLRA*, 96 HARV. L. REV. 1769, 1769-71, 1775-76 (1983) (noting "major factor" in contemporaneous decline of collective bargaining is "skyrocketing use of coercive and illegal tactics" by employers that "current system of unfair labor practice remedies has proved powerless" to remedy).

In California the NLRB frequently takes more than a year simply to decide whether to issue a complaint. SUF ¶ 4. Once a complaint issues, an ALJ's decision, which is still not an enforceable judgment, can take years. *Id.* ¶ 5. This is all assuming that the Board's process has not been stopped by the now-frequent employer-filed constitutional challenges to the Board's authority. *See Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 781 (5th Cir. 2025). The NLRB's recent protracted loss of quorum only further worsened matters. SUF ¶ 8. Federal shutdowns—a recurring threat these days—also halt the NLRB's ability to process cases. *Id.* ¶ 7. The NLRB's delays and inefficacy cause workers to lose faith in the NLRB's ability to enforce the NLRA and hinder workers from exercising their rights under the NLRA. *Id.* ¶ 8.

## **ARGUMENT**

### **I. Summary Judgment Standard**

Summary judgment is proper where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the movant shows the absence of material factual issues, the non-movant must identify factual allegations revealing a genuine issue of fact to avoid summary judgment. *Bricklayers Loc. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

### **II. The *Garmon* doctrine does not control.**

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

"[T]he NLRA contains no statutory provision indicating the extent to which it was intended to pre-empt state law." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 733 (1985). While the NLRA centralized its own administration in a single agency—the NLRB—*Garmon* recognized that "the statutory implications concerning what has been taken from the States and what has been left to them are of a Delphic nature." *Garmon*, 359 U.S. at 241. Faced with that silence, the Court ultimately inferred a congressional intent that states not regulate conduct that "is arguably subject to [§] 7 or [§] 8 of the [NLRA]." *Id.* at 245. For such conduct, the Court declared, states "must defer to the exclusive competence of" the NLRB—a "specially constituted tribunal" that would enforce labor policy through its "specialized knowledge and cumulative experience." *Id.* at 242, 244-45. Thus, and as detailed below, the NLRB's inability to regulate and lost independence negate *Garmon*'s own premises, such that *Garmon* does not here control. *Infra* II.A-B.

That *Garmon* should not be extended to circumstances where it does not control is supported by several considerations. First, *Garmon* sets forth a preemption rule that extends well beyond normal obstacle preemption. Federal statutes do not preempt exercises of states' traditional police powers that do not conflict with or pose an obstacle to the federal law unless Congress made "clear and manifest" its intent that the statute have a more expansive preemptive effect. *E.g. Eng. v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990); *see also Glacier Nw.*, 598 U.S. at 785 (Thomas, J., concurring) (citing *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). Regulation of labor relations is a traditional state police power. *Chicago, B. & Q.R. Co. v. McGuire*, 219 U.S. 549, 570 (1911) (pre-NLRA recognition of states' historic police powers to enact laws "dealing with the relation of employer and employed"). The presumption against preemption was the starting point for *Wisconsin Lab. Rels. Bd. v. Fred Rueping Leather Co.*, a decision that three years after the NLRA's enactment upheld a state scheme much like that created by AB 288. 279 N.W. 673, 677,

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

679-80 (Wis. 1938). The court concluded that the Act's legislative history did not indicate a desire to preempt such a state scheme, as opposed to centralize federal administration of federal labor law. *Id*. at 679-80. This conclusion was buttressed by analysis of the NLRA's Section 10(a) and conflict of law clause—which provided the NLRA prevailed over contrary federal law yet did not state the NLRA prevailed over contrary state law. *Id*. at 677-78. Specific applications of state law certainly could be obstacle preempted if they conflicted with the NLRA, but the court concluded Congress did not intend to completely preempt state regulation of conduct covered by the NLRA. *See id*. at 681; *see also Amalgamated Ass'n of St. Elec. Ry. & Motor Coach Emps. of Am., Div. 998 v. Wisconsin Emp. Rels. Bd.*, 340 U.S. 383, 402-03 (1951) (Frankfurter, J., dissenting) (similar).

Accordingly, regardless of one's view of *Garmon*, these principles demonstrate that *Garmon*'s expansive rule should not be extended to circumstances where it does not control, such as when the NLRB has lost independence, or the NLRB no longer adequately protects workers' statutory rights. Indeed, it is routine in the employment relationship for federal law to accommodate state regulation of the same conduct, provided that the state regulation does not otherwise conflict with federal law. *E.g. Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48–49, (1974) (explaining "Title VII was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination"); *infra* p. 26.

*Second*, *Garmon* suggested courts interpreting the NLRA's preemptive scope must ask what Congress would have intended in light of emergent problems that "were not[] foreseen" or were only "dimly perceived" by Congress. 359 U.S. at 239-240. *Garmon*'s own standard thus contemplates that courts will take account of new circumstances, in order to through "the judicial process. . . carry[] out with fidelity the purposes of Congress." *See id*. In fact, the Court has expressly eschewed "apply[ing] the *Garmon* guidelines in a literal, mechanical fashion." *Sears, Roebuck & Co. v. San Diego Cnty. Dist. Council of Carpenters*, 436 U.S. 180, 188 (1978)

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

("*Sears*").

The Fourth Circuit's decision in *Nat'l Ass'n of Immigr. Judges v. Owen* was one illustration of how to account for an agency like the NLRB losing its independence and ceasing to adequately enforce the NLRA. 139 F.4th 293 (4th Cir. 2025); IBT's Opp. to Mot. for Prelim. Inj., Dkt. 16 at 13-14. This Court's Preliminary Injunction Order rightly found that decision compelling. Dkt. 30 ("PI Order") at 14. Since then, the Supreme Court vacated *Owen* on grounds that the Court of Appeals decided *Owen* based on "an issue the parties had not raised." *Margolin v. Nat'l Ass'n of Immigr. Judges*, 608 U.S. 339 at 340 (2026). Two Justices separately voiced their view that *Owen* was wrong on the merits. *Id*. at 343-345. But they did not address the NLRA or *Garmon*'s prescription that courts interpreting the NLRA's preemptive scope must account for novel circumstances "not[] foreseen by the Congress". 359 U.S. at 239-40.

**A. Lost independence negates *Garmon*'s applicability.**

1. The *Garmon* doctrine presupposes an independent NLRB.

The NLRB has lost its independence. Yet the NLRB's exclusive jurisdiction is staked on its independence. *Garmon* reasoned that Congress intended the NLRB would shape labor policy as a "specific and specially constituted tribunal" that would bring to bear its "specialized knowledge and cumulative experience." 359 U.S. at 242. The Court did not specify what was special about the NLRB's constitution because that issue was not before the Court. In fact, it likely took for granted the NLRB's status as an independent agency since just one year before issuing *Garmon*, the Court had reaffirmed *Humphrey's Executor* in its decision in *Wiener v. United States*, 357 U.S. 349 (1958).

But the NLRB's independence is the key feature of the "special[] constitut[ion]" *Garmon* emphasized. As soon as the Supreme Court upheld the constitutionality of the Federal Trade Commission's removal protections in *Humphrey's Executor*, Congress inserted the Board's

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

removal protections into its draft legislation establishing the NLRB to confirm the protection of the Board's independence. *See Slaughter*, 146 S. Ct. at 2339 (Sotomayor, J., dissenting); *see also* Labor Law Professors' Amicus Brief, Dkt. 26-1 at 15-17 (elaborating how independence was central to Congress's plan for how NLRA would be enforced, and explaining that "Congress made the removal protections for NLRB members explicit because Congress was concerned that '[i]f Congress in creating the Board vests the appointment power in the President it might be implied that it is intended to vest also in the President a general power of removal'"). And a proposed amendment to place the NLRB under the Department of Labor was defeated after Congressmembers and members of the pre-NLRA Board stressed the necessity of the Board's independence. *E.g.* H.R. REP. NO. 74-969, at 11 (1935) (Board Member Biddle), Dkt. 16-9 at 2 ("The value and success of any quasi-judicial board dealing with labor relations lies first and foremost in its independence and impartiality . . . Where Congress has defined a policy and created an administrative board to carry out that policy, it has with marked consistency recognized that the board so created should . . . be free of control by the executive departments or by any particular administration"). Senator Wagner himself explained independence was vital to avoid "political influences" and "interference with [the NLRB's] truly judicial functions". *National Labor Relations Board: Hearings on S. 1958 Before the Senate Comm. on Education and Labor, 74th Cong.*, at 115-16 (1935) (Sen. Wagner), Dkt. 16-10 at 3 (adding that "a board of this kind [must] be absolutely free of any kind of political influence, or even a suspicion of being under any political influence, because if it is, it will be a failure").

This history makes explicit what *Garmon* left implicit: the Board's ability to apply its "specialized knowledge and cumulative experience" hinges on its "special[] constitut[ion]" *as an independent agency*. 359 U.S. at 242. This makes sense. It is well-established that the point of establishing independent agencies is to ensure they have the freedom to decide specialized

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

problems by applying specialized expertise—rather than by attempting to appease a President. *E.g. Wilcox*, 145 S. Ct. at 1417 (Kagan, J., dissenting). And the Supreme Court has continued to understand *Garmon* preemption to be linked to the Board's ability to apply its expertise *as an independent agency*. *Sears*, 436 U.S. at 191 (1978) (emphasis added) ("The [NLRA] protected the collective-bargaining activities of employees and their representatives and created a regulatory scheme to be administered by an *independent* agency which would develop experience and expertise in the labor relations area. The Court [in its decisional law that culminated in *Garmon*] promptly decided that the federal agency's power to implement the policies of the new legislation was exclusive . . . .").[3]

That the Courts of Appeal can decline to enforce NLRB decisions that are arbitrary and capricious or contrary to law is an insufficient safeguard against Presidential pressure to fail to enforce the Act as intended by Congress. *First*, the Act's goals are harmed by the delay and expense needed to seek judicial review. *E.g. Silverman*, 1986 WL 15735, at *1 (explaining time needed to obtain enforceable court order chills worker organizing). *Second*, while courts might now review the NLRB's interpretations of law *de novo*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), the NLRB's fact-findings and judgment-calls will still receive judicial deference, *McLamb v. NLRB*, 141 F.4th 1308, 1315 (D.C. Cir. 2025). *Third*, administrative law's high tolerance for agency *inaction* means that Board members who fear getting fired may undermine the NLRA by declining to take enforcement actions, *see Heckler v. Chaney*, 470 U.S. 821, 831 (1985) (agency "[r]efusals to take enforcement steps" are presumptively not judicially

---

[3] That Congress intended the NLRA and its remedial scheme to survive the Board Members' removal protections—MSJ at 16 n.5—does not mean that Congress intended the NLRA and NLRB to be *the only* means of safeguarding labor rights absent those removal protections. Furthermore, the NLRA's severability provision does not speak to *Garmon*'s implied preemption doctrine, which was judicially constructed rather than enacted by Congress. *See Garmon*, 359 U.S. at 239-241; *see also Metro. Life Ins. Co.*, 471 U.S. at 733 (explaining NLRA preemption questions require Court "to discern legislative intent from the general purpose of the NLRA, and not from any particular statutory language").

reviewable), delaying issuing decisions, *see Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (claim under APA to compel agency action can proceed only where plaintiff asserts agency failed to take a discrete agency action that it is required to take), and failing to undertake appropriate policymaking. *Fourth*, the Wagner Act's drafters deemed independence necessary in part to preserve public confidence in the NLRB, without which confidence they did not believe the Board could adequately fulfill its function.

2. Without the Board's removal protections, the NLRB is not independent.

Without the Board's removal protections, the NLRB has lost the independence upon which the *Garmon* doctrine is premised. These protections—which have been non-operative ever since the Supreme Court stayed Wilcox's reinstatement—were constitutive of Congress's vision for the NLRB's independence, as explained above. In addition, logic demonstrates that removal protections are a necessary condition for that independence. It is well-established that removal protections are a defining feature of independent agencies. *E.g. Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 230 (2020) ("Neither *amicus* nor the House explains how the CFPB would be 'independent' if its head were required to implement the President's policies upon pain of removal."); *Fed. Commc'ns Comm'n v. Consumers' Rsch.*, 606 U.S. 656, 708 (2025) (Kavanaugh, J., concurring) ("[T]he FCC formally is not an independent agency because . . . no statutory text restricts the President's authority to remove FCC Commissioners at will."); *Slaughter*, 146 S. Ct. at 2319 (Gorsuch, J., concurring) ("[N]ow removal protections are a thing of the past, and the President enjoys direct control over independent and executive agencies alike."); *see also Seila L. LLC*, 591 U.S. at 231 ("[T]he various 'bureaucratic minutiae' a President might use to corral agency personnel is no substitute for at will removal.").

In fact, while discussing *Slaughter*'s consequences in her dissenting opinion, Justice Sotomayor explained how easily other structural features associated with independent agencies

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

can be negated absent removal protections. To whatever extent the NLRA's staggered, five-year terms for Board members might have facilitated bipartisan-membership and lengthy terms when backed by removal protections, they no longer do so because these terms can now "be cut short at the president's will" and the President can "simply . . . fir[e] all [Board members] of the opposite party." *Slaughter*, 146 S. Ct. at 2340.[4] Moreover, "the multimember structure itself could be eliminated, by executive fiat, with sufficient arbitrary firings to winnow a[n] [agency] down to a sole remaining chair." *Id*.

Amici Chamber of Commerce's ("Chamber Amici") note that the NLRB's prosecutorial functions are vested in its independent counsel is beside the point. All that establishes is that the President can both prosecute and adjudicate through formally distinct NLRB actors. *See, e.g.*, Exec. Order 14215, §7 ("[n]o employee of the executive branch ... may advance an interpretation of the law ... that contravenes the President . . . . .").

3. The record countermands concluding the NLRB remains independent.

Thus, absent the Board's removal protections, the NLRB lacks the independence necessary to sustain *Garmon*. This is so as a matter of law. The Court need go no further.

Yet should this Court require more, the record is inconsistent with concluding that the NLRB remains independent. The President has made clear that his interpretations of law bind the entire executive branch—including "so-called independent agencies". The Board now must receive pre-clearance from the EOP to enact rules. And the President has established an infrastructure of continuous presence within, and continuous contact with, the NLRB. From the White House Liaison and the Schedule C appointees within the NLRB who are tasked with

---

[4] Amici Chamber of Commerce posit that the Board members' staggered terms "ensure that appointments to the Board will stretch across more than one presidential administration." Dkt. 44-1 at 14. Absent removal protections, these staggered terms at most "ensure[]" the appointment will stretch to 12:01 pm on any January 20 that a presidency changes hands. And that's assuming the Board member does not first run afoul of their appointing president.

"driv[ing] the unusually expansive and transformative agenda the American people elected President Trump to accomplish," to the Senior Executive Service personnel who must ensure the NLRB "delivers on key administration priorities", to the Board's Regulatory Policy Advisor and Regulatory Second who interface with the EOP for the Board's rulemaking. There is no aspect of the NLRB's interpretation, development, and enforcement of the NLRA over which the President has not assumed control. The NLRB is no longer the independent tribunal that Congress intended.

4. Any intent to promote uniformity through such broad preemption was conditioned on the NLRB's independence.

There is no "clear and manifest" indication that Congress would have intended a non-independent NLRB to effect *Garmon*'s unusually sweeping preemption regime. *Eng.*, 496 U.S. at 79. This Court's Order reasoned that Congress's primary interest in establishing the NLRB was uniformity and avoidance of inconsistency. PI Order at 15. Yet the authorities the Order cites nowhere state uniformity was Congress's primary interest—much less rank uniformity against independence. They simply do not point to a clear and manifest intent that whatever objectives for uniformity Congress held would sustain *Garmon* absent independence.

Whatever exclusive jurisdiction Congress meant to confer on the NLRB was inextricably intertwined with Congress's understanding that the NLRB would be independent. *Garmon* itself presented these concepts as being inextricably intertwined in constituting "the unifying consideration" of the Court's preemption decisions. 359 U.S. at 242 (emphasis added) ("[T]he unifying consideration of our decisions has been regard to the fact that Congress has entrusted administration of the labor policy for the Nation to a centralized administrative agency . . . *equipped with its specialized knowledge and cumulative experience.*"); *see also id.* (noting Congress "confide[d] primary interpretation and application of its rules to a specific and specially constituted tribunal").

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

Justice Sotomayor recently indicated—in discussion that the majority did not dispute—that independence was "inextricably bound" with any Congressional objective of centralizing labor administration. *See Slaughter*, 146 S. Ct. at 2339. "In creating and empowering administrative agencies throughout the late-19th and 20th centuries, Congress recognized not only the need for efficient and effective regulation of the increasingly complex American economy, but also the risks of concentrating such power in the hands of the President with no check against the influence of partisan control. *Id.* So, "for the FTC, the two ideas, a commission and independence for the commission, were inextricably bound together." *Id.* (citing R. Cushman, The Independent Regulatory Commissions 188 (1941)). The NLRB, in turn, "was patterned expressly on the FTC, [and] complete independence was necessary to insure complete impartiality." *Id.* (citing same).[5]

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

Again: Senator Wagner himself stated pointedly that "a board of this kind [must] be absolutely free of any kind of political influence, or even a suspicion of being under any political influence, because if it is, it will be a failure." *Supra* p. 12. Why would Congress want this "failure" to be *the only* means of protecting labor rights for the workers under its jurisdiction? This is far from a "clear and manifest" intent to establish *Garmon*'s atypically broad preemption rule in the absence of the NLRB's independence. *Eng.*, 496 U.S. at 79. Congress simply did not envision that the only means of protecting workers' labor rights would be an agency beholden to the President—an agency that, moreover, certainly will raise that "suspicion" nationwide.

5. Ending quorums is now a tool of Presidential control.

*Garmon* does not control during lost quorums. Without a quorum, the Board can neither effect enforceable judgments, nor enact rulemaking, nor fulfill its crucial function of issuing new,

[5] Similarly, Justice Gorsuch observed the "correlation between the creation of the independent agency and broad grants of administrative power" *Slaughter*, 146 S. Ct. at 2315 (Gorsuch, J., concurring), which further indicates that any Congressional intent to effectuate *Garmon*'s anomalously broad preemption regime was conditioned on the agency's independence.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

precedential decisions for Regional Directors and ALJs to follow in light of changing industrial realities. While Congress may have envisioned the Board would at times lack a quorum, Congress's deliberate protection of the NLRB's independence makes clear it did not intend or contemplate that a President could arbitrarily end basic statutory protections and enforcement and deprive the NLRB of a quorum for any reason and as long as they please. The recent more than 11-month lapse of quorum shows how, under *Garmon*, lost independence leaves this country perpetually on this edge of protracted voids of meaningful labor regulation.

The Court has already blessed an exception to *Garmon* permitting state regulation when parties "lack[] a 'reasonable opportunity' to secure a Board decision on the legal status of the conduct at issue." *Glacier*, 598 U.S. at 777 n.1. This exception—which was first recognized by the full Court in *Sears*—demonstrates the Court's willingness to undertake a functional inquiry to evaluate whether the avenue for Board adjudication is sufficiently acceptable to support applying *Garmon* preemption. *See also Sears*, 436 U.S. at 188-89 ("[T]he Court has refused to apply the *Garmon* guidelines in a literal, mechanical fashion."). While the Union believes the NLRB's atrophy in recent decades had already undermined the NLRB's claim to being an acceptable forum, the *Sears*' exception's logic applies at least during lost quorums, because quorums deprive charging parties of their pathway to an enforceable Board order, and leave workers without recourse when employers flout regional as well as ALJ determinations.

In *Sears*, the Court faced an employer's state court action against a union's trespassory picketing. The Court held that neither the fact that the picketing was arguably prohibited nor the fact that it was arguably protected rendered the action *Garmon* preempted. Although *Sears* announced the reasonable opportunity exception while discussing the arguably protected branch, *id.* at 202-03, *Sears*' reasoning contemplates that the underlying principle of this exception would equally apply to clearly or arguably prohibited conduct—even if that conduct presents the state

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

forum with an identical controversy to what would have been presented to the Board. Specifically, *Sears* observed that "[a]part from notions of 'primary jurisdiction,' there would be no objection to state courts' and the NLRB's exercising concurrent jurisdiction over conduct prohibited by the federal Act. But there is a constitutional objection to state-court interference with conduct actually protected by the Act. Considerations of federal supremacy, therefore, are implicated to a greater extent when labor-related activity is protected than when it is prohibited." 436 U.S. at 199-200 & n. 29 (footnotes omitted). The primary jurisdiction concerns articulated in *Garmon* upon which *Sears* predicates preemption of ***prohibited*** conduct do not apply during a lost quorum. Specifically, *Garmon* reasoned that this primary jurisdiction serves to ensure "centralized administration . . . to obtain uniform application of [the NLRA]" as opposed to subject labor disputes to "[a] multiplicity of tribunals". 359 U.S. at 242-43. Without a quorum, that purpose is not served. Different Regional Directors sending cases to various ALJs without any avenue to obtain a final determination are just another multiplicity of tribunals that will interpret Board precedent and facts in different ways, and there is no ability to invoke the centralized Board to ensure the NLRA's uniform application. Read together, this reasoning from *Sears* and *Garmon* supports applying *Sears*' fundamental insight—that courts must engage in a pragmatic inquiry to evaluate whether there is an acceptable method of presenting disputes to the Board—to both clearly and arguably prohibited conduct during lost quorums.

And while the employer in *Sears* may not have had a feasible means of initiating any case, the *Sears* exception jurisprudence does not indicate that the mere ability to initiate a case with an NLRB Regional Office necessarily constitutes a "reasonable opportunity". Plaintiff itself notes that *Sears* focused on the ability to "invoke *the Board's* jurisdiction." 436 U.S. at 201 (emphasis added). Furthermore, the Court has favorably cited Justice White's *Lockridge* dissent as authority for this exception. *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 393 n.10 (1986).

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

In that dissent, Justice White reasoned *Garmon* must not "blindly pre-emp[t]" when "there is no provision for an authoritative decision by the Board in the first instance[.]" *Amalgamated Ass'n of St., Elec. Ry. & Motor Coach Emp. of Am. v. Lockridge*, 403 U.S. 274, at 326 (1971). True, Justice White was referring to arguably *protected* activity and lamented that for such conduct the "aggrieved party" cannot secure an NLRB "hearing." *Id*. at 325-28. But his use of the language "authoritative decision" presupposes that this hearing can be appealed to the Board, and result in a final order. And his limiting his analysis to protected activity is because he did not confront the situation in which such an authoritative decision cannot be secured even for *prohibited* conduct.

Second, in *Sears*, Justice Blackman's concurrence stated that if the union filed a § 8(a)(1) charge after being asked to leave the employer's property, state jurisdiction would be preempted until the NLRB had resolved the charge. 436 U.S. at 209. In turn, Justice Powell concurred to reject this conclusion. Powell stated "I would not join the Court's opinion if I thought it fairly could be read" to imply that "state-court jurisdiction is pre-empted forthwith upon the filing of a charge by the union." *Id*. at 214. He reasoned in part that "[i]f an [NLRB] charge is filed, nothing is likely to happen 'in a timely fashion' . . . th[is] 'no-man's land' . . . is an open invitation to self-help. I am unwilling to believe that Congress intended, by its silence in the Act, to create a situation where there is no forum to which the parties may turn for orderly interim relief in the face of a potentially explosive situation." *Id*. at 213. When employers lack the threat of timely, enforceable accountability from the government for violations of workers' labor rights, the conditions are likewise ripe for the explosive strikes that the Wagner Act intended to obviate. 29 U.S.C. § 151 (noting employers' refusal to accept collective bargaining and denying rights to organize led to such strikes, which the NLRA seeks to obviate).

Plaintiff's claim that "[i]f Congress intended to allow states to act during [lost quorums], it would have said so," MSJ at 15, ignores that nothing in the NLRA says states may regulate in the

circumstances that were at issue in *Sears*. Yet *Sears* ruled states may. And it was just as apparent from the NLRA's scheme that parties would sometimes face those circumstances, *see Sears*, 436 U.S. at 202 & n.33, as that parties will sometimes face lost quorums. The statute's silence thus cannot be dispositive.

* * *

Congress certainly would not have intended for the Court-created *Garmon* doctrine to apply now when the President may halt the Board from enforcing the law with "You're Fired", thereby shutting down labor law in both the federal government and states whenever and for however long that President pleases. Or when the President may sway the Board's enforcement actions through that mere threat.

**B. The NLRB no longer protects workers' rights.**

The decades-long atrophy of the NLRB's ability to protect organizing and collective bargaining since the lapse of the 1950's labor-management accord, *see supra* pp. 7-8, has created a context so remote from *Garmon*'s as to undermine that decision's construction of Congress's intent, given the NLRA's fundamental objective of advancing "meaningful collective bargaining", *Brown* 518 U.S. at 237, and Congress's expectation that the Board would actively "adapt the [NLRA] to changing" industrial realities to do so. *J. Weingarten*, 420 U.S. at 266. "During the 1950s and 1960s, the prevailing view" in industrial relations literature was that "American managers had accommodated to collective bargaining and accepted unions as legitimate and lasting parties to the employment relationship." SUF ¶ 1. "[N]o one in the 1950s or 1960s foresaw the changes in managerial behavior" that "stopp[ed] [and reversed] the expansion of [private sector] collective bargaining." *Id.* ¶ 2. Furthermore, this atrophy is contributing to the industrial instability and workplace conflict that Congress intended to cure when enacting the statute in 1935. Neither Congress nor the *Garmon* Court could have foreseen these developments, and

Bush Gottlieb
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

*Garmon* should no longer control. *See also United Const. Workers v. Laburnum Const. Corp.*, 347 U.S. 656, 669 (1954) (pre-*Garmon*, suggesting preemption inquiry should consider "whe[ther] the [NLRB's] preventive administrative procedures are impotent or inadequate"); *Garmon*, 359 U.S. at 240 (explaining Court must use "the judicial process. . . [to] carry[] out with fidelity the purposes of Congress" in light of emergent problems that "were not" or at most "were only dimly perceived" by Congress).

**III. AB 288's triggers are permissible.**

For the above reasons, *Garmon* and its progeny no longer control, and so AB 288 would not be preempted even if it lacked triggers and gave PERB immediate jurisdiction over any matter that could be brought before the Board. Thus, each of its triggers for PERB jurisdiction survives Plaintiff's challenge. In any event, the triggers generally focus PERB's jurisdiction to the specific circumstances detailed above that undermine *Garmon's* premises: lost independence or lost quorum, Sec. 2(b)(1)(B)(i), or the type of delay or judicial interference that undermines collective bargaining and that, absent state intervention, would create the "no-man's land" of non-enforcement of labor protections that the *Garmon* exception recognized by *Sears* aims to prevent, Secs. 2(b)(1)(A) and (B)(ii-iv).

Plaintiff expressly concedes certain triggers are not preempted. MSJ at 17-18.[6] The Court,

[6] There is thus no warrant for entertaining amici's contrary arguments on those triggers. Regardless, Chamber Amici conjure hypotheticals in which these triggers "may" apply and in which that application "may" be preempted, and amici Coalition for a Democratic Workplace et al. similarly forecast certain potential applications of AB 288 that may conflict with the NLRA. These are arguments to raise, if ever, in as-applied challenges—not grounds for facially preempting these triggers. Plus, Chamber Amici's claim that the "loses coverage" trigger "skips over who decides," Dkt. 44-1 at 20, ignores that *Garmon* doctrine already permits fora outside the NLRB to make threshold interpretations of the NLRA to determine whether *Garmon* applies. *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 394-99 (1986). This Court already rejected Chamber Amici's argument regarding supervisors, PI Order at 12, which argument also ignores the fact that states often exercise jurisdiction over workforces excluded from the NLRA, *Chamber of Com. of the United States of Am. v. City of Seattle*, 890 F.3d 769, 791-94 (9th Cir. 2018), and at most has home in an as-applied challenge.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

however, should reject Plaintiff's attempt to write the words "whether through legislative, executive, or judicial action" out of § 923(b)(1)(A) and to write the words "where the injunction is a final, non-appealable order" into § § 923.1(b)(1)(A) and 923.1(b)(1)(B)(i). Dkt. 39-3 ¶ 2. This Court has already reasoned that § 923(b)(1)(A) in its entirety, and the enjoinment trigger as written in § 923.1(b)(1)(B)(i), are not preempted. "[I]f a worker is no longer subject to the NLRA, the worker's conduct is neither protected nor prohibited by the NLRA." PI Order at 11. That logic applies regardless of whether it was legislative, executive, or judicial action that caused the worker to lose coverage. And Plaintiff's preferred limitation is internally inconsistent because such executive or judicial action might claim, and be found by a reviewing court, to be constructing Congress's intent.

And "[i]f the NLRB is enjoined from processing a case, it has lost authority over that subject matter. With the NLRB no longer occupying that space, there is no entity with which PERB's exercise of jurisdiction will conflict." *Id.* at 12. Plaintiff observes, concerning non-final orders, that "the NLRB [may] regain[] jurisdiction should its position prevail at final judgment." MSJ at 18 n.7. But Plaintiff does not explain how it is appropriate, while faced with Plaintiff's facial challenge, for the Court to re-write the statute to include limitations the statute does not. Should PERB continue to exercise jurisdiction after the NLRB regains jurisdiction, Plaintiff may bring an as-applied challenge at which point competing arguments can be considered on a crystallized record. Congress never intended that workers would lack recourse for years as cases enjoining the NLRB travel through the appellate process in search of a final judgment.

**IV. AB 288 is not obstacle preempted.**

Absent *Garmon*'s doctrine, states are not preempted from enforcing the rights protected by the NLRA because obstacle preemption requires federal and state law to be "irreconcilab[le]". *United States v. California*, 921 F.3d 865, 881-82 (9th Cir. 2019). Plaintiff appears to stipulate

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

that—in addition to being preempted "under the principles of *Garmon* and its progeny"— AB 288 "is preempted under general theories of obstacle preemption, because it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of congress." MSJ at 10-11. But Plaintiff never explains how. Plaintiff quotes general language from preemption decisions in a confusing sequence, but the only application of these standards that Plaintiff offers to explain its obstacle preemption argument is "[b]y empowering PERB to exercise jurisdiction over private sector labor relations, concurrent with the NLRB, AB 288 sets the stage for PERB to supplant or augment federal labor policy with its own, a state of affairs the Supreme Court has consistently rejected." MSJ at 16-17. Perhaps so under *Garmon*'s doctrine, but to the extent Plaintiff's obstacle preemption argument just repackages the *Garmon* argument, it fails for reasons already stated. Plaintiff cites *Nash v. Fla. Indus. Comm'n*, 389 U.S. 235 (1967). *Nash* addressed whether a state can withhold unemployment insurance from someone solely because they filed an unfair labor practice charge. *Id*. at 236-37. Holding no, the Court reasoned "Congress has made it clear that it wishes all persons with information about such practices to be completely free from coercion against reporting them to the Board.**"** *Id*. at 238 (citing §8(a)(4) (prohibiting discrimination against employees who file charges). This just shows that, absent *Garmon*, whether or not a given provision of state law is obstacle preempted will require case-by-case analysis.

Consider this scenario. An employer fires a worker for engaging in concerted activity for mutual aid or protection (such as going on strike). The state then enforces the same prohibition recognized in the NLRA against this conduct, and the state orders the employee reinstated with backpay.

Plaintiff offers no explanation of how this is "irreconcilab[le]" with the NLRA. *California*, 921 F.3d at 881-82 (9th Cir. 2019). Plaintiff never claims that, much less explains how, this would "disturb[] or impede[]" a "particular balance of interests" such that Congress "deliberate[ly]"

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

intended to exclude the state's enforcement. *Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 959 F.3d 1201, 1212 (9th Cir. 2020). Plaintiff never claims or explains how this "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). Because it does not. The State would simply be protecting conduct the protection of which is a core matter in the NLRA, and advancing the same purposes and objectives as the NLRA. *Compare* 29 U.S.C. § 151 (protecting worker organizing and collective bargaining) *with* Lab. Code § 923.1 (same). This would be true even if AB 288 lacked triggers and conferred blanket PERB jurisdiction. But the lack of obstacle to Congress's objectives is all the more apparent considering that AB 288's triggers are all targeted to contexts in which the NLRB has been disabled from or is incapable of enforcing the NLRA's protections, or is unwilling to do so due to presidential influence Congress intended to preclude.

That this example—and any of similar others that could be imagined—cannot be claimed to be obstacle preempted other than by reference to "the principles of *Garmon* and its progeny" is fatal to any obstacle preemption challenge separate from the *Garmon* challenge. After all, Plaintiff has brought a facial challenge to the four triggers listed in paragraph 1 of its proposed order. Dkt. 39-3 at 1-2; MSJ at 9 ("The NLRB seeks summary judgment on its claim that the NLRA facially preempts AB 288 (apart from three limited circumstances . . . . )"). Plaintiff thus "must show that no set of circumstances exists under which" PERB's exercise of jurisdiction under those triggers "would be valid". *Knox v. Brnovich*, 907 F.3d 1167, 1173 (9th Cir. 2018).

AB 288 in no way bars anyone from bringing charges to the NLRB and seeking the NLRA's protections, nor does it purport to extinguish any of the rights or protections enshrined in the NLRA. It simply permits PERB to advance the same fundamental policies as the NLRA. This accords with the NLRA's "full purposes and objectives," *Volkswagen*, 959 F.3d at 1212—all the more so considering that the NLRB has proved incapable of realizing the NLRA's fundamental

goal of protecting and promoting collective bargaining.

And because Plaintiff brings a facial challenge to the jurisdictional triggers that it seeks to enjoin, this Court need not address whether applications of PERB exercising its jurisdiction in which PERB may use standards or methods that differ from the NLRB's would be obstacle preempted. Specific instances can be addressed through as-applied challenges. AB 288 allows severance of any specific provisions that may later be found to be obstacle preempted. And there certainly is no warrant in categorically ruling out diverging standards and methods. Differing state and federal standards are pervasive in concurrent regulation of firms and employment. *E.g. California v. ARC Am. Corp*, 490 U.S. 93, 100-02 (1989) (Sherman Act, which lacks savings clause, construed to permit states' enforcement standards to differ from federal); Cal. Bus. & Prof. Code § 16600 (prohibiting non-compete agreements that current federal balancing standard, *Caudill v. Lancaster Bingo Co.*, 2005 WL 2738930, at *4 (S.D. Ohio Oct. 24, 2005), permits); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48–49, (1974) (explaining "Title VII was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination"; *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1196 (9th Cir. 2002) (Title VII permits different state remedies); *see also* Dkt. 26 at 9-10 (Labor Law Professors' amicus brief elaborating how "Congress routinely designs federal employment statutes to operate alongside state police powers, establishing a floor of protection for workers rather than occupying the field").[7]

**V. Sections 10(a) and 14(c) are not exclusive bases for state regulation.**

The plain text of Sections 10(a) and 14(c) bars concluding they are exclusive gates to state

---

[7] Different amici flag features of AB 288 that authorize PERB to use standards and methods that diverge from those the NLRB uses. Dkt 44-1 at 18; Dkt 49-1 at 20. But Plaintiff's MSJ does not argue against these features, and for good reason: again, Plaintiff's facial challenge provides no occasion for addressing whether or when those may be obstacle preempted. Regardless, IBT's Opposition to Preliminary Injunction explained that they are not. Dkt. 16 at 22-24.

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

regulation. These sections only address the NLRB's authority to cede or decline its jurisdiction—i.e., to tell parties: "Don't come here"—and make clear that the NLRB's doing so does not deprive states of their jurisdiction. These provisions just set forth two circumstances in which *only* states will exercise jurisdiction. Section 10(a) says the Board's "power" to "prevent any person from engaging in any unfair labor practice [under the NLRA]. . . shall not be affected by any other means of adjustment or prevention . . ." 29 U.S.C. § 160(a). The proviso then simply "provide[s]" that the Board is "empowered" to agree "to cede to [any state] jurisdiction over any cases in any industry." *Id*. Facially and in context of the language it qualifies, this proviso addresses the NLRB's ability to agree that only the state will hear certain cases. It does not say states may not exercise concurrent jurisdiction over NLRA-covered conduct absent such agreement. It does not even say the only way the NLRB may cede such jurisdiction is by such agreement. 14(c), in turn, simply provides the Board may "decline" jurisdiction over certain disputes, and makes clear states may still hear those disputes. *Id*. § 164(c). This neither bars states' concurrent jurisdiction over conduct as to which the NLRB has not declined jurisdiction, nor purports to exclude other circumstances in which the NLRB may decline jurisdiction.

The Supreme Court made clear that Sections 10(a) and 14(c) are not the exclusive avenues to state jurisdiction when—long after those provisions' enactments—it created the rule that states may intervene when parties "lack[] a reasonable opportunity to secure a Board decision on the legal status of the conduct at issue." *Glacier*, 598 U.S. at 777 n.1 (citing *Sears*). The Court could not have announced this new exception to preemption if it understood 10(a) and 14(c) to exhaustively codify the bases for states' jurisdiction. *Guss*'s suggestion that 10(a) is the exclusive means for state regulation is therefore bookended by contrary Supreme Court authority. *Id*.; *Laburnum*, 347 U.S. at 657, 659 n.2, 667-69 & n. 9 (reasoning based on text and legislative history that 10(a) did not exclude state remedies for conduct within NLRB's jurisdiction); *accord*

*Russell*, 356 U.S. at 641, 644-46; *see also Guss*, 353 U.S. at 14-19 (Burton, J., dissenting). *Guss*'s suggestion thus does not control. And *Committee of Interns* just addressed whether the NLRB ceded jurisdiction. 566 F.2d 810 (2d Cir. 1977). Its dicta, *id.* at 813 n.3, does not indicate states can never intervene absent cession, nor is that decision from this Circuit.[8]

If this Court nonetheless concludes Congress intended Sections 10(a) and 14(c) to be exclusive in the world as it looked in 1959, the Court should recognize that same Congress would not have intended them to be exclusive today. First, whereas the NLRB has proved incapable of protecting collective bargaining after the labor-management accord's breakdown, state public sector bargaining administrative schemes have proliferated since 1959, providing additional capacity these states lacked before then. Second, courts have never yet held that, without a quorum, the Board can issue the orders needed to effect such delegations under 10(a) or 14(c). 29 U.S.C. § 153(b) (omitting such orders from matters Board may delegate to regional directors). Third, without independence, the NLRB might withhold its agreement to delegate matters to states for a reason that Congress expressly intended would *not* influence the NLRB's decisions. Namely, the President's telling NLRB members they will be fired if they agree to delegate matters to states. Perhaps Jeff Bezos or Elon Musk—who had front-row seats at this President's inauguration—don't want state jurisdiction over the many labor disputes against their companies. Or the President might just want to stymie a state the President doesn't like.

## VI. Extending *Garmon* would contravene the Tenth Amendment.

For preemption to satisfy the 10th Amendment, the federal law must be "best read as one

[8] Section 10(a)'s proviso and 14(c) both constituted Congressional correctives to specific Supreme Court decisions diminishing states' authority. 10(a)'s proviso rejected *Bethlehem Steel*'s negation of a cession agreement between the NLRB and state. *Guss*, 353 U.S. at 16 (Burton, J., dissenting). Section 14(c) responded to *Guss*'s divesting states of jurisdiction when the Board declined jurisdiction on commerce-threshold grounds. *Lockridge*, 403 U.S., at 315-16 (White J., dissenting) (describing congressional revulsion at *Guss*'s creation of "no-man's land", and noting 14(c) aimed to "fill th[is] chasm" and casts "doubt' on *Garmon*'s "foundations").

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

that regulates private actors," as opposed to one that really just directs states to not regulate. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 471, 477-78 (2018). Although *Murphy* concluded that there was "no way" the law there at issue could be read as the former rather than latter, *id*. at 480, the decision's articulation of a "best read" standard indicates courts may take a pragmatic inquiry, when appropriate, in cases where the federal law formally confers rights or restrictions on private actors. *Compare id.* at 477 (noting all preemptive laws confer such rights or restrictions) *with id*. at 480 (noting there was "no way" to read law that did not confer federal rights or restrictions on private actors as anything other than direct command to states). This principle should be understood or extended to require the federal law not just formally regulate private actors, but instead "meaningfully achieve the purpose for which it was passed[.]" *Cf. Ass'n To Pres. & Protect Loc. Livelihoods v. Sidman*, 147 F.4th 40, 71-72 (1st Cir. 2025) (conducting similar inquiry of state law in dormant commerce clause analysis). In recent decades, the NLRB ceased to do so. It certainly does not do so when it cannot fully engage in independent decision making and when, due to a lost quorum, the Board cannot even issue decisions and orders and the agency's action cannot become an enforceable judgment.

## CONCLUSION

The Court should deny the NLRB's motion for summary judgment and grant IBT's cross-motion for summary judgment.

//

//

//

//

//

//

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260

DATED: September 22, 2026

JULIE GUTMAN DICKINSON
JENNIFER A. ABRUZZO *(pro hac vice forthcoming)*
HECTOR DE HARO
LUKE TAYLOR
BUSH GOTTLIEB, A Law Corporation

By: /s/ Luke Taylor
LUKE TAYLOR
Attorneys for Intervenor International Brotherhood of Teamsters

BUSH GOTTLIEB
801 North Brand Boulevard, Suite 950
Glendale, California 91203-1260